Teresa B. Clemmer (AK Bar No. 0111059)
Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
310 K Street, Suite 200
Anchorage, AK 99501
Phone: 907-278-2000
teresa@bvt-law.com
peter@bvt-law.com
karen@bvt-law.com

*Counsel for Plaintiffs Alatna Village Council, Allakaket Tribal
Council, Evansville Tribal Council, Huslia Tribal Council,
Tanana Tribal Council, and Tanana Chiefs Conference*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALATNA VILLAGE COUNCIL; ALLAKAKET TRIBAL COUNCIL; EVANSVILLE TRIBAL COUNCIL; HUSLIA TRIBAL COUNCIL; TANANA TRIBAL COUNCIL; and TANANA CHIEFS CONFERENCE, | Case No. 3:20-cv-00253-SLG |
| Plaintiffs, | |
| v. | |
| CHAD PADGETT in his official capacity as Alaska State Director for the U.S. Bureau of Land Management; CASEY HAMMOND in his official capacity as Principal Deputy Assistant Secretary Exercising the Authority of the Assistant Secretary for Land and Minerals Management in the U.S. Department of the Interior; TIMOTHY LA MARR in his official capacity as Central Yukon Field Office Manager in the U.S. | |

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    1

Bureau of Land Management; ROBERT
WALLACE in his official capacity as
Assistant Secretary for Fish and Wildlife and
Parks in the U.S. Department of the Interior;
GREGORY DUDGEON in his official
capacity as Superintendent of the Gates of
the Arctic National Park and Preserve in the
National Park Service; DAVID HOBBIE in
his official capacity as Alaska Regional
Regulatory Chief for the U.S. Army Corps of
Engineers; TIMOTHY HESS in his official
capacity as Associate Administrator for
Federal Lands, Federal Highway
Administration; UNITED STATES
DEPARTMENT OF THE INTERIOR;
UNITED STATES BUREAU OF LAND
MANAGEMENT; NATIONAL PARK
SERVICE; UNITED STATES ARMY
CORPS OF ENGINEERS; and UNITED
STATES DEPARTMENT OF
TRANSPORTATION,

Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

**Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101-3233; National
Historic Preservation Act, 54 U.S.C. §§ 306108-307108; National Environmental
Protection Act, 42 U.S.C. §§ 4321-4370j; Clean Water Act, §§ 1251-1388; Federal
Land Policy and Management Act, 43 U.S.C. §§ 1701-1787; Administrative
Procedure Act, 5 U.S.C. §§ 701-706**

## I. NATURE OF THE CASE

1.      Alaska Native people have subsisted in the Northwest and Yukon-Koyukuk

regions of Alaska just south of the Brooks Range for millennia.  They have depended on

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 2 of 132

the integrity of their natural environment to sustain their traditional culture, as well as their spiritual, social, and physical well-being. Respect for the land and wild resources is deeply ingrained, as each generation teaches the next to learn from the past, plan for the future, and honor the generations to come. With these values at the core of their communities, and with wise and judicious guidance from elders and other leaders, Plaintiffs and their members have successfully utilized and conserved their natural environment for many generations.

2. The Ambler Road Project is intended to provide access to large-scale industrial mining activities, and it would also enable the development of hundreds of smaller hard-rock mines in a previously undeveloped area. Mining operations are anticipated to sprawl out in every direction from the road corridor passing directly through and between several National Parks, National Wildlife Refuges, and other conservation system units, thus piercing the heart of one of the most spectacular and sensitive regions of Interior Alaska. The Project and associated mining and secondary roads would have severe consequences for highly productive fish and wildlife habitat, cherished public lands, and Alaska Native subsistence communities that have depended on the region's wild abundance for thousands of years.

3. The Proposed Ambler Road Project and associated development of the Ambler Mining District threaten the inherent human right of Plaintiffs and their members to continue traditional hunting, fishing, and gathering practices that serve as the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    3

foundation of their culture, spirituality, and way of life. The impacts from the proposed industrial development would cause severe harm across the region to all the resources that Alaska Natives revere—including caribou, fish, water resources, wetlands, and vegetation—as well as to their opportunities for subsistence and the social cohesion, culture, traditions, language, health, and well-being that depend on participation in subsistence harvesting and sharing networks.

4. Defendants have conducted rushed, flawed, premature, and inadequate reviews relating to the adverse impacts of the Ambler Road Project and associated mining activity and secondary access roads on fish, wildlife, habitat, subsistence, historic properties, water resources, and public lands.

5. Defendants' actions pertaining to rights-of-way and permits for the Ambler Road Project violate federal laws with procedural and substantive standards that must be adhered to in governmental decision-making.

6. Plaintiffs assert claims under (a) the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. 3101-3233, and implementing regulations; (b) National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-307108, and implementing regulations; (c) National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370j, and implementing regulations; (d) Clean Water Act, 33 U.S.C. §§ 1251-1388, and implementing regulations; (e) Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, and implementing regulations; and (f) the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                4

standards for agency decision-making in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

7.    Plaintiffs challenge (a) the Joint Record of Decision for the Ambler Road Project approved by the U.S. Bureau of Land Management and the U.S. Army Corps of Engineers ("Joint BLM-Corps ROD") on or about July 23, 2020, *see* BLM No. FF-09112, Corps No. POA-2013-00396; (b) the Record of Decision for the Ambler Road Project approved jointly by the U.S. Department of the Interior, on behalf of the National Park Service, and by the U.S. Department of the Interior, on behalf of the Federal Highway Administration ("Joint NPS-FHWA ROD"), on or about July 14, 2020; (c) the Final Environmental Impact Statement ("EIS") for the Ambler Road Project published by Defendants on or about March 26, 2020; (d) the ANILCA § 810 Final Evaluation for the Ambler Road Project published by Defendants on or about July 23, 2020; and (e) Defendants' implementation of the NHPA § 106 process and the Programmatic Agreement ("PA") for the Ambler Road Project that became effective on or about April 27, 2020, including without limitation the draft Cultural Resource Management Plan distributed August 6, 2020 and other attachments to the PA.

8.    Defendants' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law.  5 U.S.C. § 706(2).  To the extent Defendants have failed to act, that action is unlawfully withheld

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    5

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 5 of 132

or unreasonably delayed.  *Id.* § 706(1).

9.      Plaintiffs seek declaratory, injunctive, mandamus, vacatur, and other and further relief.

## II.  JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (civil action against United States), 28 U.S.C. § 1361 (action to compel mandatory duty), and 28 U.S.C. § 1362 (federal question raised by Tribes).

11.      This Court has personal jurisdiction over Defendants and their sovereign immunity is waived pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1346, 1361 because Defendants are federal agencies, officers, and employees of the United States acting in their official capacities.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiffs reside within the District of Alaska, Defendants maintain offices within the District of Alaska, a substantial part of the events or omissions giving rise to the claims occurred within the District of Alaska, and the Ambler Road Project and associated mining activity and secondary access roads would be constructed and developed within the District of Alaska.

13.      Judicial review is authorized pursuant to 5 U.S.C. §§ 701–706 because Defendants' actions, failures to act, findings, conclusions, and decisions in connection

with their approval and issuance of the Final EIS, Joint BLM-Corps ROD, Joint NPS-FHWA ROD, ANILCA § 810 Final Evaluation, and NHPA § 106 PA and in the processes leading to their approval are final agency actions that have adversely affected and aggrieved Plaintiffs.

14. Declaratory, injunctive, mandamus, vacatur, and other and further relief are authorized pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1361, 2201–2202.

## III.  PARTIES

### A. PLAINTIFFS

15. Plaintiff ALATNA VILLAGE COUNCIL is the governing body of a sovereign federally-recognized Indian Tribe.[1]  The community of Alatna Village is located on the north bank of the Koyukuk River, southwest of its confluence with the Alatna River, approximately 57 miles upriver from Hughes Village and just west of Allakaket Village.  The population of Alatna Village is primarily Kobuk Iñupiat, and subsistence is central to their culture, identity, and way of life.  Alatna Village Council engaged in government-to-government consultation with Defendants and submitted comments relating to the Ambler Road Project.  Alatna Village Council also served as a cooperating agency in Defendants' environmental review under NEPA, as well as a consulting party in Defendants' NHPA § 106 review.  Throughout these efforts, Alatna

---

[1] See 85 Fed. Reg. 5462, 5466 (Jan. 30, 2020).  Alatna Village Council is federally-recognized as "Alatna Village."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    7

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 7 of 132

Village Council expressed concern that the proposed industrial access road and associated mining activity and secondary access roads would cause harm to subsistence resources and activities and that such development would cause harm to the Tribe and its members.

16.     Plaintiff ALLAKAKET TRIBAL COUNCIL is the governing body of a sovereign federally-recognized Indian Tribe.[2]  The community of Allakaket Village lies on the south bank of the Koyukuk River, southwest of its confluence with the Alatna River, approximately 57 miles upriver from Hughes Village and just east of Alatna Village.  The population of Allakaket Village is primarily Koyukon Athabascan, and subsistence is central to their culture, identity, and way of life.  Allakaket Tribal Council engaged in government-to-government consultation with Defendants and submitted comments relating to the Ambler Road Project.  Allakaket Tribal Council also served as a cooperating agency in Defendants' environmental review under NEPA, as well as a consulting party in Defendants' NHPA § 106 review.  Throughout these efforts, Allakaket Tribal Council expressed concern that the proposed industrial access road and associated mining activity and secondary access roads would cause harm to subsistence resources and activities and that such development would cause harm to the Tribe and its members.

17.     Plaintiff  EVANSVILLE TRIBAL COUNCIL is the governing body of a

---

[2] *See id.*  Allakaket Tribal Council is federally-recognized as "Allakaket Village."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG          8

sovereign federally-recognized Indian Tribe.[3]  The community of Evansville Village is situated near the confluence of the Koyukuk River and John River, about 20 miles south of the Gates of the Arctic National Park and Preserve ("Gates of the Arctic"), and adjacent to Bettles Field.  The population of Evansville Village is a mixture of Koyukon Athabascan and Kobuk Iñupiat, and subsistence is central to their culture, identity, and way of life.  Evansville Tribal Council engaged in government-to-government consultation with Defendants and submitted comments relating to the Ambler Road Project.  Evansville Tribal Council also served as a consulting party in Defendants' NHPA § 106 review.  Throughout these efforts, Evansville Tribal Council expressed concern that the proposed industrial access road and associated mining activity and secondary access roads would cause harm to subsistence resources and activities and that such development would cause harm to the Tribe and its members.

18.     Plaintiff HUSLIA TRIBAL COUNCIL is the governing body of a sovereign federally-recognized Indian Tribe.[4]  The community of Huslia Village sits on the north bank of the Koyukuk River, within the Koyukuk National Wildlife Refuge and about 170 river miles northwest of Galena Village.  The population of Huslia Village is predominantly Koyukon Athabascan, and subsistence is central to their culture, identity, and way of life.  Huslia Tribal Council engaged in government-to-government

---

[3] *See id*.  Evansville Tribal Council is federally recognized as "Evansville Village" and "Bettles Field."

[4] *See id.*  Huslia Tribal Council is federally recognized as "Huslia Village."

consultation with Defendants and submitted comments relating to the Ambler Road Project. Huslia Tribal Council also served as a consulting party in Defendants' NHPA § 106 review. Throughout these efforts, Huslia Tribal Council expressed concern that the proposed industrial access road and associated mining activity and secondary access roads would cause harm to subsistence resources and activities and that such development would cause harm to the Tribe and its members.

19.     Plaintiff TANANA TRIBAL COUNCIL is the governing body of a sovereign federally-recognized Indian Tribe.[5] The Native Village of Tanana is located about two miles west of the confluence of the Tanana River and Yukon River, about 30 miles east of the Nowitna National Wildlife Refuge and approximately 121 miles from Ruby Village. The population of the Native Village of Tanana is predominantly Koyukon Athabascan, and subsistence is central to their culture, identity, and way of life. Tanana Tribal Council engaged in government-to-government consultation with Defendants and submitted comments relating to the Ambler Road Project. Tanana Tribal Council also served as a consulting party in Defendants' NHPA § 106 review. Throughout these efforts, Tanana Tribal Council expressed concern that the proposed industrial access road and associated mining activity and secondary access roads would cause harm to subsistence resources and activities and that such development would

---

[5] *See id*. at 5467. Tanana Tribal Council is federally recognized as "Native Village of Tanana."

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 10 of 132

cause harm to the Tribe and its members.

20.     Plaintiff TANANA CHIEFS CONFERENCE ("TCC") is a sovereign Tribal consortium with forty-two Tribal members across Interior Alaska, including thirty-seven federally recognized Tribes and five Alaska Native associations.[6]  Each of the Plaintiff Tribes identified above is a member of TCC, except for Native Village of Kobuk, which lies to the west of the TCC region.  TCC is also an Alaska Native non-profit corporation organized under the Alaska Native Claims Settlement Act ("ANCSA") to provide health and social services for the more than 13,000 Alaska Native people in the Interior Alaska region.  *See* 43 U.S.C. § 1606(a)(5).  TCC is incorporated in Alaska as "Dena' Nena' Henash," which means "Our Land Speaks."  TCC's mission is to preserve the indigenous way of life for future generations, and its strategic plan calls for strong leadership, communication, and advocacy.  TCC's activities include healthcare services, natural resource management, Tribal development services, public safety, community planning, and transportation.

21.     The TCC region is vast, spanning 235,000 square miles or about 37% of the entire state.  The TCC region encompasses six sub-regions, each identified by their major river systems and watersheds, including the Lower Yukon Subregion, the Upper Kuskokwim Subregion, the Upper Tanana Subregion, the Yukon Flats Subregion, the

---

[6] *See Beversdorf v. Tanana Chiefs Conf., Inc.*, Order Mot. Dismiss, 4FA-17-01911CI (Ak., Sept. 27, 2017) (recognizing TCC's sovereignty).

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 11 of 132

Yukon Koyukuk Subregion, and the Yukon Tanana Subregion. The Fairbanks North Star Borough also lies within the TCC region. The Alaska Native population of the TCC region is primarily Athabascan, but the region also includes people of Iñupiat, Yup'ik, and other cultures. Subsistence is fundamental to their culture, identity, and way of life.

22. TCC participated extensively in the environmental, subsistence, and historic property review processes relating to the proposed Ambler Road Project. TCC submitted detailed comments and served as a consulting party in Defendants' NHPA § 106 review. Throughout these efforts, TCC expressed concern that the proposed industrial access road and associated mining activity and secondary access roads would cause harm to subsistence resources and activities and that such development would cause harm to TCC, its Tribal members, and the individual Alaska Native people it serves.

23. The way of life of Plaintiffs' Tribal members and their communities depend on wild resources for subsistence and for maintaining sharing networks, kinship ties, and other social, cultural, physical, spiritual, and religious aspects of their identity and well-being. Many individual Tribal members testified at one or more of the public hearings relating to the Ambler Road Project, and they have been personally affected by Defendants' decision to approve the Project. Some of the Plaintiffs have also adopted formal resolutions expressing opposition to the Ambler Road Project.

24. With respect to the agency actions, failures to act, findings, conclusions,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    12

and decisions challenged in this Complaint, Plaintiffs and their members have standing and they have exhausted administrative remedies.

25.     Defendants' inadequate consultation and reviews in violation of ANILCA, NHPA, NEPA, the Clean Water Act, FLPMA, and their implementing regulations as well as the standards for agency decision-making in the APA have adversely affected and aggrieved Plaintiffs and their members by interfering with their ability to meaningfully participate in and influence governmental decision-making processes relating to the Ambler Road Project and by denying them a meaningful opportunity to exercise the statutory rights they possess under these statutes and regulatory schemes.

26.     Defendants' unlawful decisions approving and issuing the Final EIS, ANILCA § 810 Final Evaluation, and NHPA §106 PA and failing to carry out meaningful and legally sufficient subsistence, historic property, and environmental review processes have adversely affected and aggrieved Plaintiffs and their members by failing to adequately consider impacts and implement protections for subsistence, health, historic properties, water resources, and wildlife and their habitat.

27.     Defendants' violations of ANILCA, NHPA, NEPA, the Clean Water Act, FLPMA, and their implementing regulations as well as the standards for agency decision-making in the APA have resulted in unlawful decisions in the Joint BLM-Corps ROD and the Joint NPS-FHWA approving the Ambler Road Project without adequate protections for Tribal interests, and these and other unlawful decisions have adversely affected and

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 13 of 132

aggrieved Plaintiffs and their members.

**B. DEFENDANTS**

28.    Defendant CHAD PADGETT is being sued in his official capacity as State Director for the Alaska Region (Region 11) of the U.S. Bureau of Land Management ("BLM"), which is a sub-agency of the U.S. Department of the Interior ("DOI"). Defendant Padgett is an agency official who signed the Joint BLM-Corps ROD and recommended its approval. Defendant Padgett also issued the Final EIS, and he executed the NHPA § 106 PA on behalf of BLM.

29.    Defendant CASEY HAMMOND is being sued in his official capacity as Principal Deputy Assistant Secretary for Land and Minerals Management within DOI. Defendant Hammond also purports to exercise the authority of the Assistant Secretary for Land and Minerals Management within DOI. The Assistant Secretary for Land and Minerals Management within DOI is responsible for overseeing the activities and decisions of BLM, along with the Office of Surface Mining, Reclamation, and Enforcement, the Bureau of Ocean Energy Management, and the Bureau of Safety and Environmental Enforcement, all of which are sub-agencies within DOI. Defendant Hammond is an agency official who signed the Joint BLM-Corps ROD and contends that he thereby approved it.

30.    Defendant TIMOTHY LA MARR is being sued in his official capacity as Central Yukon Field Office Manager for the Fairbanks District within the Alaska Region

of BLM. Defendant La Marr is an agency official who signed the ANILCA § 810 Evaluation.

31.     Defendant ROBERT WALLACE is being sued in his official capacity as Assistant Secretary for Fish and Wildlife and Parks within DOI. Defendant Wallace is responsible for overseeing the activities and decisions of the National Park Service ("NPS") and U.S. Fish & Wildlife Service, which are sub-agencies within DOI. Defendant Wallace is an agency official who signed and approved the Joint NPS-FHWA ROD.

32.     Defendant GREGORY DUDGEON is being sued in his official capacity as Superintendent of the Gates of the Arctic, which is a conservation system unit under the jurisdiction of NPS. Defendant Dudgeon is an agency official who signed and approved the NHPA § 106 PA.

33.     Defendant DAVID HOBBIE is being sued in his official capacity as Regional Regulatory Chief for the Alaska District of the U.S. Army Corps of Engineers ("Corps"), which is a sub-agency within the United States Army and the United States Department of Defense. Defendant Hobbie is an agency official who signed and approved the Joint BLM-Corps ROD.

34.     Defendant TIMOTHY HESS in being sued in his official capacity as Associate Administrator for Federal Lands, Federal Highway Administration ("FHWA"), which is a sub-agency within the United States Department of Transportation ("DOT").

Defendant Hess is an agency official who signed and approved the Joint NPS-FHWA ROD.

35.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the department of the executive branch of the federal government responsible for overseeing the activities and decisions of BLM, NPS, and other sub-agencies.  The mission of DOI is to conserve and manage the Nation's natural resources and cultural heritage for the benefit of the American people, provide scientific and other information about natural resources and natural hazards to address societal challenges and create opportunities for the American people, and honor the Nation's trust responsibilities and special commitments to Alaska Natives, American Indians, and affiliated island communities to help them prosper.

36.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is a federal agency within DOI entrusted with the administration of the public lands.  The mission of BLM is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.  BLM served as the lead agency in preparing the EIS for the Ambler Road Project, and BLM is responsible for issuing a right-of-way across approximately 25 miles of BLM-managed lands in connection with the Project.

37.     Defendant NATIONAL PARK SERVICE is a federal agency within DOI entrusted with managing national parks, national monuments, and other conservation and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    16

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 16 of 132

historic properties. The dual mission of NPS is to preserve the ecological and historical integrity of the public lands within its jurisdiction while also making them available for public use and enjoyment. NPS prepared an Environmental and Economic Analysis to determine the route for the Ambler Road Project within Gates of the Arctic, and NPS is responsible for issuing a right-of-way across approximately 26 miles of NPS-managed lands in connection with the Project.

38. Defendant UNITED STATES ARMY CORPS OF ENGINEERS is a federal agency within the United States Army and the United States Department of Defense. The Corps is responsible for administering the permitting program under Section 404 of the Clean Water Act and authorizing the placement of dredged or fill material into waters of the United States. Corps permitting encompasses dredge-and-fill placement associated with bridges, culverts, camps, pads, gravel mining, and other facilities and activities along the entire 211-mile length of the Ambler Road Project.

39. Defendant UNITED STATES DEPARTMENT OF TRANSPORTATION is the federal agency within the executive branch of the federal government responsible for public transportation, including highways, aviation, railroads, and other transportation modes, as well as other transportation-related functions. DOT is responsible for overseeing the activities and decisions of FHWA and other sub-agencies. The mission of DOT is to ensure that the nation's transportation systems are safe, efficient, and modern and that they improve quality of life, productivity, and competitiveness.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    17

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 17 of 132

# IV. FACTS

## A. ALASKA NATIVE PEOPLE AND INTERIOR ALASKA

40.     Athabascan people have thrived for millennia in Interior Alaska.  Their general pattern of life revolves with the seasons.  They harvest fish in the summer and fall, hunt caribou in the fall, and gather plants and berries in the spring, summer, and fall. Athabascan society is matrilineal with strong kinship ties.  Social gatherings known as potlatches bring communities together for several days or weeks, and participants enjoy feasting, dancing, storytelling, and singing.  Athabascan culture, spirituality, and tradition emphasize a close connection between humans and animal spirits.

41.     Iñupiat people are members of a larger Inuit culture, which spans coastal and interior regions of northern Alaska, Canada, and Greenland.  For Iñupiat living in Interior Alaska, subsistence hunting, fishing, and gathering are central to their way of life, culture, and spiritual practice.  They depend on a variety of natural resources, including fish, caribou, sheep, bear, moose, ducks, geese, rabbits, berries, and plants where available.  Iñupiat culture, spirituality, and tradition are intimately connected with animal spirits.  They maintain and share their way of life with future generations through subsistence harvesting, dancing, and language.

42.     Under the stewardship of Athabascan, Iñupiat, and other Alaska Native people over many centuries, the lands they inhabit and the hunting and fishing grounds surrounding their remote villages in Interior Alaska have remained intact ecosystems

which continue to support vibrant and productive subsistence ways of life.

43.     The Western Arctic Caribou Herd of Interior Alaska is the largest herd in state.  Caribou are a key resource for Plaintiffs and their members who rely on the caribou migrating through their villages and nearby hunting grounds, both for physical sustenance and for their culture, spirituality, traditions, health, and well-being.

44.     The region also supports moose and other terrestrial mammals, as well as fish, all of which serve as important subsistence resources for Plaintiffs and their members.  Fish have provided the greatest quantity of subsistence resources in Interior Alaska for thousands of years, including salmon and sheefish.  Salmon inhabit large rivers and tributaries throughout the region.  Sheefish are especially important to subsistent communities because of their extended seasonal availability and proximity to communities.

45.     More generally, the region of Interior Alaska south of the Brooks Range and surrounding the Ambler Road Project is world-renowned for its rich biodiversity and ancient cultural values, as well as its extensive rivers, lakes, wetlands, and boreal forests. The region's major river systems include the majestic and federally-designated Kobuk Wild River, Alatna Wild River, John Wild River, Koyukuk Wild River, Noatak Wild River, Nowitna Wild River, Selawik Wild River, Tinayguk Wild River, as well as the mighty Yukon River and the Tanana River.  The exceptional and abundant nature of the region is also illustrated by the public lands within it, including Gates of the Arctic,

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 19 of 132

which is home to some of the most intact ecosystems in the world, as well as the Kobuk

Valley National Park, Kobuk National Preserve, Noatak National Preserve, Selawik

National Wildlife Refuge, Koyukuk National Wildlife Refuge, Kanuti National Wildlife

Refuge, and Yukon Flats National Wildlife Refuge.

## B. MINING PROPOSALS AND AMBLER ROAD PROJECT

46.     Mining companies have explored the lowlands and foothills south of the

Brooks Range for several decades, and there are at least four known deposits in the

Ambler Mining District, namely the Arctic, Bornite, Sun, and Smucker deposits.

47.     Ambler Metals, LLC[7] has been conducting mineral exploration activities in

the area in recent years, focusing primarily on the Arctic and Bornite deposits.  Ambler's

Arctic Project consists of 1,358 contiguous State and federal mining claims spanning

approximately 114,500 acres.  It is the most advanced project in the area, with an

estimated 43 million tonnes of copper, zinc, lead, gold, silver, and other metal resources.

A feasibility study was completed for the Arctic Project in August 2020.[8]

48.     There are also hundreds of other mining claims along the proposed Ambler

---

[7] In February 2020, Trilogy Metals, Inc. and South32 Limited announced the completion
of the formation of a 50/50 joint venture company named "Ambler Metals LLC."  *See*
Final EIS, appx. H, at H-3 n.1.

[8] *See* Trilogy Metals, News Release (Aug. 20, 2020), *available at*
https://trilogymetals.com/assets/docs/nr/2020-08-20_TMQPR_Arctic-FS-Results-
Final.pdf.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    20

Road corridor.[9]

49.     In light of the mineral potential of the area, the Alaska Industrial

Development and Export Authority ("AIDEA") has been advocating for and sponsoring

the construction of a 211-mile, year-round, industrial access road that would traverse

some of the most remote and undeveloped lands in Alaska.  The Ambler Road would run

from east to west, starting at the Dalton Highway north of Fairbanks and stretching

almost two-thirds of the way to Kotzebue Sound.

50.     The fundamental purpose of the Ambler Road Project is to "support

mineral resource exploration and development in the District" and to "provide surface

transportation access to the District and allow for expanded exploration, mine

development, and mine operations at mineral prospects throughout the District."   Joint

BLM-Corps ROD, at 6.

51.     According to the anticipated mining scenario in the EIS prepared by

Defendants, the Ambler Road Project would facilitate the construction of four large-scale

mines for the extraction of copper, lead, zinc, silver, gold, cobalt, and molybdenum.

52.     In addition, the construction of the Project would make it more likely that

hundreds of smaller mines will be developed throughout the region.  *See* Final EIS, appx.

H, at H-51.

_____

[9] *See* Final EIS, at 1-2 (indicating "[t]here are more than 1,300 active mining claims in
the [Ambler Mining District] vicinity") and H-51 (stating "[h]undreds of smaller claims
exist throughout the study area").

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    21

## C. ADVERSE IMPACTS

53.     The Ambler Road Project would introduce a large industrial road corridor into the heart of a rural area whose residents depend on its wild abundance.  A pioneering road through a roadless area poses significant socio-ecological disruptions to the human and natural environments.  This Project, combined with impacts from mine development and secondary access roads, has the potential to cause devastating effects on Alaska Native communities in the region and the wildlife and habitat they depend on for their traditional culture, sustenance, spirituality, and way of life.   The following are just a few examples.

### 1. Caribou

54.     Potential impacts on caribou include without limitation behavioral disturbance, constricted home range size, less range fidelity, crowding, range shifts, increased competition for resources, increased predation, increased startle and flight responses, higher stress levels, increased energy expenditure, displacement from migratory routes and foraging habitat, reduced foraging rates, decreased reproductive success, and overall population declines.

55.     Potential impacts on caribou habitat include without limitation habitat loss, degradation, contamination, and fragmentation affecting thousands of acres, and the web of secondary access roads would increase fragmentation exponentially.

56.     Implementation of project design features and mitigation measures would

not eliminate such impacts.

## 2. Fish and Water Resources

57.    Construction of the Ambler Road Project would lead to large-scale hard rock mining, extensive gravel extraction activities, and a network of secondary access roads in close proximity to essential habitat for salmon, sheefish, whitefish, Arctic grayling, and other species of fish integral to the subsistence way of life throughout the region.  Some of the most important and vulnerable resources near the proposed mining locations include the Kobuk River sheefish spawning grounds and the Alatna River whitefish spawning grounds, both of which are of critical importance for the survival of the fish populations and for the subsistence fishing communities who rely on them.

58.    The Ambler Road Project and associated facilities include dozens of bridges, thousands of culverts, about 44 gravel mining sites, and over 200 miles of compacted soil and cleared vegetation.  Individually and collectively, these Project elements have the potential to cause substantial harm to surrounding fish populations and their habitat in 11 major river systems and thousands of smaller streams, water bodies, and wetlands.

59.    The mining facilitated by the Ambler Road Project will involve massive soil and rock movement; large-scale pumping and dewatering; transportation and utilization of large quantities of diesel fuel and toxic chemicals, such as mercury and cyanide; dispersal of large quantities of toxic fugitive dust; releases of acid mine drainage

through drilling, leaching and potential tailings dam failures; and many other destructive activities.

60.     Potential impacts on fish and their habitat include without limitation, and on a gigantic scale in all directions surrounding the network of roads and mine sites, permanent destruction of streams and wetlands; disruption of surface water and groundwater flows, including blockages, diversion, reduced connectivity, flooding, and erosion; reduction of aquatic habitat; reduction in biodiversity, fish production, and carrying capacity; toxic contamination of waterways, wetlands, and surrounding vegetation and soils; bioaccumulation of toxins in fish tissue, leading to reduced growth rates and increased mortality; expansion of pathways for toxins to spread due to changes in surface and groundwater hydrology; reductions in the algae, zooplankton, and aquatic invertebrate populations on which fish feed; introduction of non-native aquatic species and vegetation; and reduced water quantity in the groundwater table, surface waters, and most importantly the hyporheic zone that is essential for spawning and egg incubation and fundamental to the survival of aquatic life.  All of this could lead to overall population-level and watershed-wide declines or extirpations for multiple fish species. Implementation of project design features and mitigation measures would not eliminate such impacts.

61.     The potential adverse impacts of the Ambler Road Project and associated mining and secondary access roads also include the contamination or degradation of local

drinking water supplies. For instance, the drinking water well for the City of Kobuk is "likely influenced by the water quality of the Kobuk River" and, since it is downstream from Alternative A, which was selected by Defendants, it "could be impacted" by oil or hazardous substance spills along that roadway route. Final EIS, at 3-24.

62.     Other threats to fish, surface waters, and the safety and integrity drinking water resources include without limitation releases of naturally occurring asbestos through construction activities and leakage or spills of fuels and other hazardous chemicals used in connection with mining activities at the major hard-rock mine sites or other smaller mines in the region.

63.     Implementation of project design features and mitigation measures would not eliminate such impacts.

### 3. Wetlands, Vegetation, and Ecosystem Services

64.     Thousands of acres of wetlands and vegetation would be damaged or destroyed by the Ambler Road Project, and associated mining activities and secondary access roads. As a result, wetland functions and ecosystem services, such as flood control, groundwater replenishment, shoreline stabilization, storm protection, sediment and nutrient retention and export, water purification, biodiversity protection, and others, would decline.

65.     Fugitive toxic dust dispersed through the air and water could lead to some of the most widespread and long-lasting harm, including destruction of lichen, moss, and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    25

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 25 of 132

other vegetation types that provide important forage for caribou. Fugitive dust impacts would occur along the Ambler Road, and in areas surrounding mine footprints, blasting, crushing, and loading sites, ore and tailings stockpiles, and along the entire truck haul route along the Dalton Highway to Fairbanks. Fugitive dust from heavy metals can travel thousands of feet to several kilometers, persist in soil for many decades, and cause complete loss of lichen and moss. Rare and high-value types of vegetation are most at risk.

66.     In addition to damage from toxic dust, the Ambler Road Project, mining activities, and secondary access roads would harm wetlands, vegetation, and ecosystem services in many ways, including without limitation by causing extensive changes to surface and groundwater resources; altering natural vegetation types (e.g., destroying lichens, mosses, and tundra types, and replacing boreal forest with perennial grasses, such as blue-joint ); and causing other forms of degradation. These changes would make the region vulnerable to increased wildfire frequency and severity and exacerbate climate change-related risks.

67.     Implementation of project design features and mitigation measures would not eliminate such impacts.

### 4. Subsistence

68.     As a result of the damage to caribou, fish, and habitat described above, as well as other factors, the Ambler Road Project, mining activities, and secondary access

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    26

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 26 of 132

roads would harm traditional Alaska Native subsistence culture in many communities throughout the region. For generations, these communities have remained stable and resilient through rich cultural traditions and community life revolving around subsistence hunting and harvesting. The Ambler Road Project would introduce a large industrial road corridor into a previously undeveloped area.

69. Potential adverse impacts include without limitation declines in resource abundance and availability; reduced access and harvesting opportunities; and disruption of sharing networks, social cohesion, transmission of knowledge to future generations, and spiritual, cultural, and physical health and well-being.

70. When opportunities to engage in subsistence activities are limited, opportunities to transmit knowledge about those activities, which are learned through participation, are also limited. The loss of direct use of the land could lead to reduced knowledge among the younger generation of place names, stories, language, spiritual practices and traditional ecological knowledge associated with those areas, as well as short- or long-term declines in the subsistence way of life. Disruptions to subsistence could come with high costs to social, cultural, and physical well-being, including without limitation adverse impacts on the more vulnerable, lower income, unconnected, and lower-harvest households.

71. Implementation of project design features and mitigation measures would not eliminate such impacts.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    27

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 27 of 132

### 5. Social Cohesion and Health

72.     The Ambler Road Project, mining activity, and secondary access roads would have similarly destructive impacts on social cohesion and public health. It is widely recognized that communities situated near large extractive development facilities experience one or more major boom and bust cycles over the course of mining development, along with associated short- and long-term adverse impacts.

73.     Declines in the availability of, access to, and abundance of subsistence resources can have numerous cascading adverse health effects, including without limitation reduced food security; greater reliance on processed and commercial foods; decreased quantity and quality of subsistence resources; declines in psychosocial wellbeing; reduced community cohesion; increases in substance abuse, tobacco use, domestic violence, and suicide; increases in illness, such as diabetes, cancer, respiratory disorders, and heart disease; and increases in premature deaths.

74.     Declines in subsistence resources can also have adverse economic impacts, and concomitant social and health impacts, through the replacement of subsistence foods with commercial foods that have to be shipped at high costs to remote locations.

75.     Exposure of subsistence communities and their traditional harvesting areas to industrial pollution, facilities, and operations can compound these adverse health impacts by exposing residents to harmful levels of asbestos, toxic substances, and other hazardous materials and by increasing the incidence of accidents and injuries.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    28

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 28 of 132

76.     Naturally-occurring asbestos ("NOA") is an important problem associated with all of the Ambler Road Project action alternatives. NOA is common in the region, but the amounts and locations are not known. Small asbestos fibers can remain suspended in the air for long periods of time, and they can be carried long distances by wind or water before settling. Residents of communities near the Ambler Road Project could experience long-term adverse health effects from exposure to NOA after it has been disturbed by construction and mining activity.

77.     Implementation of project design features and mitigation measures would not eliminate such impacts.

### 6. Historic Properties

78.     The Ambler Road Project, mining activity, and secondary access roads would also adversely affect historic properties, including without limitation cultural landscapes, historic districts, and traditional cultural properties ("TCPs").

79.     The introduction of large-scale industrial activity into geographic areas that have served important religious, cultural, and traditional functions in the life of indigenous Tribes has the potential to degrade or destroy the spatial organization, land patterns, and character-defining features of these landscapes, including without limitation topography, vegetation, circulation, water features, structures, site furnishings, and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    29

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 29 of 132

objects.[10]

80. Plaintiffs and other Tribal communities are intimately connected with and dependent on these cultural landscapes, historic districts, ethnohistoric resources, and TCPs. They depend on them for their very identities, spirituality, intergenerational learning, social cohesion, and sense of purpose and meaning. Diminishing or destroying such historic properties is tantamount to diminishing or destroying the communities themselves and their fundamental identities as Tribes and indigenous peoples.

81. Implementation of project design features and mitigation measures would not eliminate such impacts.

D. PROCESS OVERVIEW AND TIMELINE

82. In November 2015, the Alaska Industrial Development and Export Authority ("AIDEA") submitted to Defendants a consolidated application for rights-of-way and other permits and authorizations for the construction and operation of a 211-mile, year-round, industrial access road.

83. AIDEA has stated that the road generally will not be open to the public, but many commenters have characterized that assumption as faulty and unrealistic.

84. Approximately 61% of the Ambler Road route would cross lands owned and managed by the State of Alaska, and another 15% of the route would traverse lands

---

[10] *See generally* U.S. Department of the Interior, NPS, *The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes* (1996).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    30

owned by Alaska Regional Native Corporations and local village corporations established under the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1606-1607. The proposed Ambler Road would pass through only about 25 miles of BLM-managed lands and 26 miles of NPS-managed lands, each comprising about 12% of the overall route. Some of the gravel sources that may be used in constructing the Ambler Road are on private land owned by Alaska Native individuals (Native Allotments).

85. Each of the Defendants determined that AIDEA's initial consolidated application was incomplete and failed to provide sufficient information upon which to base their permitting decisions.

86. AIDEA submitted additional information as part of a revised permit application in June 2016. This supplement did not contain detailed information about the design or location of the Ambler Road, and it did not include site-specific data concerning fish, wildlife, wetlands, hydrology, and other resources that would be affected by the proposed industrial access road and associated mining activity and secondary access roads. Nevertheless, Defendants BLM, NPS, and the Corps determined that their respective components of the application were complete.

87. In February 2017, BLM commenced the NEPA review process for the proposed Ambler Road Project. *See* 82 Fed. Reg. 12119 (Feb. 28, 2017). BLM served as the lead agency, and cooperating agencies included the Corps along with the U.S. Coast Guard, U.S. Environmental Protection Agency, Alatna Village Council, Allakaket

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    31

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 31 of 132

Village Council, Hughes Traditional Council, Noorvik Native Community, Northwest Arctic Borough, and Alaska Department of Natural Resources.

88.    BLM also served as the lead agency in conducting the ANILCA § 810 evaluation and NHPA § 106 review in connection with the Ambler Road Project.

89.    The scoping phase of the NEPA review process took place from November 2017 through January 2018.  The final Scoping Summary Report was issued in April 2018.  The Draft EIS was published in August 2019, *see* 84 Fed. Reg. 45799 (Aug. 30, 2019), and the public comment period for the Draft EIS ended on October 29, 2019.

90.    The ANILCA § 810 hearings were conducted in conjunction with the Draft EIS hearings, and these took place during September and October 2019.

91.    The NHPA § 106 consultation meetings took place from January 2018 through November 2019.

92.    On a parallel track, NPS, in cooperation with FHWA, prepared an Environmental and Economic Analysis ("EEA") for the portion of the road crossing Gates of the Arctic.  Public comments on the EEA were accepted from September 2017 through January 2018, and public meetings were held in November and December 2017.  NPS issued the Draft EEA for the Project in August 2019.

93.    The Corps issued a public notice relating to Clean Water Act § 404 permitting in September 2019.  *See* Corps, Public Notice, POA-2013-00396 (Sept. 13, 2019).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    32

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 32 of 132

94.     In February 2020, between the issuance of the Draft EIS and Final EIS,

AIDEA submitted a revised 404 permit application to the Corps containing major

modifications to its original proposal.  AIDEA did not update its application with BLM to

reflect those changes, as discussed below.  Despite these changes, the Corps did not

publish a new or revised public notice, seek additional public comment, or prepare a

supplemental EIS.  The first time the public learned of the revised 404 permit application

was when the Joint BLM-Corps ROD was issued in July 2020.

95.     On March 26, 2020, during the emergence of the COVID-19 pandemic,

BLM issued the Final EIS for the Ambler Road Project.  *See* 85 Fed. Reg. 17353 (Mar.

27, 2020).  In an appendix, the Final EIS included a purportedly "final" ANILCA § 810

subsistence evaluation, although this document was unsigned and lacked the final

substantive determinations required under 810(a)(3).  *See* Final EIS, appx. M.  Another

appendix set forth an unsigned NHPA § 106 PA relating to historic properties.  *See id*.

appx. J.

96.     The NHPA § 106 PA was subsequently executed by BLM, NPS, the Alaska

State Historic Preservation Officer, Advisory Council on Historic Preservation, Alaska

Department of Natural Resources, and Northwest Arctic Borough, and it became

effective on April 27, 2020.  *See* Joint BLM-Corps ROD, appx. H.  The Cultural

Resource Management Plan is proposed to be a key mechanism for implementing the PA,

but it was still in draft form at the time the PA became effective, and it remained in draft

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    33

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 33 of 132

form through at least early August 2020. The term of the PA is only 25 years, despite the 50-year term for the Ambler Road Project approved by BLM.

97.    BLM and the Corps issued the Joint BLM-Corps ROD for the Ambler Road Project on July 23, 2020. *See* 85 Fed. Reg. 45440 (July 28, 2020). The Joint BLM-Corps ROD included an appendix with a final signed version of the ANILCA § 810 Evaluation. For the first time, this document made public the required 810(a)(3) substantive determinations. *See* Joint BLM-Corps ROD, appx. E.

98.    BLM's portion of the Joint BLM-Corps ROD approved the Final EIS, as well as the ANILCA § 810 Evaluation and NHPA § 106 PA. BLM selected Alternative A for the Project and specified design features and mitigation measures to be used in connection with BLM's future issuance of a right-of-way and other permits and authorizations for the Ambler Road Project.

99.    The main elements of Alternative A, as approved by BLM, are: (a) a 211-mile industrial access road (25 miles of which cross BLM lands), (b) a northerly east-to-west route for the road corridor from the Dalton Highway (North Slope Haul Road) to the Ambler Mining District, (c) a 250-foot wide right-of-way (up to 400 feet wide in some locations), (d) a 50-year term, (5) three-phased construction, (e) year-round use, (f) two lanes with shoulders forming a 32-foot wide roadway, (g) an estimated 29 bridges, (h) 2,903 culverts, (i) 20 vehicle turnouts, (j) 4 permanent maintenance stations, (k) 5 temporary construction camps, (l) 3 airstrips, (m) 44 gravel extraction sites, (n) 12

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    34

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 34 of 132

communication towers, and (o) a fiber optic line. The direct footprint occupied by these facilities is stated to be approximately 4,700 acres. The Project approved by BLM will also require 15 million cubic yards of gravel for construction, and another 220,000 cubic yards each year for maintenance.

100. The Corps' portion of the Joint BLM-Corps ROD adopted the Final EIS and deemed it sufficient, in combination with the NPS-FHWA EEA, to inform its subsequent 404 permitting decisions. The Corps determined that Alternative A, as modified through AIDEA's revised 404 permit application, constituted the "least environmentally damaging practicable alternative" ("LEDPA") and would not be contrary to the public interest. The Corps also determined that no compensatory mitigation would be required for the Ambler Road Project.

101. The Corps approved a very different version of the Project than BLM did. As a result of the revised 404 permit application, the Corps decision only approved a 10-year term, in contrast to the 50-year term approved by BLM. Also, the Corps decision only encompassed the first two phases of construction, not all three, as approved by BLM. This meant the roadway under Corps review was only 20 feet wide, rather than 32 feet wide. The project under Corps review also included only 15 of the ultimate 44 gravel extraction sites needed for the Project. The project elements considered in the Corps review differed in many other ways as well.

102. Moreover, the Corps decision in the Joint BLM-Corps ROD differs from

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    35

BLM's in that Corps jurisdiction encompasses waters and aquatic resources along the entire 211-mile length of the road, while BLM's jurisdiction is limited to the 25 miles of road crossing BLM-managed lands.

103.    By focusing on a narrower and/or different set of Project elements, the aquatic impacts forming the basis of the Corps decision were smaller and/or different than those associated with the BLM-approved version of the Project.  For example, Alternative A approved by BLM would permanently destroy more than 2,000 acres of wetlands and 27 acres of open water with 15 million cubic yards of gravel fill material, while the Corps decision only acknowledged that its approved elements would permanently fill and destroy about 1,400 acres of wetlands and a half-acre of open water with about 8.5 million cubic yards of gravel fill material.

104.    On the same day as the Joint BLM-Corps ROD was issued in July 2020, NPS and FHWA issued the Joint NPS-FHWA ROD for the Project, with a notice being formally published shortly thereafter.  *See* 85 Fed. Reg. 47240 (Aug. 4, 2020).

105.    Plaintiffs participated extensively in the agency review processes leading up to these final decisions, including without limitation scoping, Draft EIS review, Draft EEA review, the ANILCA § 810 evaluation, and the NHPA § 106 review.  Plaintiffs' leaders and members gave testimony at public meetings, submitted written comments, participated in government-to-government consultations, and served as cooperating agencies and consulting parties.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    36

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 36 of 132

## E. Overarching Problems with the Ambler Road Project Reviews

106.     Several overarching problems have undermined the integrity and validity of all of Defendants' decision-making processes relating to the Ambler Road Project, including without limitation the environmental review under NEPA, the subsistence evaluation under ANILCA, the historic property review and consultation process under the NHPA, government-to-government consultations with Plaintiffs and other Tribes, and decisions made in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD.

107.     The first problem is the grossly premature nature of the reviews and the lack of sufficient information to evaluate impacts.  At an AIDEA Board Meeting on April 15, 2020, two and half weeks *after* the issuance of the Final EIS for the Ambler Road Project on March 27, 2020, Board Chair Dana Pruhs made statements emphasizing the lack of any definitive project plan and other statements underscoring the overwhelming lack of information available regarding the proposed project.  Mr. Pruhs stated:

> We don't know what kind of road it's going to be.  We don't know how many culverts are going to be there.  We don't know what kind of bridges. We don't know how many trucks are going to be on the road, how heavy the trucks are going to be.  So ... the stakeholders that own ... the property along the right-of-way ... , it's hard to go to them and say here's what we're going to build and here's what you can expect.  As a property owner, ... I would want to know:  What ... are you going to build?  What's it going to do to my other land?  How far away is it?  How are you going to maintain it?  How, what's the security?  And that doesn't happen until you have a definitive project. ... [O]nce ... the mining companies are engaged and willing to participate in funding the ... design of the road ... in the field investigation, ... AIDEA, what their ... contractors, along with the mining company, would then ask for ... a land use permit, so that the ... mining companies ... the engineers, the surveyors, the helicopters, they could

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    37

actually land on the property, private or public, and do their investigation to come up with a solution which best fits the property, best fits the property owner, and best fits the end result of the mine. So, there's a lot, there's a lot ahead of us on that. It's premature ... to go to any landowner at this point in time without being joined equally by the mining company with a budget and a proposal to give the landowner.[11]

108.   These statements were made by the leadership of AIDEA, the project proponent, after the Final EIS had supposedly analyzed all of the Ambler Road Project's impacts on the environment, subsistence, historic properties, and other resources. The statements confirmed what many commenters on the Final EIS had pointed out—that the Project was in the earliest conceptual stages and that there was insufficient information about project elements or their site-specific impacts to conduct meaningful and adequate impact reviews.

109.   Basic information about the Project remains unknown or uncertain, including without limitation key aspects of the route, the number, type, and location of bridges, culverts, and other water crossings, and the number, size, and location of gravel extraction sites. Also, Defendants have not yet gathered anywhere near the necessary baseline data to support meaningful NEPA, ANILCA, NHPA, or Clean Water Act reviews or any subsequent permits and authorizations based on them. As a result, the discussions of potential impacts in the Final EIS and other review documents are highly speculative and generic.

---

[11] Dana Pruhs, Board Chair, AIDEA Board Meeting (April 15, 2020), *recording available at* http://www.aidea.org/Portals/0/2020/041520AIDEA.mp3.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                   38

110.    The feasibility of the overall project also remains uncertain given the lack of authorizations for the Ambler Road to traverse approximately 158 miles of State-owned and Native corporation-owned lands.  Doyon Limited, the Alaska Regional Native Corporation for the region, wrote a letter in early April 2020, expressing frustration that AIDEA had "never even presented a written proposal to Doyon for such access, much less a written proposal or detailed information," as well as surprise that AIDEA had "reached this point of the project" without entering negotiations with Doyon, an "indispensable party."[12]

111.    A second overarching problem is that Defendants refused to evaluate reasonably foreseeable mining activities, such as the Arctic Project and gravel extraction activities, as integral components of the reviews for the Ambler Road Project.  Instead, Defendants relegated these important and closely interconnected activities to a flawed and inadequate cumulative impact discussion in an appendix and to future permitting and review processes.

112.    A third overarching problem with Defendants' project reviews is their refusal to acknowledge the high likelihood that all or part of the roadway will be accessible to the public.  Public access is readily foreseeable, and it would substantially expand the nature and extent of impacts flowing from the Ambler Road Project.

---

[12] *See* Letter from A. Schutt, Doyon, to T. Boutin, AIDEA (April 7, 2020), *available at* https://www.alaskajournal.com/sites/alaskajournal.com/files/aidea_letter_regarding_ambler_road_doyon_final_4.7.2020.docx_.pdf.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    39

Defendants' assumption that the road will remain private is unrealistic and unreasonable, especially since BLM only has jurisdiction over 12% of the route and none of the other landowners—including NPS, the State of Alaska, and Native corporations—have committed to precluding public access.

113. A fourth overarching problem is that Defendants rely heavily on mitigation measures which have not been analyzed or shown to be effective, are broadly subject to waivers, exemptions, and modifications, and may or may not be implemented or enforced on the majority of the route that lies outside BLM jurisdiction.

114. These and the other major flaws and inadequacies of Defendants' review processes discussed below have led to a substantial mischaracterization and understatement of impacts on the environment, subsistence, historic properties, and other resources resulting from the Ambler Road Project and associated mining activities and secondary access roads.

## F. ROLE OF DEFENDANT HAMMOND

115. The Joint BLM-Corps ROD was purportedly approved by Defendant Casey Hammond through his signature under the heading "Assistant Secretary Approval." Joint BLM-Corps ROD, at 23.[13] The text below Hammond's signature describes his position at DOI as "Principal Deputy Assistant Secretary, Exercising the Authority of the

---

[13] Defendant Chad Padgett, Alaska State Director for BLM, also signed the Joint BLM-Corps ROD as a means to "recommend approval" of it. *Id.*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    40

Assistant Secretary, Land and Minerals Management." *Id*.

116. The Assistant Secretary of Land and Minerals Management is the position responsible for overseeing the activities of BLM, and the Assistant Secretary has been delegated the authority to exercise "all of the authority of the Secretary" of DOI, including granting approval of formal BLM decisions. DOI Dept. Manual, 209 DM § 7.1.[14]

117. Hammond was ostensibly granted temporary authorization to exercise the authority of the Assistant Secretary by Interior Secretary David Bernhardt through Secretarial Order 3345.[15] This purported authorization was only effective from May 5 through June 5, 2020. *See id*. Plaintiffs are informed and believe that the effective period was not extended thereafter. In the absence of any extension of the effective period for Secretarial Order 3345, Amendment 32, Hammond's purported authorization by Secretary Bernhardt to act as Assistant Secretary automatically terminated over a month before he signed the Ambler ROD on July 23, 2020.

118. The professed temporary authorization of Hammond to exercise the authority of the Assistant Secretary was also invalid and had no force or effect. The

---

[14] *See* 43 U.S.C. § 1454 (authorizing the Interior Secretary to delegate responsibilities to each Assistant Secretary).

[15] *See* Sec'y Interior, Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions, Order No. 3345, Amend. No. 32 (May 5, 2020), *available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3345-amend-32-signed-05.05.2020-508.pdf.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    41

position of Assistant Secretary is required to be filled through Presidential appointment and Senate confirmation. *See* 43 U.S.C. §§ 1453, 1453a. Any temporary appointment must comply with the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3347. Hammond's temporary appointment through Secretarial Order 3345 did not fulfill the requirements of the FVRA or the Appointments Clause of the United States Constitution. *See* U.S. Const., art. II, sec. 2, cl. 2; 5 U.S.C. §§ 3341 et seq.; *Bullock v. BLM*, Order on Mot. Summ. J., Civ. No. 4:20-cv-00062-BMM (D. Mont., Sept. 25, 2020).

119.    Plaintiffs are informed and believe that Hammond did not have authority to approve the Joint BLM-Corps ROD or otherwise exercise Assistant Secretary-level authority through his position as Principal Deputy alone. Any redelegation of authority from the Assistant Secretary to the Principal Deputy is required to be "issued and documented" in the Departmental Manual, and "no other form of redelegation is authorized." *Id*., 109 DM § 1.4, 209 DM § 7.2. *See id*., 209 DM § 7.3. Plaintiffs are not aware of any such redelegation or any other authorization that would authorize the Principal Deputy to approve the Joint BLM-Corps ROD or otherwise exercise oversight or make decisions at the Assistant Secretary level.

## V.  LEGAL FRAMEWORK AND AGENCY PROCESSES

### A.  ANILCA SUBSISTENCE EVALUATION AND DETERMINATIONS

#### 1.  ANILCA Purposes and Requirements

120.    In enacting ANILCA, Congress intended to "provide for the maintenance

of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; [and] to protect and preserve historic and archeological sites, rivers, and lands." 16 U.S.C. § 3101(b).

121. Congress also intended to "provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id.* § 3101(c); *see id.* § 3112(1). Congress found that the "continuation of the opportunity for subsistence uses ... is essential to Native physical, economic, traditional, and cultural existence." *Id.* § 3111(1).

122. Congress further found that the "situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses." *Id.* § 3111(2). Congress therefore declared it to be federal policy that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." *Id.* § 3112(1).

123. Under ANILCA, the term "subsistence" is defined broadly to mean the "customary and traditional uses by rural Alaska residents of wild, renewable resources

for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade." *Id.* § 3113.

124. Subsistence extends beyond a "sufficient food supply" and includes "customary and traditional practices which ANILCA was designed to protect." *Alaska Wilderness Rec'n & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995).

125. To achieve these conservation and subsistence objectives, ANILCA establishes both procedural and substantive requirements. Congress explained that the "national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life ... require that an administrative structure be established for the purpose of enabling rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska." 16 U.S.C. § 3111(5).

126. The ANILCA § 810 process takes place in two phases. Under the first step, commonly known as "Tier 1," the "head of the Federal agency having primary jurisdiction" over lands affected by a proposed use must evaluate: (a) the "effect" of the proposed "use, occupancy, or disposition" on "subsistence uses and needs"; (b) the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                 44

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 44 of 132

"availability of other lands for the purposes sought to be achieved"; and (c) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a). In conducting the Tier 1 evaluation, the agency must consider cumulative impacts, along with direct and indirect impacts. *See City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).

127. If, after completing the Tier 1 evaluation, the agency determines that the proposed activity "may significantly restrict subsistence uses," the agency must proceed to Tier 2. *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984). The Tier 2 threshold is "quite low." *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *aff'd* 857 F.2d 1307 (9th Cir. 1988). Only a "threat of significant restriction" is required, and such a restriction "need not be likely." *Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988).

128. In Tier 2, the agency must provide notice, hold hearings, and make a series of detailed findings and determinations demonstrating compliance with ANILCA's substantive standards. The agency is prohibited from authorizing the proposed activity unless and until the "head of such Federal agency:" (a) "gives notice to the appropriate State agency and the appropriate local committees and regional councils;" (b) "gives notice of, and holds, a hearing in the vicinity of the area involved;" and (c) "determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                               45

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 45 of 132

activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." 16 U.S.C. § 3120(a).

129. Only after a federal agency has complied with ANILCA's requirements regarding subsistence is it authorized to "manage or dispose of public lands" under its "primary jurisdiction" for other lawful uses or purposes. 16 U.S.C. § 3120(d).

130. Section 810 thus "provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 554 (1987).

131. When the Secretary of the Interior is required to prepare an EIS under NEPA, he "shall provide the notice and hearing and include the findings required by subsection (a) of this section as part of such environmental impact statement." 16 U.S.C. § 3120(b).

132. ANILCA also established Gates of the Arctic as a component of the National Park System and provided that it is to be managed "under the laws governing the administration of such lands and under the provisions of this Act." 16 U.S.C. § 410hh.

133. Congress provided that Gates of the Arctic "shall be managed" to "maintain the wild and undeveloped character of the area," "protect habitat for and the populations

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    46

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 46 of 132

of, fish and wildlife, including, but not limited to, caribou, grizzly bears, Dall sheep, moose, wolves, and raptorial birds," and to allow continued "[s]ubsistence uses by local residents ... in accordance with the provisions of subchapter II of chapter 51 of this title." *Id*. § 410hh(4)(a). Subchapter II governs subsistence management and use, and it includes the requirement for an ANILCA § 810 subsistence evaluation. *See id*. ch. 51, subch. II, § 3120.

134.   ANILCA also authorizes a surface transportation route through Gates of the Arctic, and it provides for an abbreviated EEA process in lieu of a NEPA review. *See id*. § 410hh(4)(b). At the same time, however, the permitting of such a route must be "in accordance with the provisions of this subsection," including its cross-referenced requirement for NPS to complete a Tier 1 subsistence evaluation, hold the necessary Tier 2 hearings, and make the required substantive Tier 2 determinations prior to any decision to permit the use, occupancy, or disposition of such lands.

135.   Four federal land management agencies administer about 95% of the 640 million acres of federally-owned lands in the United States. Three of these are sister agencies within DOI, namely NPS, FWS, and BLM. The fourth is the United States Forest Service within the United States Department of Agriculture.

136.   Congress granted NPS primary jurisdiction over the management of the federal lands within the National Park System through the National Park Service Organic Act, as amended, which states that "[u]nder the direction of the Secretary [of the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    47

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 47 of 132

Interior], the Director [of the National Park Service] shall have the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3).

137. Under FLPMA, 43 U.S.C. § 1701 *et seq.*, BLM has primary jurisdiction over the management of the remaining public lands that are not part of the National Park System, National Wildlife Refuge System, or National Forest System. For purposes of FLPMA, the term "public lands" means "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership ... ." *Id.* § 1702(e).

## 2. Defendants' Flawed ANILCA Subsistence Evaluation and Determinations

138. Preliminary Subsistence Study and Determinations. Defendants compiled a Subsistence Technical Report—based largely on Alaska Department of Fish & Game subsistence studies—to inform the ANILCA § 810 evaluation and the NEPA review for the Ambler Road Project.

139. The Report identified potentially affected subsistence communities by looking at "communities that harvest subsistence resources within or near the project area, use the project area to access subsistence use areas, or harvest resources that migrate through the project area and are later harvested elsewhere." Final EIS, appx. L, at L-1. The study team applied criteria to "capture communities that may experience direct or indirect impacts on their subsistence uses resulting from construction and operation" of

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    48

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 48 of 132

the Ambler Road Project." *Id*.

140.　The study team also recognized that the Ambler Road Project is "within the range of the Western Arctic Caribou Herd ... a highly migratory and important subsistence resource to communities in Western and Northwestern Alaska." *Id*.　Given the potential for Project impacts on these caribou, the study team included members of the Western Arctic Caribou Herd Working Group as part of their effort to "capture[] potential indirect or cumulative impacts to communities who use the caribou that migrate through the project area and are later harvested elsewhere." *Id*.

141.　Using these criteria, the Report identified a total of 53 potentially affected subsistence communities.　*See id*. at L-1, L-5 to L-6 (tbl. 1).

142.　A subset of 27 of the 53 communities were deemed "primary" based on "impact indicators," i.e., (1) resource importance (proportion of diet, participation, sharing) and (2) subsistence use area locations (proximity to project, bisected by project). These indicators were derived from the NEPA "context" and "intensity" criteria used to determine "significance" for purposes of deciding whether a full EIS is required or not. *See id*. at L-166.

143.　For the 27 communities deemed "primary," the report provided individualized descriptions of their subsistence uses.　*See id*. at L-26 to L-153.　The remaining 26 communities deemed non-primary were lumped together described as a group in two paragraphs.　*See id*. at L-153 to L-154.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG　　　　　　　　　49

Case 3:20-cv-00253-SLG　Document 11　Filed 01/04/21　Page 49 of 132

144.     Tier 1 Evaluation and Determinations.  At the outset of their Tier 1 evaluation, Defendants applied the same NEPA-based significance threshold that they had used in the Subsistence Technical Report.  On that basis, Defendants excluded the 26 subsistence communities that had been deemed non-primary and focused their Tier 1 evaluation entirely on the other 27 communities.  *See* Joint BLM-Corps ROD, appx. E, at E-5.  This was improper.  The "may significantly restrict" determination must be made at the end of the Tier 1 phase of the evaluation, not at the beginning of it, and the ANILCA standard is less stringent than the NEPA-based threshold.  As a result, Defendants erroneously excluded a large number of potentially affected subsistence communities from the Tier 1 evaluation.

145.     In addition to the exclusion of subsistence communities, Defendants' Tier 1 evaluation is inadequate in many ways, including without limitation the following.

146.     A key problem is the limited site-specific analysis in the Tier 1 evaluation, which flows from the uncertain nature of the Ambler Road Project and Defendants' rushed and premature reviews.  The discussion of subsistence impacts from the Ambler Road Project is largely generic, with very little discussion of site-specific impacts on particular communities.  The locations of nearly all the major Project elements, including without limitation the roadway, bridge crossings, culverts, and gravel extraction sites, are not identified.  This makes it impossible to conduct the necessary site-specific analysis regarding impacts on fish, aquatic life, water quality, wildlife, subsistence, and other

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    50

resources and public land values.  Site-specific analysis was also hindered due to the

inadequate baseline data gathered by Defendants concerning these resources and potential

impacts on them.

147.    Another major problem with the Tier 1 evaluation arises from Defendants

segregation of the Ambler Road Project from the interdependent hard-rock mining and

gravel extraction activities associated with it.  Without sufficiently detailed information

concerning the location and extent of these activities, as well as the secondary access

roads that would facilitate them, a meaningful and adequate site-specific subsistence

analysis was not possible.

148.    A further problem with Defendants' Tier 1 evaluation stems from their

assumption that the Ambler Road generally will not be open to public access.  This

assumption has led to a failure to meaningfully address whole categories of impacts,

including without limitation (a) increased competition from sport hunters and fishers, and

(b) increased public health impacts associated with public access.  It has also led to an

understatement and mischaracterization of other types of impacts.

149.    An additional problem with the Tier 1 evaluation is Defendants' reliance on

mitigation measures that have not been analyzed or demonstrated to be effective and that

are broadly subject to waivers, exemptions, and modifications.  Defendants also rely on

the uncertain and questionable ability of BLM to ensure that the Project design features

and mitigation measures will be implemented along the entire route despite BLM's lack

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    51

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 51 of 132

of jurisdiction over lands owned or managed by the State of Alaska, NPS, Native corporations, and others.

150.     Another substantial omission from the Tier 1 evaluation is any meaningful discussion of toxic dust and spills and their role in degrading and destroying vegetation used for foraging and other purposes by caribou, moose, fish, birds, and other wildlife species that are central to subsistence.  The evaluation of vegetation focuses only on direct subsistence harvesting, such as berry-picking.

151.     The Tier 1 evaluation is also deeply flawed because of its greater emphasis on the availability and accessibility of subsistence resources and its downplaying or ignoring of their abundance.  This problem is most egregious with respect to caribou.  In the Final EIS, Defendants have acknowledged the potential for devastating impacts on caribou abundance as a result of the Ambler Road Project, including population-level declines, especially when combined with mining activity and secondary access roads. Yet Defendants have excluded many subsistence communities from the Tier 1 evaluation based on criteria relating to availability and accessibility rather than abundance.  Also, the cursory discussion of caribou population declines lacks any meaningful discussion of what a population decline would mean for individual communities.

152.     The scope and content of the subsistence data relied on by Defendants was inadequate for a full and meaningful Tier 1 evaluation, and Defendants compounded the problem by mischaracterizing it and cherry-picking information.  Some examples include

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    52

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 52 of 132

without limitation the following: (a) inaccurate descriptions and assumptions regarding the locations and areas where subsistence activities take place; (b) unfounded and erroneous contentions that certain areas are less important or peripheral for subsistence use; (c) failure to properly characterize and take into account available subsistence data; (d) erroneous contentions that the Project and associated activities will only cause minor shifts in caribou migration routes and will not have significant impacts on subsistence; (e) faulty and inaccurate information regarding the extent of community reliance on subsistence resources; and (f) failure to take seriously traditional knowledge in communities regarding their own subsistence use.

153. Defendants' Tier 1 evaluation of impacts on "subsistence uses and needs" is flawed and inadequate in many ways as well, including without limitation Defendants': (a) utilization of an overly narrow understanding of subsistence; (b) imposition of unduly restrictive thresholds, such as whether a resource comprised the "majority" of wild foods consumed by residents or whether their subsistence use areas were "bisected" by the Ambler Road Project; (c) exclusion of or minimal attention to culturally important resources, such as birds, and culturally important practices, such as bartering and sharing; (d) flawed and inadequate analysis of caribou impacts, including without limitation major data gaps, erroneous facts and reasoning concerning displacement distance and calving habitat; (e) failure to adequately identify which lands are needed for subsistence purposes; (f) failure to meaningfully consider and take into account the comments and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG          53

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 53 of 132

traditional knowledge provided by Plaintiffs, other Tribes, and their members; (h) flawed and inadequate analysis of cumulative impacts, including without limitation lack of a meaningful analysis of climate change and failure to meaningfully evaluate the combined impacts of the Ambler Road Project and resulting mining activities and secondary access roads; and (i) reliance on the flawed and inadequate NEPA environmental review (described below).

154. Defendants have also failed to adequately consider the "availability of other lands" for the Ambler Road Project that would have had lesser impacts on subsistence. Defendants failed to show that the State-owned, Native corporation-owned, local government-owned, and private lands along the routes for the action alternatives would be available within a meaningful timeframe. Defendants also failed to consider the availability of lands associated with potentially less impactful routes, such as routes proposed during scoping that travel west from the Ambler Mining District to the Chukchi Sea, Kotzebue Sound, and Seward Peninsula.

155. Defendants failed to adequately consider "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes" as well, including without limitation (a) an alternative with a right-of-way width narrower than 250 to 400 feet, (b) an alternative with a shorter term than 50 years, (c) a seasonal winter ice-road, (d) a single-phase construction alternative, (e) a rail transportation alternative, (f) an alternative incorporating an ore pipeline to reduce

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG          54

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 54 of 132

impacts associated with truck traffic, fugitive dust, and oil and hazardous substance spills, or some combination thereof.

156.    Defendants applied an overly high threshold to determine whether to proceed with a Tier 2 analysis.  Instead of properly applying the minimal "may significantly restrict" standard, Defendants erroneously focused on whether impacts would be "substantial," "large," "major," or "extensive."  Joint BLM-Corps ROD, appx. E, at E-4.  As a result, Defendants improperly excluded another 7 communities from further analysis when their subsistence impacts would have surpassed the minimal "may significantly restrict" threshold.

157.    Defendants also failed to adequately explain their significance determinations and rationale for determining which communities to carry forward into Tier 2.  Defendants did not specify which communities are expected to suffer impacts to which subsistence resources.  Instead, Defendants vaguely and ambiguously indicated that the Project "may significantly impact at least one resource for all above communities."  *Id.* at E-15, E-23.  Defendants also erroneously listed one community— Stevens Village—on both the "no significant restriction" and "may significantly restrict" lists, *id.* at E-23, illustrating their rushed approach and failure to take the process seriously.

158.    Tier 2 Hearings and Determinations.  Defendants ultimately made positive "may significantly restrict" determinations for 20 subsistence communities.  *Id.*

Defendants held Tier 2 hearings in these communities in conjunction with Draft EIS hearings.  *See* BLM, Ambler Road Final EIS, appx. I, at I-3.

159.    Defendants are prohibited from authorizing the Ambler Road Project unless and until they make reasonable and well-supported determinations at the end of the Tier 2 phase that "(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."  16 U.S.C. § 3120(a)(3).

160.    The first Tier 2 determination essentially asks Defendants to balance the necessity of the Ambler Road Project against the degree of harm to subsistence communities.  Defendants determined that the importance of the Project overrode the harm to subsistence.  The legitimacy of this determination is undermined by the many flaws in the Tier 1 evaluation discussed above, which resulted in a gross mischaracterization and understatement of the adverse impacts on subsistence. Moreover, through a series of improper threshold determinations, Defendants excluded 33 of the original 53 potentially affected subsistence communities from the Tier 2 hearings.  As a result, Defendants' balancing determination at the end of the Tier 2 phase was unfounded and unreasonable.  It also heavily discounted the degree of subsistence

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                          56

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 56 of 132

impacts and the number of subsistence communities affected.

161.    Defendants' second Tier 2 determination that the "minimal amount of public lands" would be used is likewise unfounded and unreasonable.  Defendants simply accepted the project proponent's request for a 250-foot right-of-way (expanded in some areas to 400 feet).  Defendants never analyzed the feasibility of a narrower right-of-way or the subsistence benefits of a smaller right-of-way footprint.  By contrast, the State of Alaska recently limited access roads for the Donlin Mine to a 150-foot right-of-way.[16]  If Defendants had used a similar approach for the 211-mile Ambler Road Project, this would have reduced the right-of-way footprint by thousands of acres and thereby substantially reduced the extent of subsistence impacts.  A narrower right-of-way would also ensure public scrutiny of future requests for roadway realignments or modifications exceeding the initially authorized footprint.

162.    Defendants' third Tier 2 determination regarding the minimization of adverse impacts on subsistence is also unfounded and unreasonable.  Defendants refused to consider project alternatives with potentially lesser impacts, including without limitation westward routes, a shorter term than 50 years, a seasonal winter ice-road, a single-phase construction alternative, a rail transportation alternative, and an alternative incorporating an ore pipeline.  Defendants also relied on unproven mitigation measures

---

[16] *See* Alaska Dept. Nat. Res., Final Finding and Decision, ADL 232346 (Jan. 2, 2020), *available at* http://dnr.alaska.gov/mlw/notice/donlin/pdf/Jungjuk-Rd-Easement-PD-232346.pdf.

that are subject to waivers, exemptions, and modifications, and that may or may not be implemented or enforced on lands outside BLM's jurisdiction.

### 3. Defendants' Failure to Conduct an ANILCA Subsistence Evaluation for NPS Lands

163.    NPS is the agency with primary jurisdiction over lands within Gates of the Arctic, but NPS did not conduct its own ANILCA § 810 evaluation.

164.    NPS merely indicated that it had "collaborated" with BLM in developing the ANILCA § 810 Evaluation, with BLM serving as the "primary author."  Joint NPS-FHWA ROD, at 4.  NPS also noted that the final ANILCA § 810 Evaluation was attached as an appendix to the Joint BLM-Corps ROD.  *See id*.

165.    NPS did not sign or otherwise adopt the ANILCA § 810 evaluation prepared by BLM, either by directly signing the ANILCA § 810 evaluation or by signing on to the Joint BLM-Corps ROD to which it is attached.

166.    NPS did not replicate or incorporate by reference the findings and determinations set forth in the ANILCA § 810 Evaluation in the Joint NPS-FHWA ROD.

167.    Neither the Joint BLM-Corps ROD nor the ANILCA § 810 Evaluation was signed, adopted, or approved by anyone at DOI with authority over NPS or the lands under its primary jurisdiction.

168.    In the absence of reasonable and well-supported Tier 2 determinations approved with respect to NPS lands, Defendants are prohibited from authorizing the use of NPS lands in connection with the Ambler Road Project.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    58

## B.  NHPA HISTORIC PROPERTY REVIEW AND CONSULTATION PROCESS

### 1.  NHPA Purposes and Requirements

169.    When Congress enacted the NHPA in 1966, it found and declared that the "historical and cultural foundation of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People."  Pub. L. No. 89-665, (b), 80 Stat. 915, 915 (1966).

170.    The NHPA seeks to "foster the conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations."  54 U.S.C. § 300101(1).  The NHPA includes a "series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance."  *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006) (internal citation omitted).  To achieve this "productive harmony," Congress enacted NHPA § 106.

171.    The NHPA requires that the "head of any federal agency" with authority over a proposed "undertaking" must, before approving it, "take into account the effect of the undertaking on any historic property," give the Advisory Council on Historic Preservation ("ACHP") a "reasonable opportunity to comment" on the proposed undertaking, 54 U.S.C. § 306108, and "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance" to potentially affected historic properties.  *Id*. § 302706(b).

172.    The ACHP has exclusive authority to promulgate regulations governing the implementation NHPA § 106.  *Id*. § 304108(a).  The ACHP's implementing regulations are set forth at 36 C.F.R. Part 800, and they are binding on all federal agencies.  *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't Interior*, 608 F.3d 592, 607 (9th Cir. 2010) (citations omitted).

173.    The ACHP regulations establish a four-step process through which federal agencies must fulfill their NHPA § 106 obligations: (1) initiate the process where an undertaking has the potential to affect historic properties; (2) identify historic properties; (3) assess adverse effects on historic properties; and (4) resolve adverse effects.  *See Presidio Historical Ass'n v. Presidio Trust*, No. C12-00522, 2013 WL 2435089, at *4 (N.D. Cal. June 3, 2013); 36 C.F.R. §§ 800.3-800.6.  The goal of the NHPA § 106 process is to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties."  36 C.F.R. § 800.1(a). The NHPA § 106 process aims to "accommodate historic preservation concerns with the needs of Federal undertakings."  *Id.*  NHPA § 106 is a "'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs" on historic properties.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citation omitted).

174.    Step 1 – Initiation.  The first step of the NHPA § 106 process requires the federal agency to determine whether the proposed action is an "undertaking" and, if so,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                              60

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 60 of 132

"whether it is the type of activity that has the potential to cause adverse effects on historic properties." 36 C.F.R. § 800.3(a).

175.    An "undertaking" is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of the Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." *Id*. § 800.16(y); 54 U.S.C. § 300320.

176.    An "historic property" is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in the National Register." 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 300308. Historic properties "include[] properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization that meet the National Register criteria." *Id*. § 800.16(l)(1); 54 U.S.C. § 302706(a). Properties of traditional religious and cultural importance are often referred to as TCPs or cultural landscapes. A TCP is a property "eligible for inclusion in the National Register because of its association with cultural practices and beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continued cultural identity of the community."[17] A cultural landscape is a property encompassing a "geographic area including both cultural and natural resources

---

[17] Patricia L. Parker & Thomas F. King, *National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties* 1 (rev. ed. 1998).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    61

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 61 of 132

and wildlife or domestic animals therein, associated with an historic event, activity, or person exhibiting other cultural or aesthetic values."[18]  Both TCPs and cultural landscapes are among the historic properties that must be considered by federal agencies during the NHPA § 106 process.  *See Muckleshoot*, 177 F.3d at 807.[19]

177.  "Eligible for inclusion" includes "both properties formally determined as such in accordance with [36 C.F.R. Part 63] and all other properties that meet the National Register criteria."  36 C.F.R. § 800.16(l)(2); *see id.* § 60.4 (National Register criteria).  Property of "traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register."  *Id.* § 302706(a).

178.  The NHPA § 106 process must be initiated early enough in the undertaking's planning process that it can inform the development, evaluation, and selection of alternatives that avoid, minimize, or mitigate adverse effects on historic properties.  *See* 36 C.F.R. §§ 800.1(c); 800.6(a); 800.8(a)(2).

179.  During the first step, federal agencies must identify "consulting parties," including "any Indian tribes ... that may attach religious and cultural significance to historic properties" potentially affected by the undertaking and initiate the consultation

---

[18] Charles A. Birnbaum, *Preservation Briefs: Protecting Cultural Landscapes: Planning, Treatment and Management of Historic Landscapes* 1 (1994).
[19] *See also* ACHP, *Information Paper on Cultural Landscapes: Understanding and Interpreting Indigenous Places and Landscapes* 1 (Oct. 11, 2016).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    62

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 62 of 132

process. *Id*. § 800.3(f)(2).

180. <u>Step 2 – Identification and Evaluation</u>. Step two requires federal agencies to determine the undertaking's APE and "take the steps necessary to identify historic properties" within the APE. *Id.* § 800.4(a)(1), (b).

181. APE refers to the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties," and it is "influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* § 800.16(d).

182. Agencies must "make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1). Such efforts "may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id*.

183. In addition to identifying historic properties previously listed on, or determined eligible for inclusion on, the National Register, agencies must "apply the National Register criteria ... to properties identified within the [APE] that have not been previously evaluated for National Register eligibility." *Id*. § 800.4(c)(1).

184. In applying the National Register criteria, agencies must "acknowledge that Indian tribes ... possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." *Id*.

185. <u>Step 3 – Assessment</u>. Step three requires federal agencies to "apply the

criteria of adverse effect to historic properties within the [APE]." *Id*. § 800.5(a). This means agencies must "assess the effects of the undertaking" on historic properties within the APE and "determine whether the effect will be adverse." *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013) (internal quotation omitted).

186. An undertaking causes adverse effects if it "may alter, directly or indirectly, any of the characteristics of the historic property that qualify the property for inclusion in the National Register in any manner that would diminish the integrity of the property's location, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1).

187. Adverse effects do not need to physically alter an historic property to be direct. Direct "refers to the causality, and not the physicality, of the effect."[20] Accordingly, "if the effect comes from the undertaking at the same time and place with no intervening cause, it is 'direct' regardless of its specific type (e.g., whether it is visual, physical, auditory, etc.)." *Id*. at 2. *See Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019).

188. Additionally, adverse effects include "reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be

---

[20] Memo. from ACHP Office Gen. Counsel to ACHP Staff, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act*, at 2 (June 7, 2019), *available at* http://shpo.nv.gov/uploads/documents/OGC_memo_to_ACHP_staff_re_meaning_of_direct_6-7-19.pdf.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    64

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 64 of 132

cumulative." 36 C.F.R. § 800.5(a)(1).

189. Examples of adverse effects include without limitation: (a) "[p]hysical destruction of or damage to all or part of the property;" (b) "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;" (c) "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;" and (d) "[t]ransfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance." *Id*. § 800.5(a)(2)(i), (iv), (v), (vii).

190. Step 4 - Resolution. Step four requires federal agencies to "develop and evaluate modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* § 800.6(a).

191. Agency commitments to avoidance, minimization, and mitigation may be documented through a memorandum of agreement ("MOA"). *See id*. § 800.6(b). The execution and implementation of the MOA "evidences the agency official's compliance with section 106" and governs NHPA § 106 compliance for the undertaking moving forward. *Id.* § 800.6(c). A PA may be developed instead of an MOA "for dealing with the potential adverse effects of complex projects or multiple undertakings," such as long-term or phased undertakings. *Id*. § 800.14(b)(3).

192. Consultation. Consultation is the most important aspect of the NHPA §

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                65

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 65 of 132

106 process and is supposed to occur at every step. The accommodation of historic preservation concerns with the needs of federal undertakings occurs "*through consultation*." *Id.* § 800.1(a) (emphasis added). Consultation is the "process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f).

193. Federal agencies must "consult with any Indian tribe ... that attaches religious and cultural significance to historic properties that may be affected by the undertaking." *Id.* § 800.2(c)(2)(ii); 54 U.S.C. § 302706(b). They must consult with Tribes at specific points about specific determinations during each step of the NHPA § 106 process. *See id.* §§ 800.4(a)(4), (b), (c)(1), 800.5(a), 800.6(a).

194. Throughout consultation, federal agencies must grant Tribes "*special consideration*." *Quechan Tribe v. U.S. Dept. Interior*, 755 F. Supp. 2d 1104, 1109 (S.D. Cal. 2010) (emphasis in original). Consultation with Tribes is "not an empty formality," *id.* at 1108, and cannot be satisfied by "mere *pro forma* recitals," "professions of good intent," and "solicitations to consult." *Id.* at 1118. Instead, consultation "must recognize the government-to-government relationship" between the federal government and Tribes, and it should be conducted in a manner "respectful of tribal sovereignty" and "sensitive to the concerns and needs" of the Tribes. 36 C.F.R. § 800.2(c)(2)(ii)(B)-(C).

195. Consultation "should commence early in the planning process," and Tribes

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG     66

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 66 of 132

must have a "reasonable opportunity to identify [their] concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate [their] views on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A).

## 2. Defendants' Flawed NHPA Historic Property Review and Consultation Process

196.    The Ambler Road Project is a federal undertaking subject to NHPA § 106 requirements, and Plaintiffs and other Tribes affected by the undertaking are sovereign and federally-recognized Tribal governments entitled to robust consultation during that process.

197.    As with the other public reviews, an overarching problem with Defendants' NHPA review for historic properties was its grossly premature timing and the resulting lack of basic information about the Ambler Road Project, such as the locations of roadway, bridge crossings, culverts, and gravel extraction sites.  Defendants also failed to conduct studies or otherwise gather information about potentially affected historic properties, including the location of cultural landscapes, historic districts, and TCPs.

198.    Instead of requiring AIDEA to present a more fully developed project proposal, Defendants simply postponed the substantive NHPA § 106 review and consultations to the post-ROD timeframe through the implementation of a PA.

199.    While some aspects of NHPA § 106 implementation can be conducted under the framework of a PA, several key decisions were improperly made during the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    67

cursory NHPA process leading up to Defendants' adoption of the Joint BLM-Corps ROD and the Joint NPS-FHWA ROD without adequate Tribal consultations.

200. One key decision was Defendants' refusal to consider and take into account broad historic properties, such as cultural landscapes, historic districts, and TCPs, before or during the alternative selection phase. A second important decision was the choice of three action alternatives that would be analyzed. A third crucial decision was the selection of the final alternative, Alternative A, in the two Joint RODs.

201. All three of these decisions were made long before the substantive NHPA evaluation and consultations were set to begin in the post-ROD period under the PA. For broad landscape-level historic properties, however, the selection of the project alternative is, in itself, the most impactful decision. After-the-fact consultation on a narrow, site-specific basis cannot meaningfully address the impacts inexorably flowing from the overall location of the route and the design features associated with the project.

202. Plaintiffs and other Tribes attempted to call Defendants' attention to cultural landscapes and TCPs that needed to be evaluated early on in the NHPA process because of their broad geographic scope and the importance of alternative selection in determining what the adverse effects on them would be. The Tribes emphasized the deep traditional religious and cultural significance to them of cultural landscapes and TCPs, and they explained that the Ambler Road Project would pierce through and change the fundamental character of these landscape-level historic properties. They urged

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                      68

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 68 of 132

Defendants to consider such historic properties in developing, evaluating, and selecting alternatives and throughout the NHPA § 106 process.

203. For instance, at the preliminary January 2018 NHPA § 106 meeting near the end of scoping, Plaintiffs and others explained that "... Tribal communities perceive cultural resources on a landscape scale reflecting their traditional land domain" and emphasized that "areas of cultural or religious significance ... must be identified in advance in order to evaluate and compare impact and mitigation potential between alternatives." Scoping Summary Report, appx. A, at 184, 185 (April 2018).

204. Defendants failed to make a reasonable and good faith effort to carry out appropriate identification efforts and refused to evaluate landscape-level properties at the time when it mattered and when adverse effects could be properly evaluated—during the development, analysis, and selection of alternatives.

205. A fourth critical decision was the establishment of the boundaries for the APE, which defines the area where the agencies will study and consider impacts on historic properties during the post-ROD period. Defendants defined the APE as a narrow linear corridor, with direct impacts to be considered within the 250- to 400-foot road right-of-way and indirect impacts to be considered in an adjacent 1-mile zone. This bounded area is far too small for any meaningful consideration of landscape-level historic properties, which can span hundreds or thousands of square miles, or the adverse impacts on them resulting from the 211-mile Ambler Road Project.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    69

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 69 of 132

206. The APE boundary is also based on a flawed understanding of the types of impacts that must be considered during the NHPA process. Defendants focused heavily on construction-related ground disturbances and downplayed or excluded other types of impacts that must be considered, such as noise, air pollution, and visual degradation, as well as cumulative effects, such as mining activity and secondary access roads.

207. These and other decisions finalized in the PA were required to be made after robust and meaningful consultations with Plaintiffs, other Tribes, and other consulting parties, but Defendants failed to ensure that such consultations were carried out.

208. Defendants held 9 of the 11 NHPA meetings in Anchorage, Fairbanks, and via teleconference. Only 2 meetings were held in Tribal villages. Moreover, the content of the meetings consisted mainly of presentations made by Defendants to the attendees and discussions between agency officials concerning the text of the PA. There was little or no two-way dialogue with affected Tribes about substantive NHPA issues, and the format, timing, and location of the meetings discouraged Tribal participation.

209. Defendants erroneously advised Plaintiffs and other consulting parties that the main substantive consultations associated with NHPA § 106 process generally take place through the implementation of the PA after the project alternative is chosen in the ROD. Defendants failed to acknowledge that substantive Tribal consultations must be carried out as an integral part of alternatives development and the evaluation of adverse

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    70

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 70 of 132

effects for an undertaking. Defendants' consideration of landscape-level historic properties through the implementation of the PA after the project alternative has already been selected does not comport with NHPA § 106 requirements.

210. Defendants' postponement of substantive consultations, refusal to give early consideration to landscape-level historic properties, sidelining of Tribal concerns, and failure to engage in meaningful two-way consultations with Tribes before making key decisions amounted to a failure to grant Tribes the special consideration they are entitled to in the NHPA § 106 process, recognizing the recognizing their special expertise in identifying and evaluating historic properties and adverse effects, cognizant of the government-to-government relationship, respectful of Tribal sovereignty, and sensitive to Tribal concerns and needs.

211. These failures also meant that Defendants failed to develop and consider alternatives that may have avoided, minimized, or mitigated adverse effects on landscape-level properties, such as routes proposed during scoping that travel west from the Ambler Mining District to the Chukchi Sea, Kotzebue Sound, and Seward Peninsula, and alternatives that would have reduced adverse impacts, such as (a) an alternative with a right-of-way width narrower than 250 to 400 feet, (b) an alternative with a shorter term than 50 years, (c) a seasonal winter ice-road, (d) a single-phase construction alternative, (e) a rail transportation alternative, (f) an alternative incorporating an ore pipeline to reduce impacts associated with truck traffic, fugitive dust, and oil and hazardous

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                71

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 71 of 132

substance spills, or some combination thereof.

212.    None of the action alternatives evaluated by Defendants, including the alternatives selected in the two Joint RODs, included features that would avoid, minimize, or mitigate adverse effects on cultural landscapes, historic districts, and TCPs.

213.    Additionally, the PA will be implemented largely through the Cultural Resources Management Plan ("CRMP") but, as of August 2020, after the issuance of the two Joint RODs, this document remained in draft form.  This is illustrative of Defendants' rushed, sloppy, and perfunctory approach to the NHPA § 106 process.  Their failure to finalize the CRMP after conducting an adequate consultation process means that the implementation plan could be changed by Defendants and the other agencies involved in a way that is even less protective of historic properties without adequate consultation and input from Plaintiffs, other Tribes, and other consulting parties.

214.    The cursory and superficial NHPA § 106 process undertaken by Defendants was deficient in numerous other ways as well.  The following are a few examples.

215.    Defendants (a) failed to conduct baseline studies relating to landscape-level historic properties in order to inform alternatives development; (b) established excessively narrow APE boundaries adjacent to the road corridor on an arbitrary basis with no supporting evidence or rationale; (c) effectively limited the scope of the NHPA § 106 process to small, localized historic properties consisting of archaeological resources and artifacts; (d) accepted oral and written comments from Plaintiffs and other consulting

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    72

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 72 of 132

parties, but handled these like any other public comments, rather than engaging in a meaningful two-way dialogue and consultation in a manner respectful of Tribes' specialized knowledge and sovereignty; (e) interacted with Plaintiffs and other consulting parties in a *pro forma* manner, failing to take their concerns, comments, and traditional knowledge about historic properties and potential adverse effects into account in any meaningful way; (f) rushed through the NHPA § 106 process and did not make a sufficient effort to ensure adequate opportunities for participation by Plaintiffs and other consulting parties; (g) failed to provide Plaintiffs and other consulting parties sufficient time to review relevant documents and materials in advance of NHPA § 106 meetings; (h) ignored requests from Plaintiffs and other consulting parties to enhance Tribal participation by holding more in-person meetings in villages, scheduling meetings outside periods of intense subsistence harvest activities, and providing more advance time for document review; (i) provided inadequate time for Tribal review of future cultural resource submittals by AIDEA; (j) failed to provide adequate review and Tribal participation for each proposed phase of road construction; and (k) failed to adequately consult with Plaintiffs and other consulting parties at specific steps in the NHPA § 106 process, including without limitation key steps such as information-gathering, identification and evaluation of historic properties, assessment of effects, application of the criteria of adverse effect, resolution of adverse effects through the development and evaluation of alternatives that avoid, minimize, and mitigate adverse effects, and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG          73

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 73 of 132

development and implementation of the PA.

216. Defendants' many failures in the NHPA § 106 process are compounded by the overarching issues described above. Defendants' refusal to acknowledge the likelihood that the Ambler Road will become generally accessible to the public ignores the potential for adverse effects on historic properties due to trespassing, vandalism, increased off-road vehicle use, and other factors. Defendants' failure to consider hard-rock mining and gravel extraction activities as connected actions together with the Ambler Road means that the combined impacts of all of these interdependent activities on historic properties will not fully be evaluated or taken into account. Defendants' reliance on design features and mitigation measures that have not yet been developed or shown to be effective and are broadly subject to waivers, exemptions, and modifications, and Defendants' failure to ensure that such measures will be properly implemented along the entire route, not just on BLM-managed lands, increases the risk of adverse effects on historic properties.

## C. NEPA ENVIRONMENTAL REVIEW

### 1. NEPA Purposes and Requirements

217. NEPA requires federal agencies to prepare an EIS before approving any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Regulations promulgated by the Council of Environmental Quality ("CEQ") to implement NEPA are set forth at 40 C.F.R. §§ 1500–1508, and they are

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                          74

binding on all federal agencies.[21] *See* 40 C.F.R. § 1500.3. Federal agencies "shall integrate the NEPA process with other planning at the earliest possible time." *Id.* § 1501.2. *See* 36 C.F.R. § 800.8(a).

218. An agency preparing an EIS "may not 'segment' its analysis so as to conceal the environmental significance of the project or projects." *Hammond v. Norton*, 370 F. Supp. 2d 226, 244 (D.D.C. 2005) (internal quotation omitted). "Connected" actions should be considered together in the same EIS. 40 C.F.R. § 1508.25(a). Actions are connected if they: (a) "[a]utomatically trigger other actions which may require environmental impact statements;" (b) "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or (c) "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1).

219. Courts apply an "independent utility" test to determine "whether multiple actions are so connected as to mandate consideration in a single EIS." *Sierra Club v. BLM*, 786 F.3d 1219, 1226 (9th Cir. 2015). Relevant factors include without limitation: (a) whether each project would have taken place without the other; (b) whether projects have been separated from each other to circumvent full NEPA review or downplay impacts; (c) whether each project was intended to stand alone; (d) whether one project

---

[21] CEQ has recently revised its regulations implementing NEPA, and the changes take effect September 14, 2020. *See* 85 Fed. Reg. 43304 (July 16, 2020). CEQ's prior regulations govern Defendants' decision-making in this matter. All references in this complaint are to the 1978 CEQ regulations as they existed prior to September 14, 2020.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG            75

would be irrational or unwise without another; and (e) whether a project will render a subsequent project a *fait accompli* or otherwise tie the agency's hands.

220.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions in an EIS. *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000). The effects that must be analyzed in the EIS include without limitation impacts on natural resources, ecosystems, cultural resources, social systems, and health. 40 C.F.R. §§ 1508.8(b), 1508.14. An EIS must: (a) "[r]igorously explore and objectively evaluate all reasonable alternatives," *id*. § 1502.14(a); (b) analyze the "environmental effects of alternatives including the proposed action," *id*. § 1502.16(d); (c) analyze "[d]irect effects and their significance" and "[i]ndirect effects and their significance," *id*. § 1502.16(a)– (b); *see id.* § 1508.8; (d) analyze the "cumulative impact" on the environment resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions," *id*. § 1508.7; *see id.* §§ 1502.16, 1508.8; and (e) analyze the "[m]eans to mitigate adverse environmental impacts," *id*. § 1502.16(h); *see id.* §§ 1502.14(f), 1508.20.

221.    An agency "[s]hall prepare supplements to either draft or final environmental impact statements if: (i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    76

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 76 of 132

proposed action or its impacts." *Id*. § 1502.9(c)(1).

222.    NEPA seeks to ensure the use of high-quality scientific information and mandates scientific integrity. *See id*. §§ 1500.1(b), 1502.24. In the absence of adequate baseline data, "there is simply no way to determine what effect the proposed [action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). Where "incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a).

223.    Overall, the analysis in the EIS must provide a "clear basis for choice among options by the decisionmaker and the public." *Id*. § 1502.14.

## 2. Defendants' Flawed NEPA Environmental Review

224.    The overarching problems discussed above have undermined the validity and adequacy of Defendants' environmental review under NEPA.

225.    The entire NEPA review is premature given the early, conceptual stage of the Ambler Road Project. In the absence of site-specific project information, Defendants were not able to meaningfully evaluate the impacts of the Ambler Road Project on the receiving environment in the Northwest and Yukon-Koyukuk regions of Alaska. The analysis in the Final EIS is largely generic and draws heavily on NEPA reviews relating

to other projects in other regions.

226. One example of this is Defendants' treatment of water withdrawals. Since fish spawning grounds are often in areas where there is upwelling of water from below through gravel riverbeds, water withdrawals lowering the water table could eliminate this upwelling and decimate the process, leading to fish population declines and severe impacts on subsistence.

227. The Final EIS acknowledges generally that the Ambler Road Project will require massive water withdrawals. Ice roads and ice pads, for instance, would be used during winter construction in connection with gravel mining, equipment staging, bridge construction, and other activities. In a generic manner, the Final EIS explains that ice roads in Alaska typically require an estimated 1 million gallons of water for each mile of a 25-foot-wide ice road, ice pads generally require about 250,000 gallons per acre, and the water needed for the ice roads and ice pads associated with the Ambler Road Project would be withdrawn from lakes, large rivers, and other freshwater sources in the vicinity of construction and operational activities.

228. The Final EIS lacks any site-specific or quantified analysis of many key issues, including without limitation (a) the location and number of miles of ice roads to be constructed; (b) the location, number, and acreage of ice pads to be constructed; (c) which water bodies would be affected by water withdrawals; (d) how many water bodies would be affected; (e) what quantities of water would be extracted from them; (f) whether

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    78

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 78 of 132

they contain fish, spawning habitat, or other aquatic resources; (g) how they are hydrologically connected to surrounding waters and wetlands; (h) how much water would remain in the water bodies after the withdrawals; (i) whether there would be sufficient water left in them to support fish and aquatic life; and (j) the nature and extent of the impacts of the withdrawals on those waters, fish, aquatic resources, and surrounding wetlands, riparian areas, upland areas, vegetation, and wildlife.

229.    The cumulative impact analysis in the Final EIS contains a similarly generic discussion of water withdrawal impacts relating to mining.  It explains that the drawdown of the water table to access ore, as is typical during mining operations, could be very harmful to water resources, fish, and aquatic life.  It also notes that fresh water would need to be withdrawn for domestic use and ore processing, but that these water needs would vary by the size of the mining operations.  After summarizing the general types of impacts that would occur, Defendants simply state that it is difficult to quantify the impact that future mines may have on fish and aquatic habitat.

230.    The premature timing of the NEPA review has led to many other generic discussions and inadequate site-specific analyses in the Final EIS, including without limitation the analyses of direct, indirect, and cumulative impacts and mitigation measures for many other affected resources, such as caribou, fish, drinking water, wetlands, vegetation, ecosystem services, subsistence, social cohesion, health, historic properties, and cultural resources.  The discussion of various types of road- and mining-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    79

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 79 of 132

related impacts are likewise cursory and lack site-specificity, including without limitation asbestos, oil spills, hazardous substances, fugitive dust, noise, disturbance, invasive species, climate change, and habitat fragmentation.

231.    Another overarching issue is Defendants' failure to consider reasonably foreseeable mining activities, such as the Arctic Project and gravel extraction activities, as connected actions and evaluate their impacts as part of the same NEPA review as the Ambler Road Project.  As a result, Defendants failed to acknowledge and properly evaluate the combined impacts of these activities, and this led to an understatement of impacts in the Final EIS.

232.    A third overarching problem with Defendants' NEPA review is their refusal to acknowledge the high likelihood that all or part of the roadway will be accessible to the public.  Public access is readily foreseeable, and Defendants' assumption that the road will remain private is unrealistic and unreasonable.

233.    For purposes of analyzing Project impacts, the Final EIS relies heavily on the assumption that the roadway will remain closed to the public based on agreements, terms, and conditions in place between BLM and AIDEA.  Yet BLM's jurisdiction only encompasses 25 of the 211 miles of the roadway, and BLM does not have jurisdiction to implement and enforce its restrictions on the remaining 186 miles of NPS lands, State lands, and Native corporation lands.  None of these entities has made any final determination as to whether the portion of the roadway passing through their lands will

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    80

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 80 of 132

be open to the public or not.

234.    The Final EIS also acknowledges the existence of hundreds of smaller mining claims in the region and the likelihood that many smaller mining companies and some local communities will construct secondary access roads to connect with the Ambler Road all along its route.  It is nonsensical for Defendants to assume that gatehouses limiting entrance at the eastern and western termini of the Ambler Road will result in meaningful enforcement of public access limitations throughout the entire 211-mile length of the road when they acknowledge that there will probably be numerous other points of entry along the route.

235.    The Final EIS acknowledges many exceptions to the faulty premise that the Ambler Road will remain solely a private, industrial access road.  These include without limitation commercial deliveries of goods to local communities; utilization of the road by federal, State, and local government agencies and officials for compliance monitoring, oversight, fire management, law enforcement, emergency prevention and response, and other purposes; utilization of the road by scientists and researchers engaged in data-gathering and other activities; unauthorized use by hunters, fishers, harvesters, and residents; utilization by the State and Native corporations and their employees and contractors in connection with the use and development of their lands; utilization of AIDEA's proposed but unevaluated "subsistence ramps" by subsistence harvesters; and other exceptions.  Despite such acknowledgments, Defendants treat these uses as *de*

*minimis* and analyze Project impacts based primarily on private, industrial uses.

236. Under the weight of all the exceptions, BLM's limited jurisdiction, and Defendants' acknowledgment that there will likely be extensive secondary access roads associated with smaller mining operations and local villages, the assumption that there will be no public access simply crumbles.

237. The many adverse impacts associated with public access, including without limitation increased off-road vehicle use, habitat degradation, increased fishing and hunting competition, increased spread of invasive species, increased wildfire risk, increased boat traffic, increased water pollution, cultural disruption, public health impacts, increased strain on local infrastructure and services, and other impacts remain unaddressed or inadequately addressed in the Final EIS.

238. In the absence of a fully developed project proposal, Defendants' approach to NEPA review has leaned heavily on the proposal of generic design features and mitigation measures borrowed from other contexts combined with unfounded conclusions that these will be sufficient to eliminate or reduce significant impacts, even though the nature and extent of Ambler Road-related impacts cannot yet be known, and even though the effectiveness of such measures in a project-specific and site-specific context cannot yet be demonstrated. The hubris of this approach is compounded by the authorization of waivers, exemptions, and modifications that could weaken or eliminate whatever effectiveness such measures might have. It is also compounded by the fact that most

such measures have been proposed by BLM with the assumption that they will be implemented along the entire 211-mile route, glossing over the profound uncertainties about BLM's ability to implement or enforce such requirements on the 186 miles of private lands, State lands, and other non-BLM-managed lands along the route.

239. A further problem with Defendants' NEPA review is their failure to consider a reasonable range of alternatives. The action alternatives in the Final EIS are far too similar to each other and vary only with respect to the route. The core features of all three action alternatives are the same, including without limitation the roadway width, right-of-way term and width; year-round use; industrial road access; vehicle types and traffic volumes; design speed; three-phased construction; gravel extraction; airstrips; work camps; supporting infrastructure; telecommunication facilities; energy generation; and mitigation measures.

240. None of the action alternatives in the Final EIS maximize protection for subsistence, wildlife, habitat, ecosystems, historic properties, cultural landscapes, TCPs, social cohesion, and/or public health. Defendants should have considered at least one alternative protective of such interests and resources, such as (a) an alternative with a right-of-way width narrower than 250 to 400 feet, (b) an alternative with a shorter term than 50 years, (c) a seasonal winter ice-road, (d) a single-phase construction alternative, (e) a rail transportation alternative, (f) an alternative incorporating an ore pipeline to reduce impacts associated with truck traffic, fugitive dust, and oil and hazardous

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    83

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 83 of 132

substance spills, or some combination thereof. Defendants also failed to consider alternatives with potentially less impactful routes, such as routes proposed during scoping that travel west from the Ambler Mining District to the Chukchi Sea, Kotzebue Sound, and Seward Peninsula.

241. The range of alternatives is also deficient as a result of Defendants' failure to conduct proper ANILCA § 810 and NHPA § 106 processes as described above. The action alternatives in the Final EIS do not include sufficient features to reduce impacts on subsistence, and they do not reflect the required consultations and evaluations with respect to historic properties, including cultural landscapes, historic properties, and TCPs, and they do not include adequate features designed to reduce adverse effects on them.

242. The Final EIS for the Ambler Road Project is fundamentally flawed in numerous other ways with respect to caribou, fish, water resources, wetlands, vegetation, ecosystem services, subsistence, social cohesion, health, historic properties, cultural resources, and other receptors. These flaws, gaps, and inadequacies include without limitation: (a) inadequate baseline data and other data gaps; (b) improper tiering to or incorporation by reference of other documents; (c) erroneous assumptions; (d) overly generalized and non-quantified analysis; (e) failure to adequately address climate change; (f) failure to adequately consider direct, indirect, and cumulative impacts; (g) failure to meaningfully take into account traditional knowledge; (h) failure to adequately analyze the efficacy of design features and mitigation measures; (i) overall understatement of

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    84

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 84 of 132

impacts; (j) reliance on an inadequate ANILCA § 810 subsistence evaluation; and (k) reliance on an improperly delayed and inadequate NHPA § 106 historic property review process.

## D. CLEAN WATER ACT PERMITTING PROCESS

### 1. Clean Water Act Purposes and Requirements

243.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a). The statute prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit.  *Id*. § 1311(a).  Under section 404 of the Clean Water Act, the Corps is authorized to issue permits for the discharge of dredge or fill material "at specified disposal sites." *Id*. § 1344.

244.    A 404 permit application must include without limitation a "complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice," as well as the "location" and "scheduling of the activity." 33 C.F.R. § 325.1(d)(1).  "All activities which the applicant plans to undertake which are reasonably related to the same project and for which a [404] permit would be required should be included in the same permit application."  *Id*. § 325.1(d)(1).  The application must also include without limitation a "description of the type, composition and quantity of the material to be dredged, the method of dredging, the site and plans for disposal of the dredged material," as well as the "source of the material" and a "description of the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    85

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 85 of 132

type, composition and quantity of the material," and the "location of the disposal site." *Id*. §§ 325.1(d)(3)–(4).

245.    Early in the 404 permitting process, the Corps must provide public notice and an opportunity for public hearings.  33 U.S.C. § 1344(a).  The public notice "must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for," and the "level of detail provided in the public notice must be commensurate with the scope and scale of the impacts."  33 C.F.R. § 332.4(b)(1).  Public notice is the "primary method of advising all interested parties of the proposed activity for which a permit is sought, and of soliciting comments and information necessary to evaluate the probable impact on the public interest."  *Id.* § 325.3(a).  The notice must, therefore, include "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."  *Id*.

246.    United States Environmental Protection Agency ("EPA") guidelines promulgated under section 404(b)(1) of the Clean Water Act ("Guidelines") govern 404 permitting by the Corps.  *See* 40 C.F.R. pt. 230.  The Guidelines are designed to ensure that dredged or fill material is not discharged into the aquatic ecosystem "unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  *Id*. § 230.1(c).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    86

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 86 of 132

247.    A 404 permit must be denied if the proposed discharge would not comply with the Guidelines.  *See* 40 C.F.R. §§ 230.10, 230.91(c); 33 C.F.R. § 320.4(a)(1).  "The burden of proof to demonstrate compliance with the Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued."[22]

248.    The Corps is also prohibited from issuing a 404 permit if the proposed discharge will "cause or contribute to significant degradation of the waters of the United States."  40 C.F.R. § 230.10(c).  Findings relating to "significant degradation" must be based upon "appropriate factual determinations, evaluations, and tests."  *Id*.  Effects "contributing to significant degradation considered individually or collectively" include without limitation impacts on:  (a) "human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;" (b) "life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;" and (c) "aquatic ecosystem diversity, productivity, and stability," including without limitation "loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate

---

[22] Robert H. Wayland, III, EPA, and Michael L. Davis, U.S. Army, *Memorandum: Appropriate Level of Analysis Required for Evaluating Compliance with the CWA Section 404(b)(1) Guidelines Alternatives Requirements* (April 11, 2019) (citing 40 C.F.R. § 230.12(a)(3)(iv)).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                87

nutrients, purify water, or reduce wave energy." *Id*.

249. The Corps is further prohibited from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id*. § 230.10(d). *See* 40 C.F.R. pt. 230, subpt. H.

250. If such steps will not be sufficient to completely eliminate "environmental losses resulting from unavoidable impacts," the Corps "must determine the compensatory mitigation to be required in a [404] permit, based on what is practicable and capable of compensating for aquatic resource functions that will be lost as a result of the permitted activity." *Id*. § 230.93(a)(1). The "fundamental objective of compensatory mitigation is to offset environmental losses" resulting from "unavoidable impacts" on aquatic resources arising from the issuance of a 404 permit. *Id*. Compensatory mitigation requirements "must be commensurate with the amount and type of impact" associated with a particular 404 permit. *Id*.

251. To ensure these non-degradation, minimization, and compensatory mitigation requirements are satisfied, the Corps must fully evaluate and make detailed factual findings concerning the impacts of the proposed discharge, including without limitation short-term and long-term impacts; direct, indirect, and secondary impacts; and individual and cumulative impacts. *See id*. § 230.10(c), § 230.11. The types of impacts requiring comprehensive evaluations and findings include without limitation impacts on

the physical and chemical characteristics of the aquatic ecosystem, the biological characteristics of the aquatic ecosystem, special aquatic sites, and human use characteristics. *See id*. §§ 230.10(c), § 230.11, and subpts. C, D, E, F.

252. The Corps must deny a 404 permit where (a) there is a "practicable alternative ... that would have less adverse effect on the aquatic ecosystem," (b) the proposed discharge will result in "significant degradation of the aquatic ecosystem," (c) the proposed discharge does not include "all appropriate and practicable measures to minimize potential harm," or (d) there "does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines." *Id*. § 230.12(a)(3).

## 2. Defendant Corps' Flawed CWA Permitting Process

253. Defendant Corps issued a public notice relating to Clean Water Act § 404 permitting for the Ambler Road Project in September 2019 based on a flawed and inadequate permit application and supplementary materials submitted by AIDEA in 2015 and 2016.

254. In February 2020, AIDEA submitted a revised 404 permit application to the Corps seeking a 10-year term, in contrast to the 50-year term AIDEA sought from BLM. Also, the revised permit application only encompassed the first two phases of construction, not all three. This meant the roadway under Corps review was only 20 feet wide, rather than 32 feet wide. The project under Corps review also included only 15 of

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    89

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 89 of 132

the ultimate 44 gravel extraction sites needed for the Project. The project elements considered in the Corps review differed in many other ways as well.

255. The changes in AIDEA's revised permit application altered the nature and magnitude of the proposed activity as well as associated impacts and avoidance, minimization, and mitigation measures under consideration by the Corps. The revised application also resulted in substantial deviations between the versions of the project being considered by BLM and the Corps, respectively.

256. By focusing on a narrower and/or different set of Project elements, the aquatic impacts forming the basis of the Corps decision were smaller and/or different than those associated with the BLM-approved version of the Project. For example, Alternative A approved by BLM would permanently destroy more than 2,000 acres of wetlands and 27 acres of open waters with 15 million cubic yards of gravel fill material, while the Corps decision only acknowledged that its approved elements would permanently fill and destroy about 1,400 acres of wetlands and a half-acre of open water with about 8.5 million cubic yards of gravel fill material.

257. Despite the changes, the Corps did not publish a new or revised public notice, seek additional public comment, or prepare a Supplemental EIS. The first time the public learned of the revised 404 permit application was when the Joint BLM-Corps ROD was issued in July 2020. As a result, the original public notice gave the public an inaccurate picture of the nature and magnitude of the project, the project duration, and the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                               90

associated impacts, avoidance, minimization, and mitigation measures.  The public notice was also insufficient to generate meaningful comment.

258.    In addition to the public notice problem, the premature approach to Defendants' review of the conceptual Ambler Road Project meant that the same generic, non-site-specific, and largely unquantified type of analysis permeating the NEPA review characterized the Corps permitting process as well.  Indeed, the Corps adopted the Final EIS and deemed it sufficient, in combination with the NPS-FHWA EEA, to inform its 404 permitting decisions.

259.    As discussed above, the discussion of water withdrawals in the Final EIS exemplifies the problems pervading the NEPA review and Corps 404 permitting process. Despite the tremendous threats large-scale water withdrawals pose to fish spawning and fish habitat, the analysis of water withdrawals relied on by the Corps lacks any site-specific or quantified analysis of many key issues that are critical for understanding the impacts of water withdrawals on the sensitive watersheds and hydrologic systems traversed by the Ambler Road Project and surrounding the Ambler Mining District, as well as the potential ability, or inability, of mitigation measures to reduce or eliminate such harmful impacts.

260.    The validity of the Corps' 404 permitting process is also plagued by Defendants' failure to consider hard-rock mining activity, such as the Arctic project, and gravel extraction activities as connected actions and evaluate their combined and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    91

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 91 of 132

synergistic impacts as part of the NEPA review for the Ambler Road Project. The improper segmentation of these activities is especially glaring in the context of 404 permitting because the massive water withdrawals and toxic discharges associated with hard-rock mining can have devastating impacts on surroundings fish populations. Similarly, gravel resources are commonly extracted from stream beds important for fish spawning and can have severe impacts on fish populations and habitat. These issues should have been addressed in a coherent fashion in a single EIS and 404 permitting process considering the Ambler Road Project, hard-rock mining, and gravel extraction together as the interconnected activities that they are.

261. Given the lack of a developed Ambler Road Project and the fundamentally inadequate NEPA review, the Corps lacked sufficient information to demonstrate compliance with EPA's 404(b)(1) Guidelines, including without limitation the following Corps obligations: (a) demonstrating that the discharges will not have unacceptable adverse impacts; (b) demonstrating that the discharges will not cause or contribute to significant degradation; (c) conducting sufficient factual determinations, evaluations, and tests to support findings relating to significant degradation; (d) requiring sufficient measures for avoidance and minimization of adverse impacts; (e) requiring compensatory mitigation; (f) demonstrating that there are no practicable alternatives with less adverse effect; and (g) making a reasonable judgment concerning compliance with the Guidelines.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    92

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 92 of 132

262.    Another enormous problem with the Corp's permitting process is its failure to provide for any compensatory mitigation, despite its acknowledgment of massive impacts on water resources, including without limitation the permanent destruction of huge swaths of wetlands and open waters, that cannot be eliminated.  Compensatory mitigation is an important component of 404 permitting,[23] and the Corps has arbitrarily and unreasonably skipped over it without any legitimate rationale or justification.

E.  MANAGEMENT OF PUBLIC LANDS UNDER FLPMA

1.  Federal Land Management Authorizations and Requirements

263.    FLPMA governs BLM's issuance of rights-of-way across public lands. The geographic scope of each right-of-way "shall be limited to the ground which" (1) "will be occupied by facilities which constitute the project for which the right-of-way is granted ... ;" (2) is "necessary for the operation or maintenance of the project;" (3) is "necessary to protect the public safety;" and (4) "will do no unnecessary damage to the environment." *Id*. § 1764(a).

264.    Each right-of-way must also contain protective terms and conditions, including without limitation provisions to (a) "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment;" (b) "require compliance with applicable air and water quality standards;" (c) "protect the lawful users

---

[23] *See* EPA-Corps, Compensatory Mitigation for Losses of Aquatic Resources, Final Rule, 73 Fed. Reg. 19594 (April 10, 2008) (40 C.F.R. pt. 230, subpt. J).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    93

of the lands adjacent to or traversed by such right-of-way;" (d) "protect the interests of individuals living in the general area traversed by the right-of-way who rely on the fish, wildlife, and other biotic resources of the area for subsistence purposes;" and (e) "otherwise protect the public interest in the lands traversed by the right-of-way or adjacent thereto."  *Id*. § 1765(b).

265.    BLM also has a more general duty to "take any action necessary to prevent unnecessary or undue degradation" of public lands.  *Id*. § 1732(b).

## 2.  Defendants' Flawed Approach to Land Management Decisionmaking

266.    The many issues described above render Defendants' decision in the Joint BLM-Corps ROD inconsistent with the requirements of FLPMA.

267.    Defendants' authorization of a 250- to 400-foot right-of-way goes far beyond the geographic scope of the ground "occupied" by the Ambler Road Project facilities and that "necessary" for the "operation or maintenance" of the Project and for "public safety."  This excessive scope involves thousands of acres more than necessary, and it will do "unnecessary damage to the environment."

268.    Defendants have not demonstrated that their design features and mitigation measures will be protective of the environment, scenic and aesthetic values, fish and wildlife habitat, air and water quality standards, local residents, subsistence resources and activities, or the public interest, or that their decision takes sufficient action to prevent undue degradation of public lands.  On the contrary, these are all topics that remain

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    94

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 94 of 132

murky and unilluminated due to Defendants' premature and deeply flawed NEPA review, ANILCA § 810 evaluation, and NHPA § 106 process; their improper segregation of the Ambler Road Project from hard-rock mining and gravel extraction activities; their refusal to acknowledge the likelihood of public access; their failure to gather baseline data; their failure to conduct site-specific and project-specific analyses; their failure to provide quantitative information; their failure to demonstrate the effectiveness of mitigation; and numerous other flaws and inadequacies.

## F. Administrative Procedure Act

269.    Under the APA, the "reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed ... [and] hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(1), (2)(A), (D).

270.    An agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (internal quotation omitted).

271.    An agency's actions, failures to act, findings, conclusions, and decisions are arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    95

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 95 of 132

offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. Biol. Diversity v. Zinke*, 900 F.3d 1053,1067 (9th Cir. 2018) (internal quotation omitted).

## VI. FIRST CLAIM

### Violations of ANILCA § 810 by BLM and NPS

272.    This First Claim applies to NPS to the extent it is deemed, notwithstanding the Second Claim below, to have participated in, relied on, and/or adopted the ANILCA § 810 Evaluation and determinations made by BLM.

### 1.  Unlawful Exclusion of Subsistence Communities Prior to the Tier 1 Evaluation

273.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 273 above.

274.    Before managing or disposing of public lands within their primary jurisdiction, federal agencies must identify potentially affected subsistence communities and satisfy ANILCA § 810 requirements for each of them.  16 U.S.C. § 3120.

275.    Federal agencies may eliminate subsistence communities from further evaluation if, after completing the Tier 1 evaluation, the agencies determine that the proposed activity "may significantly restrict subsistence uses" for some communities but not others. *Kunaknana*, 742 F.2d at 1151.

276.    Federal agencies are not authorized to eliminate potentially affected

subsistence communities prior to the commencement of the Tier 1 evaluation.

277.    Defendants have acknowledged the potential for severe impacts on subsistence resources as a result of the Ambler Road Project, including without limitation population declines in caribou, fish, birds, and other resources, especially when combined with mining activity and secondary access roads.

278.    Defendants identified 53 subsistence communities that would potentially be affected by the Ambler Road Project and related activities.

279.    Defendants unlawfully excluded 26 of these communities from the entire ANILCA § 810 evaluation process by applying a NEPA-based significance threshold before the Tier 1 evaluation process had begun.

280.    Defendants' unlawful exclusion of these 26 communities resulted in Defendants' failure to provide any individualized and site-specific analysis for them.

281.    BLM is the agency with "primary jurisdiction" over approximately 25 miles of public lands crossed by the Ambler Road Project.  BLM's approval of the Joint BLM-Corps ROD is a decision managing such public lands and authorizing the approval of a right-of-way that will dispose of such lands.

282.    NPS is the agency with "primary jurisdiction" over approximately 26 miles of public lands within Gates of the Arctic.  NPS's approval of the Joint NPS-FHWA ROD is a decision managing such public lands and authorizing the approval of a right-of-way that will dispose of such lands.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    97

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 97 of 132

283.    Defendants' actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to ANILCA § 810 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

284.    For the foregoing reasons and others, NPS's actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval violate ANILCA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## 2.  Failure to Conduct a Proper Tier 1 Evaluation

285.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 285 above.

286.    Before managing or disposing of public lands within their primary jurisdiction, federal agencies must conduct a proper Tier 1 evaluation with respect to each potentially affected community.  16 U.S.C. § 3120.

287.    A proper Tier 1 evaluation must reflect ANILCA's broad definition of subsistence.  16 U.S.C. § 3113; *Alaska Wilderness*, 67 F.3d at 731.

288.    In the Tier 1 evaluation, federal agencies must evaluate:  (a) the "effect" of

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                          98

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 98 of 132

the proposed "use, occupancy, or disposition" on "subsistence uses and needs"; (b) the "availability of other lands for the purposes sought to be achieved"; and (c) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a).

289.    The agencies must also consider cumulative impacts, along with direct and indirect impacts. *Tenakee Springs*, 915 F.2d at 1312.

290.    Defendants' Tier 1 evaluation is flawed and inadequate for many reasons, including without limitation the following.

291.    Defendants' Tier 1 evaluation prematurely evaluates a road construction project that is in such an early stage of development that it is impossible to meaningfully and adequately evaluate potential impacts on subsistence.

292.    Defendants' Tier 1 evaluation fails to meaningfully and adequately address the impacts of reasonably foreseeable and connected actions, including without limitation hard-rock mining and gravel extraction activities.

293.    Defendants' Tier 1 evaluation relies on the unreasonable assumption that the Ambler Road generally will not be open to public access.

294.    Defendants' Tier 1 evaluation lacks a meaningful and adequate discussion of the destruction and degradation of habitat used for foraging and other purposes by caribou, moose, and other subsistence resources due to the dispersal of toxic dust and oil and hazardous substance spills.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                99

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 99 of 132

295.     Defendants Tier 1 evaluation lacks a meaningful and adequate analysis of abundance, availability, and access for all subsistence communities and all subsistence resources.

296.     Defendants' Tier 1 evaluation is largely generic and lacks the individualized and site-specific information necessary to conduct a meaningful analysis of subsistence impacts.

297.     Defendants' Tier 1 evaluation fails to meaningfully and adequately address indirect and cumulative impacts.

298.     Defendants' Tier 1 evaluation fails to meaningfully and adequately consider impacts on subsistence uses and needs.

299.     Defendants' Tier 1 evaluation fails to meaningfully and adequately consider the availability of other lands for the Ambler Road Project that would have had lesser impacts on subsistence.

300.     Defendants' Tier 1 evaluation fails to meaningfully and adequately consider other alternatives to the Ambler Road Project that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.

301.     Defendants' Tier 1 evaluation relies on the effectiveness of design features and mitigation measures that have not been shown to be effective, are subject to waivers, exemptions, and modifications, and are of uncertain applicability on lands outside BLM's jurisdiction.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    100

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 100 of 132

302. Defendants' unlawful exclusion of numerous communities prior to the Tier 1 evaluation, erroneous assumptions, lack of individualized and site-specific analysis, and other inadequacies of the Tier 1 evaluation resulted in an overall understatement and mischaracterization of subsistence impacts.

303. Defendants' actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to ANILCA § 810 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

304. For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval violate ANILCA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

### 3. Unlawful Tier 1 Determinations and Exclusion of Subsistence Communities from Tier 2

305. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 305 above.

306. If, after completing the Tier 1 evaluation, the agency determines that the proposed activity "may significantly restrict subsistence uses," the agency must proceed

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    101

to Tier 2.  *Kunaknana*, 742 F.2d at 1151.

307.    The Tier 2 threshold is "quite low."  *Sierra Club*, 664 F. Supp. at 1307.

Only a "threat of significant restriction" is required, and such a restriction "need not be

likely."  *Hanlon*, 740 F. Supp. at 1448.

308.    Defendants applied an overly high threshold to determine whether to

proceed with a Tier 2 analysis.  Instead of properly applying the minimal "may

significantly restrict" standard, Defendants erroneously and unlawfully focused on

whether subsistence impacts would be "substantial," "large," "major," or "extensive."

309.    As a result, Defendants improperly excluded 7 subsistence communities

from Tier 2, depriving them of notice and formal hearings as well as the detailed Tier 2

determinations that demonstrate compliance with ANILCA's substantive standards.  16

U.S.C. § 3120(a).

310.    Defendants also failed to adequately explain their significance

determinations and rationale for determining which communities to carry forward into

Tier 2.

311.    Defendants' actions, failures to act, findings, conclusions, and decisions in

the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and

in the processes leading to their approval are subject to ANILCA § 810 requirements, and

they are final agency actions subject to the standards for federal agency decision-making

in the APA.  5 U.S.C. § 706(2).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    102

312.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval violate ANILCA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

### 4.  Unlawful Tier 2 Determinations and Failure to Make Tier 2 Determinations

313.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 313 above.

314.    Federal agencies are prohibited from authorizing a proposed activity unless and until the agencies determine that "(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."  16 U.S.C. § 3120(a)(3).

315.    Defendants held formal Tier 2 hearings in 20 subsistence communities, and it made formal Tier 2 determinations with respect to them.

316.    In light of the flawed and inadequate Tier 1 evaluation described above, Defendants' Tier 2 determinations with respect to these 20 communities are erroneous,

unlawful, unsupported, and inadequately explained.

317.    Defendants failed to meaningfully and adequate evaluate impacts of the Ambler Road Project and related activities on subsistence uses and needs.  As such, Defendants' determination that the significant restrictions on subsistence uses resulting from such activities are "necessary, consistent with sound management principles for the utilization of the public lands" is erroneous, unlawful, unsupported, and inadequately explained.

318.    Defendants failed to meaningfully and adequately consider the availability of other lands for the Ambler Road Project that would have had lesser impacts on subsistence.  As such, Defendants' determination that the Project will "involve the minimal amount of public lands necessary" is erroneous, unlawful, unsupported, and inadequately explained.

319.    Defendants failed to meaningfully and adequately evaluate the effectiveness of proposed design features and mitigation measures in minimizing adverse impacts on subsistence as well as other alternatives to the Ambler Road Project that would have reduced or eliminated the use, occupancy, or disposition of public lands needed for subsistence purposes.  As such, Defendants' determination that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions" is erroneous, unlawful, unsupported, and inadequately explained.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                104

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 104 of 132

320.    By unlawfully excluding 26 subsistence communities prior to the Tier 1 evaluation, and by unlawfully excluding another 7 subsistence communities prior to the Tier 2 hearings, Defendants unlawfully failed make any substantive Tier 2 findings in connection with these 33 communities.

321.    Without having made proper and adequately supported Tier 2 findings for all communities for which the Ambler Road Project and related activities "may significantly restrict subsistence uses," Defendants are prohibited from making decisions pertaining to the management and disposition of public lands in connection with the Ambler Road Project.

322.    Defendants' actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to ANILCA § 810 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

323.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the ANILCA § 810 Evaluation, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD and in the processes leading to their approval violate ANILCA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    105

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 105 of 132

# VII.  SECOND CLAIM

## Violations of ANILCA § 810 by NPS

### Failure to Conduct or Adopt ANILCA § 810 Evaluation

324.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 324 above.

325.    Only after a federal agency has complied with ANILCA's requirements regarding subsistence is it authorized to "manage or dispose of public lands" under its "primary jurisdiction" for other lawful uses or purposes.  16 U.S.C. § 3120(d).  *See id*. § 3120(a).

326.    NPS is the agency with "primary jurisdiction" over approximately 26 miles of public lands within Gates of the Arctic that will be crossed by the Ambler Road Project.

327.    NPS's approval of the Joint NPS-FHWA ROD is a decision managing such public lands and authorizing the approval of a right-of-way that will dispose of such lands.

328.    NPS failed to conduct or adopt any ANILCA § 810 evaluation in connection with its approval of the Joint NPS-FHWA ROD for the Ambler Road Project.

329.    NPS's actions, failures to act, findings, conclusions, and decisions in the Joint NPS-FHWA ROD and in the process leading to its approval are subject to ANILCA § 810 requirements, and they are final agency actions subject to the standards for federal

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                  106

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 106 of 132

agency decision-making in the APA.

330. For the foregoing reasons and others, NPS's actions, failures to act, findings, conclusions, and decisions in the Joint NPS-FHWA ROD and in the process leading to its approval violate ANILCA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## VIII.  THIRD CLAIM

### Violations of NHPA § 106 by BLM, Corps, NPS, and FHWA

#### 1.  Failure to Properly Identify and Consult with Tribes Concerning Landscape-Level Historic Properties

331. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 331 above.

332. Federal agencies must "take the steps necessary to identify historic properties" potentially affected by an undertaking.  36 C.F.R. § 800.4(a)(1), (b). Agencies must "make a reasonable and good faith effort to carry out appropriate identification efforts."  *Id.* § 800.4(b)(1).  Such efforts "may include background research, consultation, oral history interviews, sample field investigation, and field survey."  *Id.*

333. Historic properties include properties of "traditional religious and cultural importance to an Indian tribe ... that meet the National Register criteria."  36 C.F.R. § 800.16(l)(1).  Some of these properties are referred to as TCPs or cultural landscapes, and

they must be considered during the NHPA § 106 process.  *See Muckleshoot*, 177 F.3d at 807.

334.    The historic properties that must be considered during the NHPA § 106 process include those "eligible for inclusion" in the National Register, even if such properties "have not been previously evaluated for National Register eligibility."  36 C.F.R. §§ 800.4(c)(1), 800.16(l)(1)-(2).

335.    Tribes must be consulted with respect to the identification of historic properties.  Federal agencies must acknowledge that Tribes "possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them."  *Id*.

336.    The NHPA § 106 process must be initiated early enough in the planning process that it can inform the development, evaluation, and selection of alternatives that avoid, minimize, or mitigate adverse effects on historic properties.  *See id*. §§ 800.1(c); 800.6(a); 800.8(a)(2).

337.    Defendants failed to take the steps necessary to identify landscape-level historic properties, such as cultural landscapes, historic districts, and TCPs, early enough in the planning process that such historic properties and potential impacts on them could inform the development and selection of alternatives.

338.    Defendants failed to make a reasonable and good faith effort to carry out appropriate and timely identification efforts, such as background research, baseline

studies, consultation, oral history interviews, ethnohistoric studies, sample field investigation, and field surveys.

339. Defendants failed to properly consult with Plaintiffs and other Tribes regarding the identification of landscape-level historic properties, such as cultural landscapes, historic districts, and TCPs. Defendants failed to grant Tribes special consideration, recognizing their special expertise in identifying and evaluating historic properties and adverse effects, cognizant of the government-to-government relationship, respectful of Tribal sovereignty and sensitive to the Tribes' concerns and needs.

340. Defendants ignored Plaintiffs' and other Tribes' concerns, and Defendants unlawfully refused to consider the cultural landscapes and TCPs that they had identified until after the issuance of the two Joint RODs for the Ambler Road Project.

341. Defendants also gave Plaintiffs and other Tribes a misleading characterization of Defendants' legal responsibilities under the NHPA with respect to the timing of consultation concerning the identification of historic properties.

342. Defendants effectively and unlawfully limited the scope of the NHPA § 106 process to small, localized archaeological resources and historic properties and excluded landscape-level properties, such as cultural landscapes, historic districts, and TCPs.

343. Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG 109

Case 3:20-cv-00253-SLG Document 11 Filed 01/04/21 Page 109 of 132

ROD and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to NHPA § 106 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

344.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval violate the NHPA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## 2.  Unlawful Determination of the Area of Potential Effects

345.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 345 above.

346.    The APE refers to the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties," and it is "influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id*. § 800.16(d).

347.    An undertaking causes adverse effects if it "may alter, directly or indirectly, any of the characteristics of the historic property that qualify the property for inclusion in the National Register in any manner that would diminish the integrity of the property's location, setting, materials, workmanship, feeling, or association." *Id*. § 800.5(a)(1).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    110

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 110 of 132

348. Direct "refers to the causality, and not the physicality, of the effect."[24] Adverse effects include "reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id*. § 800.5(a)(1).

349. Adverse effects include without limitation: (a) "[p]hysical destruction of or damage to all or part of the property;" (b) "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;" (c) "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;" and (d) "[t]ransfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance." *Id*. § 800.5(a)(2)(i), (iv), (v), (vii).

350. Defendants unlawfully defined the APE for the Ambler Road Project as a narrow linear corridor that is too small for meaningful consideration of landscape-level historic properties or the adverse impacts on them resulting from the Ambler Road Project and associated mining activities and secondary access roads.

351. Defendants unlawfully limited the scope of adverse effects primarily to ground disturbances, and they downplayed or excluded other types of impacts affecting a

---

[24] Memo. from ACHP Office Gen. Counsel to ACHP Staff, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act*, at 2 (June 7, 2019).

broader area that must be considered, such as noise, air pollution, and visual degradation, as well as cumulative effects, such as mining activity and secondary access roads.

352.    Defendants' determination of the APE was made on an arbitrary basis with no supporting evidence or rationale.

353.    Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to NHPA § 106 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

354.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval violate the NHPA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

### 3.  Failure to Develop, Consider, and Consult with Tribes About Alternatives Protective of Landscape-Level Historic Properties

355.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 355 above.

356.    Federal agencies must "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                                    112

36 C.F.R. § 800.1(c).

357. The agencies must consult with Tribes to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id*. § 800.6(a).

358. NHPA § 106 consultation should take place "early in the NEPA process, when the ... widest possible range of alternatives are under consideration." *Id*. § 800.8.(a)(2).

359. Defendants failed to properly identify landscape-level historic properties, failed to properly consult with Plaintiffs and other Tribes with respect to such identification, and established an unlawfully narrow APE. As a result, Defendants failed to develop and consider alternatives that would avoid, minimize, or mitigate adverse effects on landscape-level properties, such as cultural landscapes, historic properties, and TCPs.

360. None of the action alternatives evaluated by Defendants, including the alternatives selected in the two Joint RODs, included features that would avoid, minimize, or mitigate adverse effects on landscape-level historic properties.

361. Defendants also failed to properly consult with Tribes about the development of alternatives, erroneously advising them that substantive NHPA § 106 consultations generally begin in the post-ROD period under the PA and after the project alternative has been selected.

362.    Defendants failed to grant Tribes special consideration, recognizing their special expertise in evaluating historic properties and adverse effects, cognizant of the government-to-government relationship, respectful of Tribal sovereignty and sensitive to the Tribes' concerns and needs.

363.    Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to NHPA § 106 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

364.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval violate the NHPA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

### 4.  Failure to Properly Consult with Tribal Governments

365.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 365 above.

366.    Plaintiffs and other Tribes affected by the Ambler Road Project are sovereign and federally-recognized Tribal governments.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    114

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 114 of 132

367.    Federal agencies must consult with any Tribe that "attaches religious and cultural significance to historic properties that may be affected" by an undertaking.  36 C.F.R. § 800.2(c)(2)(ii).  In doing so, federal agencies must grant Tribes "*special consideration*."  *Quechan Tribe*, 755 F. Supp. 2d at 1109 (emphasis in original).  Consultation with Tribes is "not an empty formality," *id*. at 1108, and cannot be satisfied by "mere *pro forma* recitals," "professions of good intent," and "solicitations to consult."  *Id*. at 1118.

368.    Consultation "should commence early in the planning process," and Tribes must have a "reasonable opportunity to identify [their] concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate [their] views on such properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800.2(c)(2)(ii)(A).

369.    Federal agencies must consult with Tribes at specific points about specific determinations during each step of the NHPA § 106 process.  *See id*. §§ 800.4(a)(4), (b), (c)(1), 800.5(a), 800.6(a).

370.    Defendants failed to take appropriate steps to ensure that NHPA § 106 meetings were accessible to Plaintiffs and other Tribes and designed to encourage their participation.

371.    Defendants failed to honor requests made by Plaintiffs and other Tribes to hold more meetings in local villages, avoid scheduling meetings during periods of intense

subsistence harvest activities, and avoid holding meetings via teleconference and in far-away cities.  Defendants also failed to provide sufficient time for document review prior to meetings, failed to provide sufficient time for review of the final draft PA, and failed to circulate or finalize the Cultural Resources Management Plan before issuance of the ROD.

372.    Defendants failed to engage Plaintiffs and other Tribes in a meaningful two-way dialogue and consultation in a manner respectful of Tribes' specialized knowledge and sovereignty.

373.    Defendants interacted with Plaintiffs and other Tribes in a *pro forma* manner, failing to take their concerns, comments, and traditional knowledge about historic properties and adverse effects into account in any meaningful way.

374.    Defendants rushed through the NHPA § 106 process and did not make a sufficient effort to ensure adequate opportunities for participation by Plaintiffs and other Tribes.

375.    Defendants failed to adequately consult with Plaintiffs and other Tribes at specific steps in the NHPA § 106 process, including without limitation key steps such as (a) information-gathering; (b) identification and evaluation of historic properties; (c) assessment of adverse effects; (d) development and evaluation of alternatives that avoid, minimize, mitigate, and resolve adverse effects and (e) development and implementation of the PA and CRMP.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    116

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 116 of 132

376.    As a result of Defendants' failure to adequately consult with Plaintiffs and other Tribes, the PA and CRMP are inadequate to ensure proper surveying and data-gathering, meaningful substantive consultations with Tribes in the future, and sufficient protections for historic resources.

377.    Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval are subject to NHPA § 106 requirements, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

378.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions during the NHPA § 106 process, in connection with the PA, and in the Joint BLM-Corps ROD and Joint NPS-FHWA ROD and in the processes leading to their approval violate the NHPA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## IX.  FOURTH CLAIM

## Violations of NEPA by BLM and the Corps:

### 1.  Failure to Consider a Reasonable Range of Alternatives

379.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 379 above.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    117

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 117 of 132

380.    Under NEPA, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).

381.    None of the action alternatives in the Final EIS maximize protection for subsistence, wildlife, fish, water resources, habitat, ecosystems, historic properties, cultural landscapes, TCPs, social cohesion, and/or public health.  Defendants should have considered at least one alternative emphasizing protection of such interests and resources. Defendants also should have considered one or more alternatives with potentially less impactful routes.

382.    Overall, the action alternatives in the Final EIS are too similar to each other and do not represent a reasonable range of alternatives.

383.    The lack of a reasonable range of alternatives is compounded by the inadequate ANILCA § 810 process, NHPA § 106 process, and Clean Water Act § 404 permitting process described above, which would have helped ensure that at least one of the alternatives included meaningful and effective protections for subsistence, historic properties, water, fish, and aquatic resources.

384.    Defendants were required to evaluate a reasonable range of alternatives, and their failure to do so violates 40 C.F.R. § 1502.14(a).

385.    Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval are subject to the requirements of NEPA and implementing regulations, and they are final

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    118

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 118 of 132

agency actions subject to the standards for federal agency decision-making in the APA.

386.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval violate NEPA and implementing regulations. These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## 2.  Improper Segmentation of NEPA Review

387.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 387 above.

388.    "Connected" actions should be considered together in the same EIS.  40 C.F.R. § 1508.25(a).  It is mandatory for multiple actions to be considered together where one or more of them lack independent utility or if their separation reflects an intent to circumvent a full and meaningful NEPA review.

389.    In the absence of large-scale hard-rock mining, the Ambler Road Project does not have independent utility and its high cost would not be economically justified.

390.    The Ambler Road Project and associated gravel extraction activities are not intended to be stand-alone projects, and they do not have utility independent of each other.

391.    Defendants failed to consider reasonably foreseeable hard-rock mining and gravel extraction activities together with the Ambler Road Project as connected actions

and evaluate their combined impacts as part of the same EIS. As a result, Defendants failed to acknowledge and properly evaluate the combined impacts of these activities, and this led to an understatement of impacts in the Final EIS.

392. Plaintiffs are informed and believe that the failure to consider mining activity as a connected action reflected a desire on the part of Defendants to improperly segment the NEPA reviews, downplay associated impacts, and circumvent a robust NEPA review fully exploring the combined impacts of the Ambler Road Project and associated hard-rock mining and gravel extraction activities.

393. Defendants were required to consider these connected actions in a single EIS, and their failure to do so violates 40 C.F.R. § 1508.25(a).

394. Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval are subject to the requirements of NEPA and implementing regulations, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

395. For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval violate NEPA and implementing regulations. These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG          120

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 120 of 132

### 3. Failure to Prepare a Supplemental EIS

396.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 396 above.

397.    Federal agencies must prepare a supplemental EIS when the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1).

398.    AIDEA submitted a revised 404 permit application to the Corps for the Ambler Road Project in February 2020. The revised application resulted in major changes to the version of the project under consideration by the Corps. The revised application also resulted in substantial deviations between the versions of the project being considered by BLM and the Corps, respectively.

399.    The project changes and discrepancies between the environmental reviews of the two agencies constitute "substantial changes in the proposed action that are relevant to environmental concerns" as well as "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

400.    Defendants were required to prepare a supplemental EIS, and their failure to do so violates 40 C.F.R. § 1502.9(c)(1).

401.    Defendants' actions, failures to act, findings, conclusions, and decisions in

the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval are subject to the requirements of NEPA and implementing regulations, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

402. For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval violate NEPA and implementing regulations. These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

### 4. Failure to Properly Analyze Direct and Indirect Effects, Cumulative Impacts, and Mitigation Measures

403. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 403 above.

404. NEPA requires federal agencies to take a "hard look" at the direct, indirect, and cumulative effects of their actions, as well as mitigation measures to reduce adverse impacts, and it requires them to use high-quality scientific information. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500, 1502, 1508; *Metcalf*, 214 F.3d at 1141.

405. Several fundamental flaws and gaps render Defendants' Final EIS inadequate and unlawful, including without limitation the following: (a) premature stage of development for the Ambler Road Project; (b) lack of basic information about Project elements; (c) lack of site-specific baseline data; (d) lack of information concerning water withdrawals; (e) erroneous assumption that the road will generally not be used by the

public; (f) lack of BLM jurisdiction over the majority of lands along the route and resulting uncertainty concerning the effectiveness of design features and mitigation measures in reducing impacts; (g) failure to consider a reasonable range of alternatives; (h) failure to consider reasonably foreseeable actions, such as hard-rock mining and gravel extraction activities, as connected actions; (i) failure to prepare a supplemental EIS; and (h) inadequate ANILCA § 810, NHPA § 106, and CWA § 404 processes.

406.    For these and other reasons, the analyses of direct and indirect effects, cumulative impacts, and mitigation measures in the Final EIS relating to many topics are flawed, inadequate, and unlawful in numerous ways.  Such topics include without limitation caribou; fish, aquatic life, and drinking water resources; wetlands, vegetation, and ecosystem services; subsistence; social cohesion and health; and historic properties and cultural resources.

407.    In an effort to address the many flaws, inadequacies, and gaps in the Final EIS, Defendants improperly relied on, purported to tier to, and/or attempted to incorporate by reference, with little or no accompanying summary or explanation, numerous other documents, including but not limited to non-NEPA documents, non-federal documents, future or incomplete NEPA reviews, and NEPA reviews concerning unrelated projects and activities.

408.    Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval

are subject to the requirements of NEPA and implementing regulations, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

409.    For the foregoing reasons and others, Defendants' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and in the processes leading to their approval violate NEPA and implementing regulations. These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## X.  FIFTH CLAIM

### Violations of the Clean Water Act § 404 by the Corps

#### 1.  Failure to Provide Adequate Public Notice

410.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 410 above.

411.    Early in the 404 permitting process for the discharge of dredge or fill material into waters of the United States, the Corps must provide public notice and an opportunity for public hearings.  33 U.S.C. § 1344(a).

412.    The public notice "must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for," and the "level of detail provided in the public notice must be commensurate with the scope and scale of the impacts."  33 C.F.R. § 332.4(b)(1).  The notice must include "sufficient information to give a clear understanding of the nature and magnitude of the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    124

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 124 of 132

activity to generate meaningful comment." *Id*.

413. Defendant Corps issued a public notice relating to Clean Water Act § 404 permitting for the Ambler Road Project in September 2019 based on a permit application and supplementary materials submitted by AIDEA in 2015 and 2016.

414. In February 2020, AIDEA submitted a revised 404 permit application to the Corps containing substantial modifications to the Ambler Road Project. Despite these changes, the Corps did not publish a new or revised public notice, seek additional public comment, or prepare a Supplemental EIS.

415. As a result, the original public notice gave the public an inaccurate picture of the nature and magnitude of the project and the associated impacts, avoidance, minimization, and mitigation measures. The public notice was also insufficient to generate meaningful comment.

416. After receiving AIDEA's revised permit application, the Corps was required to issue a new public notice, and its failure to do so violated 33 U.S.C. § 1344(a) and 33 C.F.R. § 332.4(b)(1). It also deprived the public of a meaningful opportunity to comment prior to the issuance of the Final EIS and Joint BLM-Corps ROD.

417. The Corps' actions, failures to act, findings, conclusions, and decisions in the Final EIS and Joint BLM-Corps ROD and the processes leading to their approval are subject to the public notice requirements of the Clean Water Act § 404 and implementing regulations, and they are final agency actions subject to the standards for federal agency

decision-making in the APA.

418. For the foregoing reasons and others, the Corps' actions, failures to act, findings, conclusions, and decisions in the Joint BLM-Corps ROD and the processes leading to their approval violate the Clean Water Act and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

### 2. Failure to Demonstrate Compliance with EPA's 404(b)(1) Guidelines

419. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 419 above.

420. EPA Guidelines promulgated under section 404(b)(1) of the Clean Water Act govern 404 permitting by the Corps. *See* 40 C.F.R. pt. 230.

421. A 404 permit must be denied where (a) the proposed discharge would not comply with the Guidelines; (b) the proposed discharge would cause or contribute to significant degradation of waters of the United States; (c) there is a practicable alternative with lesser adverse impacts; (d) adequate steps have not been taken to minimize adverse impacts; (e) there is inadequate compensatory mitigation; or (f) there is inadequate information to determine compliance with applicable standards and requirements. *See id*.; 33 C.F.R. § 320.4.

422. The Corps' decision in the Joint BLM-Corps ROD is unlawful because it authorizes the issuance of a 404 permit despite numerous violations of the Guidelines,

including without limitation the following: (a) failure to demonstrate that the discharges will not have unacceptable adverse impacts; (b) failure to demonstrate that the discharges will not cause or contribute to significant degradation; (c) failure to conduct sufficient factual determinations, evaluations, and tests to support findings relating to significant degradation; (d) failure to require sufficient measures for avoidance and minimization of adverse impacts; (e) failure to require any compensatory mitigation; (f) failure to demonstrate that there are no practicable alternatives with less adverse effect; and (g) authorization of a 404 permit despite the lack of sufficient information to make a reasonable judgment concerning compliance with the Guidelines.

423. The Corps' actions, failures to act, findings, conclusions, and decisions in the Joint BLM-Corps ROD and the processes leading to its approval are subject to the Clean Water Act § 404, EPA's 404(b)(1) Guidelines, and other implementing regulations, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

424. For the foregoing reasons and others, the Corps' actions, failures to act, findings, conclusions, and decisions in the Joint BLM-Corps ROD and the processes leading to its approval violate the Clean Water Act, EPA's 404(b)(1) Guidelines, and other implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                      127

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 127 of 132

# XI.  SIXTH CLAIM

## Violations of FLPMA by BLM

## Failure to Properly Limit Scope of Right-of-Way, Impose Adequately Protective Conditions, and Prevent Undue Degradation

425.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 425 above.

426.    FLPMA governs Defendant BLM's issuance of rights-of-way across public lands.  The geographic scope of each right-of-way must comply with the limitations specified in FLPMA, and each right-of-way must contain protective terms and conditions as delineated in FLPMA.  *See* 43 U.S.C. § 1764(a)-(b).  BLM also has a more general duty to "take any action necessary to prevent unnecessary or undue degradation" of public lands.  *Id*. § 1732(b).

427.    BLM's decision in the Joint BLM-Corps ROD authorizes a 250- to 400-foot right-of-way across public lands.  This width is excessive.  It will result in a right-of-way far greater than the area occupied by the facilities constituting the Ambler Road Project and the area necessary for the operation and maintenance of the Ambler Road Project, and it will do unnecessary damage to the environment.

428.    BLM's decision in the Joint BLM-Corps ROD is based on inadequate and unlawful environmental, subsistence, and historic property reviews.  As a result, it authorizes a right-of-way with terms and conditions inadequately protective of the environment, air and water quality standards, lawful users of lands adjacent to and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                128

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 128 of 132

traversed by the right-of-way, individuals who rely on the biotic resources of the area for subsistence, and the public interest.

429.    BLM's decision in the Joint BLM-Corps ROD fails to properly limit the scope of the right-of-way for the Ambler Road and fails to adopt adequately protective terms and conditions in violation of 43 U.S.C. § 1764(a)-(b), and BLM's decision also fails take the actions necessary to prevent unnecessary or undue degradation of public lands in violation of 43 U.S.C. § 1732(b).

430.    BLM's actions, failures to act, findings, conclusions, and decisions in the Joint BLM-Corps ROD and the processes leading to its approval are subject to the requirements of FLPMA and implementing regulations, and they are final agency actions subject to the standards for federal agency decision-making in the APA.

431.    For the foregoing reasons and others, BLM's actions, failures to act, findings, conclusions, and decisions in the Joint BLM-Corps ROD and in the processes leading to their approval violate FLPMA and implementing regulations, and they are arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.

## XII.  SEVENTH CLAIM

### Invalid Decisions by Interior and BLM

### Joint BLM-Corps ROD and Other Decision Documents Not Approved by Properly Authorized Agency Official

432.    Plaintiffs repeat and incorporate by reference the allegations set forth in

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                              129

paragraphs 1 through 432 above.

433.     Defendant Hammond purported to approve the Joint BLM-Corps ROD by exercising the authority of the Assistant Secretary.

434.     The position of Assistant Secretary is required to be filled through Presidential appointment and Senate confirmation.  *See* 43 U.S.C. §§ 1453, 1453a.

435.     Any temporary appointment must comply with the FVRA, 5 U.S.C. § 3347.

436.     Defendant Hammond was ostensibly granted temporary authorization to act as Assistant Secretary through Secretarial Order 3345, but any such authorization had expired on the date he signed Joint BLM-Corps ROD.

437.     Hammond's temporary appointment through Secretarial Order 3345 also violated the FVRA and the Appointments Clause of the United States Constitution.  *See* U.S. Const., art. II, sec. 2, cl. 2; 5 U.S.C. §§ 3341 et seq.; *Bullock*, Order on Mot. Summ. J., Civ. No. 4:20-cv-00062-BMM.

438.     As a result of the unlawful delegation of authority to Hammond, any "action" taken by Hammond in the performance of any "function or duty" of the Assistant Secretary has no force or effect and may not be ratified.  *See* 5 U.S.C. § 3348(d); *Bullock*, at *31-*35.

439.     Hammond's approval of the Joint BLM-Corps ROD, as well as his approval of the ANILCA § 810 Evaluation and NHPA § 106 PA, which were attached as appendices to the ROD, and other exercises of Assistant Secretary-level oversight and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG          130

Case 3:20-cv-00253-SLG   Document 11   Filed 01/04/21   Page 130 of 132

decision-making in connection with the Ambler Road Project were unlawful "actions" taken in the performance of the "functions or duties" of the Assistant Secretary, and they were invalid, without force and effect, and may not be ratified.

## XIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Enter a declaratory judgment that Defendants' actions, failures to act, findings, conclusions, and decisions pertaining to the Final EIS, ANILCA § 810 Final Evaluation, NHPA § 106 process and PA, Clean Water Act § 404 permitting, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD for the Ambler Road Project violate ANILCA, NHPA, FLPMA, the Clean Water Act, NEPA, and their implementing regulations and that these actions, failures to act, findings, conclusions, and decisions are arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure as required by law;

B.     Enter a declaratory judgment that NPS has not conducted or adopted any ANILCA § 810 Final Evaluation for the Ambler Road Project in violation of ANILCA and that its approval of the Joint NPS-FHWA ROD is thus invalid, void, and without force and effect;

C.     Enter a declaratory judgment that Defendant Hammond's approval of the Joint BLM-Corps ROD and other purported exercises of Assistant Secretary-level

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alatna Village Council v. Padgett,* Case No. 3:20-cv-00253-SLG                    131

oversight and decision-making authority in connection with the Ambler Road Project were made without proper authority and are thus invalid, void, without force and effect, and may not be ratified;

D.      Vacate and set aside the Final EIS, ANILCA § 810 Final Evaluation, NHPA § 106 PA, Joint BLM-Corps ROD, and Joint NPS-FHWA ROD for the Ambler Road Project, and all rights-of-way, permitting decisions, and other authorizations associated with them;

E.      Enter appropriate declaratory, injunctive, vacatur, and mandamus relief;

F.      Award Plaintiffs all reasonable attorney fees and costs as authorized by law, including without limitation the NHPA, 54 U.S.C. § 307105, and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

G.      Grant such other relief as this Court deems just and proper.


DATED:  January 4, 2021

                          Respectfully submitted,

                          BESSENYEY & VAN TUYN, LLC

                          By:   _s/ Teresa B. Clemmer_
                                  Teresa B. Clemmer (AK Bar No. 0111059)
                                  Peter H. Van Tuyn (AK Bar No. 8911086)
                                  Karen E. Schmidt (AK Bar No. 1211113)

                                  *Counsel for Plaintiffs Alatna Village Council,*
                                  *Allakaket Tribal Council, Evansville Tribal*
                                  *Council, Huslia Tribal Council, Tanana Tribal*
                                  *Council, and Tanana Chiefs Conference*