Teresa B. Clemmer (AK Bar No. 0111059)
CLEMMER LAW OFFICE LLC
PO Box 4086
Palmer, AK 99645
Phone: 907-982-2774
tclemmer@clemmerlaw.net

Counsel for Plaintiffs Alatna Village Council, Allakaket Tribal Council,
Evansville Tribal Council, Huslia Tribal Council, Tanana Tribal Council,
and Tanana Chiefs Conference

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALATNA VILLAGE COUNCIL, et al., | |
|            Plaintiffs, | |
| v. | Case No. 3:20-cv-00253-SLG |
| THOMAS HEINLEIN, in his official capacity, et al., | |
|            Defendants, | |
|   and | |
| AMBLER METALS, LLC, et al., | |
|            Intervenor-Defendants. | |

## PLAINTIFFS' OPENING BRIEF
## PURSUANT TO LOCAL RULE 16.3(c)(1)

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ......................................................................................... 1

FACTUAL BACKGROUND ......................................................................... 1

I.  ATHABASCAN AND IÑUPIAT TRIBES AND THEIR WAY OF LIFE ................................ 1

II. PROPOSED AMBLER ROAD AND MINING ACTIVITIES ................................. 3

III. PROCEDURAL HISTORY ........................................................................ 7

    A.  AIDEA Permit and Right-of-Way Applications ........................................... 7

    B.  Environmental Review Process ..................................................................... 9

    C.  Subsistence Evaluation ................................................................................ 10

    D.  Historic Property Review ............................................................................. 11

    E.  Final Decisions ............................................................................................. 12

        1.  *Records of Decision* ........................................................................... 12

        2.  *Corps Permit* ..................................................................................... 15

        3.  *BLM and NPS Rights-of-Way* ......................................................... 15

        4.  *Field Work Authorizations* .............................................................. 18

STANDARDS OF REVIEW ......................................................................... 18

SUMMARY OF ARGUMENT ..................................................................... 20

ARGUMENT .................................................................................................. 21

I.  ANILCA ................................................................................................... 21

    A.  Defendants Failed to Prepare an Adequate Tier 1 Subsistence

Evaluation.....................................................................................23

        1.      *Defendants Unlawfully Excluded Subsistence Communities*
              *from the Tier 1 Evaluation.* ..............................................24

        2.      *Defendants Failed to Evaluate Road and Mine Impacts on*
              *Caribou Forage Vegetation and Resultant Adverse Impacts*
              *on Subsistence.* ...............................................................30

        3.      *Defendants Failed to Evaluate Water Withdrawal and*
              *Dewatering Impacts on Fish and Resultant Adverse Impacts*
              *on Subsistence.* ...............................................................33

        4.      *Defendants Failed to Evaluate Public Access and Resultant*
              *Adverse Impacts on Subsistence.*.......................................36

    B.    Defendants' Tier 2 Hearings and Determinations Were Unlawfully
        Skewed in Favor of Road and Mining Development. .................................43

        1.      *Defendants Applied an Improper Threshold Standard and*
               *Unlawfully Excluded Subsistence Communities from the Tier 2*
               *Hearings and Determinations.* ..........................................43

        2.      *Defendants' Determination That the Adverse Impacts on*
               *Subsistence from the Ambler Road Project Are "Necessary"*
              *Was Erroneous and Unlawful.* ..........................................46

        3.      *Defendants' Determination That the Ambler Road Project*
               *Would Involve the "Minimal" Amount of Public Lands Was*
               *Erroneous and Unlawful.* ...............................................47

    C.    Defendants Failed to Satisfy Their Subsistence Protection
        Obligations Relating to Gates of the Arctic National Preserve...................50

II.    NHPA ...............................................................................................53

    A.    Defendants' "Area of Potential Effects" Is Unreasonably Narrow
        and Unsupported by Any Reasoned Evaluation...........................................57

III.    NEPA...............................................................................................60

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG          ii

    A.     Defendants Failed to Analyze Adverse Impacts on Cultural
          Resources. ................................................................................................ 62

    B.     Defendants Failed to Analyze Adverse Impacts Resulting from
          Public Access. ......................................................................................... 69

IV.    FVRA AND APPOINTMENTS CLAUSE ....................................................................... 70

    A.     Casey Hammond's Approval of the Ambler Road Project Violated
          the FVRA and the Appointments Clause. ................................................... 73

CONCLUSION ............................................................................................................ 77

EXHIBITS 1 - 6

# TABLE OF AUTHORITIES

**Cases**

*Alaska Wilderness Rec. & Tourism Assn. v. Morrison*, 67 F.3d 723
(9th Cir. 1995) ............................................................................... 19, 22, 23, 24, 44

*Amoco Prod. Co. v. Vill. Gambell*, 480 U.S. 531 (1987) .................................. 23

*Barron v. Alaska Native Tribal Health Consort.*, 373 F. Supp. 3d 1232, 1237
(D. Alaska 2019) ....................................................................................... 2

*Beversdorf v. TCC*, 4FA-17-01911CI (Alaska Super. Ct., Sept. 27, 2017) ........................ 2

*Blue Mtns. Biod. Proj. v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) .............................. 61

*Bullock v. BLM*, 489 F. Supp. 3d 1112 (D. Mont. 2020), *appeal dismissed as
moot* App. No. 20-36129 (9th Cir., Aug. 10, 2021) ............................. 71, 72, 74, 76

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962)........................................ 19

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ............................. 73

*City Tenakee Springs v. Clough*, 750 F. Supp. 1406 (D. Alaska 1990) .......... 23, 29, 44, 48

*City Tenakee Springs v. Clough*, 915 F.2d 1308 (9th Cir. 1990) ......................... 22, 24, 37

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1998)............................................................. 60

*Crawford-Hall v. United States*, 394 F. Supp. 3d 1122 (C.D. Cal. 2019)............. 73, 75, 76

*Edmond v. United States*, 520 U.S. 651 (1997)................................................................. 71

*Great Basin Res. Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016)...................................... 61

*Half Moon Bay Fish. Mktg. Assn. v. Carlucci*, 857 F.2d 505 (9th Cir. 1988) ................. 61

*Hanlon v. Barton*, 740 F. Supp. 1446 (D. Alaska 1988) ....................................... 29, 43, 44

*Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550 (9th Cir. 2016) ............................. 72

*Hoonah Indian Assn. v. Morrison*, 170 F.3d 1223 (9th Cir. 1999) ................................... 46

*Humane Soc. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ...................................................... 19

*Idaho Sporting Cong. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) ................................... 62

*Indig. Envtl. Network v. U.S. Dept. State*, 347 F. Supp. 3d 561 (D. Mont. 2018),
    *appeal dismissed as moot* App. No. 18-36068 (9th Cir., June 6, 2019)........... 62, 63

*Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002) .................................................................. 60

*Kunaknana v. Clark*, 742 F.2d 1145 (9th Cir. 1984)....................................................... 45

*LM-M v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) ......................................... 73, 75, 76

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989).................................................. 61

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) .............................................................. 60

*Mont. Wilderness Assn. v. Connell*, 725 F.3d 988 (9th Cir. 2013).................................... 55

*Motor Vehicle Mfrs. Assn. v. State Farm Ins. Co.*, 463 U.S. 29 (1983)............................ 19

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) ........... 54, 55

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2012)........ 61

*Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) ......... 60, 62, 63

*Native Vill. Quinhagak v. United States*, 35 F.3d 388 (9th Cir. 1994)........................ 23, 24

*Natl. Labor Rels. Bd. v. SW General Inc.*, 137 S. Ct. 929 (2017) ................................ 71, 72

*Natl. Parks Conserv. Assn. v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019)........................ 56

*Nat. Res. Defense Council*, 421 F.3d 797 (9th Cir. 2005).................................................. 60

*Nw. Envtl. Advocs. v. EPA*, 537 F.3d 1006 (9th Cir. 2008) .............................................. 19

*Ocean Advocs. v. Army Corps*, 361 F.3d 1108 (9th Cir. 2004)......................................... 60

*Or. Nat. Desert Assn. v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ........................................ 61

*Or. Nat. Desert Assn. v. Rose*, 921 F.3d 1185 (9th Cir. 2019)......................................... 61

*Pit River Tribe v. U.S. Forest Serv*., 469 F.3d 768 (9th Cir. 2006) ........................... 54, 60

*Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365 (9th Cir. 2001) (*en banc*) ......................... 20

*Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152 (D. Mont. 2010),
    *aff'd* 663 F.3d 439 (9th Cir. 2011) ......................................................................... 62

*Save Our Ecosys. v. Clark*, 747 F.2d 1240 (9th Cir. 1984) ............................................. 68

*Se. Alaska Conserv. Council v. U.S. Forest Serv*., 443 F. Supp. 3d 995
    (D. Alaska 2020) ...................................................................................... 24, 29, 37

*Se. Alaska Conserv. Council v. U.S. Forest Serv*., 468 F. Supp. 3d 1148
    (D. Alaska 2020) ............................................................................................... 20

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1988) ....................................................... 23

*Sierra Club v. Penfold,* 857 F.2d 1307 (9th Cir. 1988) .................................................... 37

*Sierra Club v. Penfold*, 664 F. Supp. 1299 (D. Alaska 1987), *aff'd* 857 F.2d 1307
    (9th Cir. 1988) ....................................................................................... 29, 37, 43

*Singh v. Clinton*, 618 F.3d 1085 (9th Cir. 2010) ............................................................. 19

*Te-Moak Tribe v. U.S. Dept. Interior*, 608 F.3d 592 (9th Cir. 2010) ......................... 54, 60

*Tribal Village Akutan v. Hodel*, 792 F.2d 1376 (9th Cir. 1986), *vac'd other
    grounds* 480 U.S. 943 (1987) ..................................................................... 29, 43, 44

*Vidal v. Wolf*, 501 F. Supp. 3d 117 (E.D.N.Y. 2020) ...................................................... 74

*Vill. Gambell v. Hodel*, 774 F.2d 1414 (9th Cir. 1985), *rev'd in part other
    grounds* 480 U.S. 531 (1987) ..................................................................... 29, 43, 44

**U.S. Constitution**

U.S. Const., art. II, sec. 2, cl. 2 ....................................................................................... 71

**Federal Statutes**

5 U.S.C. § 701 *et seq.* ............................................................................................ 19

5 U.S.C. § 706 ............................................................................................... 20, 75

5 U.S.C. § 3345 ............................................................................................. 72, 73

5 U.S.C. § 3346 ............................................................................................. 72, 73

5 U.S.C. § 3347 .................................................................................................... 71

5 U.S.C. § 3348 ............................................................................................. 73, 76

16 U.S.C. § 410hh ......................................................................................... 50, 52

16 U.S.C. § 3101 ................................................................................................. 22

16 U.S.C. § 3111 ................................................................................................. 22

16 U.S.C. § 3112 ................................................................................................. 22

16 U.S.C. § 3113 ............................................................................................. 23, 24

16 U.S.C. § 3120 ............................................... 11, 23, 24, 43, 45, 46, 48, 51

33 U.S.C. § 1344 .................................................................................................. 13

42 U.S.C. § 4332 ............................................................................................... 9, 41

43 U.S.C. § 1606 ................................................................................................... 2

43 U.S.C. § 1453 .................................................................................................. 71

43 U.S.C. § 1453a ................................................................................................ 71

43 U.S.C. § 1701 *et seq.* ..................................................................................... 70

43 U.S.C. § 1761 *et seq.* ..................................................................................... 70

54 U.S.C. § 100302 .............................................................................................. 51

54 U.S.C. § 300308 .............................................................................................. 54

Case 3:20-cv-00253-SLG   Document 99   Filed 12/01/21   Page 8 of 91

54 U.S.C. § 300320 .................................................................................................. 53

54 U.S.C. § 302706 .................................................................................................. 54

54 U.S.C. § 306108 .......................................................................................... 12, 54


**Federal Regulations**

33 C.F.R. § 323.1 *et seq.* ....................................................................................... 13

36 C.F.R. § 60.4 ...................................................................................................... 54

36 C.F.R. § 800.1 .................................................................................................... 55

36 C.F.R. § 800.1 *et seq.* ....................................................................................... 12

36 C.F.R. § 800.3 .............................................................................................. 54, 55

36 C.F.R. § 800.4 .............................................................................................. 54, 55

36 C.F.R. § 800.5 ........................................................................................ 54, 55, 56

36 C.F.R. § 800.6 .............................................................................................. 54, 55

36 C.F.R. § 800.14 .................................................................................................. 57

36 C.F.R. § 800.16 .......................................................................................... 53, 54

40 C.F.R. § 230.1 *et seq.* ....................................................................................... 13

40 C.F.R. § 1500.1 .................................................................................................. 61

40 C.F.R. § 1500.1 *et seq.* ....................................................................................... 9

40 C.F.R. § 1502.1 .................................................................................................. 60

40 C.F.R. § 1502.14 ................................................................................................ 60

40 C.F.R. § 1502.16 .......................................................................................... 62, 63

40 C.F.R. § 1502.22 .................................................................................... 61, 68, 69

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG

40 C.F.R. § 1502.24 ................................................................................. 61

40 C.F.R. § 1508.7 ................................................................................... 69

40 C.F.R. § 1508.8 ....................................................................... 62, 63, 69

40 C.F.R. § 1508.14 ................................................................................. 62

40 C.F.R. § 1508.20 ................................................................................. 60

40 C.F.R. § 1508.27 ................................................................................. 62


**State Statutes**

AS § 19.10.015 ........................................................................................ 49

AS § 19.40.050 ........................................................................................ 49

AS § 19.59.001 ........................................................................................ 49


**Other**

109 DM 6 (U.S. Dept. Interior, Departmental Manual ("DM"),
    https://www.doi.gov/elips/browse) ................................................. 51, 70

109 DM 7 ........................................................................................... 53, 71

209 DM 6 ........................................................................................... 51, 70

209 DM 7 ................................................................................................. 53

516 DM 1 ................................................................................................. 62

600 DM 6 ........................................................................................... 57, 67

604 DM 1 ........................................................................................... 57, 67

85 Fed. Reg. 43304 (July 16, 2020, eff. Sept. 14, 2020) .................................. 9

86 Fed. Reg. 7554 (Jan. 29, 2021) ...................................................................................... 2

ACHP, *Information Paper on Cultural Landscapes: Understanding and Interpreting Indigenous Places and Landscapes*, (Oct. 11, 2016), https://www.achp.gov/sites/default/files/whitepapers/2018-06/InformationPaperonCulturalLandscapes.pdf ...................................................... 54

ACHP, *Section 106 Applicant Toolkit*, https://www.achp.gov/digital-library -section-106-landing/section-106-applicant-toolkit ............................................... 55

ACHP Office Gen. Counsel, Memo to ACHP Staff, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act* (June 7, 2019), http://shpo.nv.gov/uploads/documents/ OGC_memo_to_ACHP_staff_re_meaning_of_direct_6-7-19.pdf ....................... 56

Alexander Hamilton, Federalist No. 76, https://guides.loc.gov/federalist-papers/text -71-80 .................................................................................................................. 71

Reorg. Plan No. 3 1950 § 3, 15 Fed. Reg. 3174, 64 Stat. 1262 (eff. May 24, 1950), https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title5a-node84-leaf107&num=0&edition=prelim ........................................................... 71

## INTRODUCTION

The proposed Ambler Road is intended to enable hard-rock mining activities on a vast scale along a 211-mile corridor just south of the Brooks Range in one of the most spectacular and abundant landscapes in the nation. Mining operations and secondary roads are expected to sprawl out in every direction from the main road corridor, resulting in severe and widespread harm to Alaska Native communities and the migrating caribou, fish spawning areas, and other wildlife and habitat that they depend on for their identity, spirituality, culture, and way of life.

Defendants conducted rushed and inadequate reviews relating to the adverse impacts of the roads and mines on subsistence, cultural resources, and the environment. The major flaws and inadequacies of Defendants' review processes have led to a mischaracterization and understatement of impacts, skewed substantive determinations, and unlawful authorizations for the utilization of public lands in violation of multiple federal laws.

## FACTUAL BACKGROUND

### I.    ATHABASCAN AND IÑUPIAT TRIBES AND THEIR WAY OF LIFE

Alaska Native people have lived in the foothills and watersheds south of the Brooks Range for thousands of years. Their way of life of depends on healthy wildlife and ecosystems for subsistence and for maintaining sharing networks, kinship ties, and other social, cultural, physical, and spiritual aspects of their identity. Respect for the land

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    1

and wild resources is deeply ingrained, as each generation teaches the next to learn from the past, plan for the future, and honor the generations to come.

Plaintiffs are the governing bodies of five sovereign federally-recognized Tribes and Tanana Chiefs Conference ("TCC"), a sovereign Tribal consortium representing dozens of Tribes throughout Interior Alaska.[1] Plaintiffs' Tribal members are primarily Koyukon Athabascan and Kobuk Iñupiat.[2] Athabascan society is matrilineal with strong kinship ties. Iñupiat people are members of a larger Inuit culture, which spans northern Alaska, Canada, and Greenland. The lives of both Athabascan and Iñupiat people in Interior Alaska revolve with the seasons as they harvest fish, caribou, moose, and other wildlife and gather plants, berries, and wood. Their culture, spirituality, and traditions emphasize a close connection between humans and animal spirits. They maintain and share their way of life with future generations through subsistence harvesting, dancing, storytelling, and language.

The Western Arctic Caribou Herd is a key resource for Athabascan and Iñupiat people in the region.[3] They rely on the caribou migrating through their villages and

---

[1] *See* 86 Fed. Reg. 7554, 7557-58 (Jan. 29, 2021); *Beversdorf v. TCC*, 4FA-17-01911CI (Alaska Super. Ct., Sept. 27, 2017) (recognizing TCC's sovereignty); *Barron v. Alaska Native Tribal Health Consort.*, 373 F. Supp. 3d 1232, 1237 (D. Alaska 2019) (recognizing sovereignty of multi-Tribal organizations). TCC is also a non-profit providing health and social services in Interior Alaska. *See* 43 U.S.C. § 1606(a)(5).
[2] *See generally* Ex. 1 (Decl. Norman Carl Burgett); Ex. 2 (Decl. Harding Sam).
[3] BLM_0015579, 0015582-83.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    2

hunting grounds for physical sustenance as well as for their culture, spirituality, traditions, health, and well-being.[4] The region also supports moose, bear, sheep, and other wildlife that serve as important subsistence resources for Alaska Native communities.

Salmon, sheefish, and other fish populations inhabit rivers and streams throughout the region, and these fish provide the greatest quantity of subsistence resources in Interior Alaska.[5] Sheefish and other types of whitefish are especially important to Interior subsistence communities because of their extended seasonal availability and widespread distribution.[6]

More generally, the region surrounding the proposed Ambler Road is world-renowned for its rich biodiversity and magnificent rivers, lakes, wetlands, and boreal forests. The exceptional nature of the region is reflected by the many federally-designated conservation system units within it, including two national parks, three national preserves, five wilderness areas, four national wildlife refuges, and eight wild rivers.[7]

## II. PROPOSED AMBLER ROAD AND MINING ACTIVITIES

Mining companies have explored the area south of the Brooks Range for several

---

[4] *See id.*
[5] BLM_0016234-35, 0016288-89, 0016312-13, 0016336-37. *See also* BLM_0016258-59 (showing substantial reliance on fish in the coastal Kotzebue Sound region as well).
[6] *See id.*; BLM_0016240, 0016296, 0016290, 0016318, 0016342.
[7] BLM_0016688.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    3

decades, and there are at least four major mineral deposits in the Ambler Mining District at the western end of the proposed Ambler Road corridor.[8] The Arctic deposit alone consists of 1,358 contiguous State and federal mining claims spanning approximately 112,000 acres.[9] It is the most advanced project in the area, with an estimated 43 million tons of copper, zinc, lead, gold, and silver.[10] The Bornite deposit is expected to be even larger.[11] There are also hundreds of other mining claims along the entire length of the Ambler Road corridor.[12]

The Alaska Industrial Development and Export Authority ("AIDEA") and its predecessor have been pursuing the construction of a road to facilitate development of the region's mineral resources.[13] The Ambler Road corridor approved by Defendants would run 211 miles from east to west, starting at the Dalton Highway, stretching more than half the way to Kotzebue Sound, and crossing several major river systems and thousands of smaller streams and wetlands.[14] Nearly 60% of the corridor approved by the agencies would traverse State lands, and another 15% would cross lands owned by Alaska Native corporations.[15] The route would traverse about 25 miles of lands managed by the U.S.

---

[8] BLM_0015406-07, 0016813.
[9] BLM_0015883.
[10] BLM_0015897.
[11] BLM_0015883, 0015897.
[12] BLM_0015928.
[13] BLM_0015407.
[14] BLM_0015659-60, 0016813, 0016883-85.
[15] BLM_0015547, 0016686.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    4

Bureau of Land Management ("BLM") lands and 26 miles of lands managed by the National Park Service ("NPS"), each comprising about 12% of the overall route.[16]

The Ambler Road and associated camps, airports, and other facilities would include dozens of bridges, thousands of culverts, about 44 gravel mining sites, and over 200 miles of compacted soil and cleared vegetation.[17] The hard-rock mining enabled by the Ambler Road would involve massive soil and rock movement; large-scale pumping and dewatering of streams; transportation and utilization of large quantities of diesel fuel, mercury, cyanide, and other toxic chemicals; widespread dispersal of toxic fugitive dust; releases of acid mine drainage through leaching and potential tailings dam failures; and many other destructive activities.[18]

The vast network of access roads and mine sites expected along the entire 211-mile corridor has the potential to cause widespread harm to Alaska Native communities throughout the region and the wildlife and habitat they depend on for their traditional culture, sustenance, spirituality, and way of life. Potential impacts on caribou include reduction in foraging habitat, displacement from migratory routes, decreased reproductive success, and overall population declines.[19] Salmon, sheefish, whitefish, and other fish populations are expected to be harmed by the permanent destruction of streams

---

[16] BLM_0015547, 0016686, 0016813.
[17] BLM_0015418-21, 0015636, 0016722-24,
[18] *See generally* BLM_0015870-0016002.
[19] BLM_0015436, 0015535-39, 0015936-39, 0015966.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    5

and wetlands, blockage and disruption of water flows, toxic contamination, reductions in

the aquatic invertebrates and plants on which fish feed, and dewatering of the hyporheic

zone that is essential for spawning and egg incubation and fundamental to the survival of

aquatic life.[20] All of this is anticipated to lead to overall population-level and watershed-

wide declines or extirpations for multiple fish species.[21] Destruction of the Kobuk River

sheefish spawning grounds and Alatna River whitefish spawning grounds would be

especially devastating due to their critical importance for the survival of fish populations

throughout the region.[22]

Destruction of subsistence resources threatens the fundamental human rights of

Alaska Native people to maintain their culture, spirituality, and way of life. When

opportunities to engage in subsistence activities are diminished, opportunities to transmit

knowledge about those activities also decline.[23] The loss of direct usage of the land leads

to reduced knowledge among the younger generation of place names, stories, language,

spiritual practices, and traditional ecological knowledge associated with those areas.[24] It

is well-documented that declines in subsistence resources and proximity to large

extractive industrial facilities can lead to numerous cascading adverse effects, including

---

[20] BLM_0015435-36, 0015511-19, 0015925-35.
[21] BLM_0015925-35, 0015966.
[22] BLM_0015925-35, 0015966.
[23] BLM_0015599, 0015966.
[24] *See id.*

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                     6

reductions in food security, social interaction, and community cohesion, as well as

increases in depression, substance abuse, tobacco use, sexual assault, domestic violence,

suicide, diabetes, cancer, respiratory disorders, heart disease, and premature death.[25] The

loss of subsistence resources would be especially severe for the more vulnerable, isolated,

lower-income, and lower-harvest households.[26]

The proposed Ambler Road and associated mines and secondary roads also pose a

major threat to cultural resources, which include broad cultural landscapes, ancestral

sites, travel routes, and other resources typically identified through ethnographic studies,

as well as artifacts, burial sites, buildings, tools, and other resources commonly identified

through archaeological studies.[27] Alaska Native communities are intimately connected

with these resources and depend on them for their spirituality, kinship ties,

intergenerational learning, social cohesion, and sense of purpose and meaning.

Destroying cultural resources is tantamount to destroying the communities themselves

and their fundamental identities as Tribes and indigenous peoples.

III.    PROCEDURAL HISTORY

    A.    **AIDEA Permit and Right-of-Way Applications**

In November 2015, AIDEA submitted permit and right-of-way applications for the

---

[25] *See generally* BLM_0109585-0109739.
[26] BLM_0015965, 0016387.
[27] *See generally* BLM_0015599-0015604, BLM_0016106-81, 0034552-0034699.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    7

proposed Ambler Road to five federal agencies—BLM, NPS, U.S. Army Corps of Engineers ("Corps"), Federal Highway Administration ("FHWA"), and U.S. Coast Guard.[28] AIDEA requested a 250-foot wide right-of-way with a 50-year term across BLM and NPS lands, as well as authorization from the Corps to construct and operate a 211-mile industrial access road across extensive waters and wetlands.[29] The consolidated application was deemed incomplete in January 2016.[30] AIDEA submitted additional information and revised applications to the agencies in June 2016,[31] and Defendants determined that their respective components of the applications were complete in July and August 2016.[32]

In February 2020, AIDEA submitted a revised permit application to the Corps containing major modifications to its original proposal, but the Corps did not publish a new public notice or seek additional public comment.[33] AIDEA did not update its application with BLM or NPS to reflect the changes, and the public did not learn of the revision until July 2020.[34]

---

[28] NPS_0000003, 0009793, 0039552-58, 0050198-0052206; BLM_0000001-30, 0015406.
[29] NPS_0009791, 0009797, 0050264, 0050268; BLM_0015406, 0015409; ACE_0010087-88.
[30] NPS_0000028-000003; BLM_0000037-46.
[31] NPS_0000078-0002852, 0009793; BLM_0000151-0000498, 0015406.
[32] NPS_0002865-66, 0009793; BLM_0000499-0000500, 0042227-31.
[33] ACE_0015332-0015765, 0015782-0015836.
[34] NPS_0009721; BLM_0016844-45.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                          8

At the time it submitted its federal permit and right-of-way applications, AIDEA did not concurrently apply for any of the myriad State of Alaska permits and rights-of-way that would be needed for the project.[35] To Plaintiffs' knowledge, AIDEA still has not done so. The federal reviews thus lacked the information that would have been developed through the State permitting processes.

## B. Environmental Review Process

The National Environmental Policy Act ("NEPA") review process for the proposed Ambler Road commenced in February 2017, with BLM serving as lead agency.[36] The scoping phase took place from November 2017 through January 2018, with the final scoping report issued in April 2018.[37] Defendants published the Draft Environmental Impact Statement ("EIS") in August 2019.[38] The public comment period for the Draft EIS coincided with the peak of the subsistence harvesting season and ended in October 2019, despite many requests for additional time to comment.[39] In March 2020, during the emergence of the COVID-19 pandemic and ignoring requests for a

---

[35] BLM_0015411, 0015627-28; 0051761-0051783. *See infra* notes 178-79.

[36] BLM_0000501-03, 0015406, 0015409, 0015411. *See* 42 U.S.C. § 4332, 40 C.F.R. § 1500.1 *et seq*. Although the NEPA regulations have recently been revised—*see* 85 Fed. Reg. 43304 (eff. Sept. 14, 2020)—the Final EIS and Joint BLM-Corps ROD were approved before the effective date of the new regulations. As such, the prior regulations govern this matter, and all references herein are to the prior regulations.

[37] BLM_0015411-12, 0006653-0006974, 00071633-00071954.

[38] BLM_0006981-0008029, 0008037-38.

[39] *See, e.g.,* BLM_0008553-54, 0081361-62, 0081383-84, 0081446, 0082294-96, 0119392-93.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    9

moratorium on decision-making,[40] Defendants issued the Final EIS for the Ambler Road project.[41]

The EIS evaluated a no-action alternative and three action alternatives.[42] All three action alternatives involve gravel road access from the Dalton Highway to the Ambler Mining District, using a three-phased approach to construction.[43] The analysis of these alternatives is based on the assumption that there will be no public access.[44] Alternatives A and B are the same in all respects, except for differing routes through Gates of the Arctic National Preserve.[45] Alternative C is also similar, except that it is a longer route starting at a more southerly point on the Dalton Highway.[46]

On a parallel track, NPS, with assistance from FHWA, prepared an Environmental and Economic Analysis ("EEA") for the portion of the road crossing Gates of the Arctic National Preserve. NPS issued the Draft EEA in August 2019 and the Final EEA in July 2020.[47]

### C. Subsistence Evaluation

BLM also served as lead agency with respect to the subsistence evaluation for the

---

[40] *See, e.g.,* BLM_0119428-30.
[41] BLM_0015376-0016699, NPS_0049013-14.
[42] BLM_0015417-0015418.
[43] BLM_0015418-20.
[44] BLM_0015418.
[45] BLM_0015418-30.
[46] *See id.*
[47] NPS_0048000-0048257, 0009785-0009878.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    10

Ambler Road project required by Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA").[48] The first phase addressed 27 of the 53 communities Defendants had originally identified as reliant on subsistence resources that could be affected.[49] Formal hearings were later conducted for only 20 of these communities during September and October 2019.[50] The Final EIS included a purportedly final ANILCA § 810 subsistence evaluation in an appendix, but this document was unsigned and lacked the substantive determinations required under ANILCA § 810(a)(3).[51] The final signed version of the ANILCA § 810 subsistence evaluation ("Subsistence Evaluation") was attached to the record of decision issued jointly by BLM and the Corps in July 2020 ("Joint BLM-Corps ROD").[52] For the first time, Defendants made public the required ANILCA § 810(a)(3) substantive determinations.[53]

   D.   **Historic Property Review**

   BLM served as lead agency with respect to the review for historic properties under

---

[48] BLM_0015409.  *See* 16 U.S.C. § 3120.
[49] BLM_0016419, 0015579, 0016196, 0016200-01.
[50] BLM_0016010-13, 0016436, 0016437. The Subsistence Evaluation is somewhat confusing as to the communities carried through to Tier 2. Defendants erroneously listed Stevens Village on both the "no significant restriction" and "may significantly restrict" lists, and on one list relating to Tier 2 hearings but not another. BLM_0016732, 0016833-34. In any event, it appears Defendants excluded at least 7 of the 27 primary communities from Tier 2.
[51] BLM_0016412-0016441.
[52] BLM_0016809-41.
[53] BLM_0016834-37.

Section 106 of the National Historic Preservation Act ("NHPA") as well.[54] NHPA § 106 consultation meetings took place from January 2018 through November 2019.[55] These consultations focused entirely on the development of a programmatic agreement under which substantive consideration of historic properties was planned to be conducted during the post-ROD period.[56] Defendants did not hold any consultations with Tribes concerning the substantive results of ethnographic studies, archaeological surveys, or other cultural resource investigations prior to their final decisions approving the EIS and Joint RODs, or before their subsequent issuance of federal permits and rights-of-way. The programmatic agreement ("PA") was executed by BLM, NPS, and others and became effective in April 2020.[57] The Cultural Resource Management Plan was meant to be a key mechanism for implementing the PA, but it was still in draft form at the time the PA became effective, and it was not finalized until April 2021 with comments still being accepted until June 2021.[58]

### E. Final Decisions

#### 1. *Records of Decision*

The Joint BLM-Corps ROD approved Alternative A as the route for the Ambler

---

[54] BLM_0015409, 0016022.  *See* 54 U.S.C. § 306108; 36 C.F.R. § 800.1 *et seq.*
[55] BLM_0016013-14.
[56] BLM_0015410, 0015440, 0015601, 0015602.
[57] BLM_0016018-0016105.
[58] BLM_00105349-00105479.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    12

Road project.[59] BLM's portion approved the Final EIS, Subsistence Evaluation, and PA as the basis for its subsequent issuance of a right-of-way and other permits and authorizations.[60] The main elements of Alternative A, as approved by BLM, are: a 211-mile industrial access road (25 miles of which cross BLM lands); an east-west route for the road corridor; a right-of-way generally 250 feet wide and up to 400 feet wide in some locations; a 50-year term; three-phased construction; year-round use; two lanes with shoulders forming a 32-foot wide roadway; an estimated 29 bridges; 2,903 culverts; 20 vehicle turnouts; 4 permanent maintenance stations, each with an airstrip; 5 temporary construction camps; 44 gravel extraction sites; and 12 communication towers.[61] The direct footprint of these facilities expected to impact more than 4,500 acres of vegetation and wetlands.[62] The project approved by BLM will also require 15 million cubic yards of gravel for construction, and another 220,000 cubic yards each year for maintenance.[63]

The Corps' portion of the Joint BLM-Corps ROD adopted the Final EIS to fulfill its NEPA obligations and inform its subsequent wetlands dredge-and-fill permitting decisions under Section 404 of the Clean Water Act ("CWA").[64] The Corps adopted the

---

[59] BLM_0016720, 0016722, 0016723.
[60] BLM_0016722-23, 0016725-27, 0016809-41, 0016931-0017020.
[61] BLM_0016722, 0016723-24, 0015418-22, 0015636, 0015703.
[62] BLM_0015698, 00115700.
[63] BLM_0015636.
[64] BLM_0016723. *See* 33 U.S.C. § 1344; 40 C.F.R. § 230.1 *et seq*.; 33 C.F.R. § 323.1 et *seq*.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    13

NHPA § 106 process led by BLM,[65] but the Corps never became a signatory to the PA.[66]

The Corps determined that Alternative A, as modified by the 2020 revised 404 permit

application, constituted the "least environmentally damaging practicable alternative" and

would not be contrary to the public interest.[67] The Corps also determined that no

compensatory mitigation would be required.[68] The Corps decision only encompassed the

first two phases of road construction, not all three as approved by BLM.[69] As such, the

Corps only approved a roadway 20 feet wide, rather than 32 feet wide.[70] The Corps

approval also included only 15 of the ultimate 44 gravel extraction sites that would be

needed for the project.[71]

Concurrently with the BLM-Corps decision, NPS and FHWA issued a separate

joint record of decision ("Joint NPS-FHWA ROD") approving Alternative A as the route

for the portion of the Ambler Road that would traverse Gates of the Arctic National

Preserve.[72] They also approved the future issuance of a right-of-way with a 50-year term,

250-foot width, all three phases of construction, and other features similar to the BLM

---

[65] BLM_0016914-15.
[66] BLM_0016052.
[67] BLM_0016723, 0016729-31.
[68] BLM_0016856, 0016869-79.
[69] BLM_0016844-45.
[70] *See id.*
[71] *See id.*
[72] NPS_0009716-0009784.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                14

decision.[73] NPS is a signatory to the PA,[74] but it did not sign, adopt, or otherwise approve the Subsistence Evaluation or prepare its own evaluation, even though it is a public land manager subject to ANILCA § 810 subsistence protection requirements just like BLM.[75]

### 2. Corps Permit

Relying on the Joint BLM-Corps ROD, the Corps issued a CWA § 404 permit to AIDEA in August 2020.[76] The Corps permit authorizes construction of Phases 1 and 2 of the proposed Ambler Road, and its term ends in July 2035.[77]

### 3. BLM and NPS Rights-of-Way

BLM issued a right-of-way across its lands in January 2021 in reliance on the Joint BLM-Corps ROD.[78] The BLM right-of-way is generally 250 feet wide, with some areas up to 400 feet.[79] It authorizes construction of the roadway and associated facilities for Phases 1, 2, and 3 of the project, and its term ends in December 2070.[80] NPS issued a similar right-of-way across Gates of the Arctic National Preserve on the same day as BLM, and its term ends in January 2071.[81]

---

[73] NPS_0009720-21.
[74] BLM_0016970.
[75] *See infra* Part I.C.
[76] ACE_0011593-0022662.
[77] ACE_0022593, 0022594,
[78] ACE_0102319-0102360.
[79] BLM_0102321.
[80] *See id.*
[81] NPS_0049696-0049791

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                15

The rights-of-way require AIDEA to submit "subject-specific plans" prior to receiving a notice to proceed ("NTP") from BLM or a special use permit ("SUP") from NPS for the construction of Phase 1, as well as additional "detailed plans" prior to receiving an NTP or SUP for other phases of construction and reclamation.[82] These plans call for extensive information not previously provided to Defendants or the public or considered as part of the subsistence, environmental, and historic property reviews. The plans must address 26 or 27 (for BLM and NPS, respectively) specified subject areas and "describe in detail the construction, operation, maintenance, and termination of the right-of-way and its associated improvements and facilities."[83] They must also include "drawings in sufficient detail to enable a complete evaluation of all proposed structures, facilities, landscaping, and measures" to ensure compliance with applicable requirements.[84]

The rights-of-way also require AIDEA to submit an enormous amount of other information that likewise was not previously provided to Defendants or the public or considered as part of the review processes, including: a survey and boundary delineation of the road corridor; site-specific information for stream crossings concerning fish species presence, in-stream flows, peak discharge, flood plain regime, and climate trends;

---

[82] BLM_0102320, 0102322, 0102327-0102343; NPS_0049699, 0049774-91.
[83] BLM_0102328; NPS_0049776.
[84] BLM_0102328; NPS_0049776.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    16

site-specific analysis concerning gravel extraction from streams, riverbeds, floodplains, lakeshores, and lake outlets; a plan to minimize human exposure to disturbed, naturally-occurring asbestos; investigation and testing to determine the potential for acid rock drainage and leaching of toxic metals; a plan to address unanticipated discovery of paleontological resources; a baseline assessment of non-native invasive species ("NNIS") and a plan to prevent their introduction and spread; a plan to address public safety risks, fire hazards, erosion, and other harmful impacts associated with timber clearing; a wildlife interaction plan detailing road design, construction timing, and other means to reduce adverse impacts on wildlife; and a dust control plan describing the potential adverse impacts of toxic fugitive dust on fish, wildlife, vegetation, and water quality and the expected effectiveness of potential mitigation measures.[85] The rights-of-way do not describe any subsequent decision-making processes or opportunities for public review and comment following the submission of these new plans and information, and they do not mention any further review under NEPA, except with respect to the use of pesticides and other chemicals.[86]

Despite Defendants' characterization of the Ambler Road project as an industrial access road and their heavy reliance on the lack of public access to justify their refusal to

_____

[85] BLM_0102327-0102343; NPS_0049774-91.
[86] BLM_0102335; NPS_0049783.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                 17

analyze the impacts associated with such access,[87] the rights-of-way do not strictly prohibit public access. For instance, the rights-of-way authorize "landowners," such as Native corporations, Native allotment owners, and State of Alaska, that "need access for land management and other functions" to drive the road at no charge after appropriate training.[88] The rights-of-way also acknowledge the potential for members of the public to "trespass along the road from crossing sites, road and trail intersections, and other locations."[89]

### 4. *Field Work Authorizations*

Defendants have authorized AIDEA to conduct preliminary field work during the 2020 and 2021 field seasons,[90] and this work is expected to continue in 2022 and beyond.[91] AIDEA's field work encompasses many subject areas that were addressed only generically in the agencies' reviews, including: cultural resource investigations; land ownership surveys; fish habitat studies; hydrology studies; wetland delineations; and geotechnical investigations at material sites, bridge sites, and culvert sites.[92]

### STANDARDS OF REVIEW

Federal agency decision-making is reviewed by courts pursuant to the

---

[87] *See infra* Parts I.A.4 and III.B.
[88] BLM_0102342; NPS_0049789.
[89] BLM_0102333; NPS_0049780.
[90] BLM_0102784-91, 0104765-0104893, 0105587-0105613.
[91] BLM_0104894-0104902, 0105240.
[92] BLM_0104894-0104902, 0105240.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                18

Administrative Procedure Act ("APA").[93] A reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional … power," or "without observance of procedure required by law."[94] Agencies "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."[95] An agency's actions, failures to act, findings, conclusions, and decisions are arbitrary and capricious if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[96] Issues that are predominantly legal, rather than factual, are reviewed for reasonableness.[97] "Whether agency action is 'not in accordance with law'" can also be a "question of statutory interpretation, rather than an assessment of reasonableness" in a particular case.[98] Courts

---

[93] *See* 5 U.S.C. § 701 *et seq*.
[94] *Id*. § 706(2)(A), (B), (D).
[95] *Motor Vehicle Mfrs. Assn. v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). *See Humane Soc. V. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010) (quotation omitted).
[96] *Motor Vehicle Mfrs.*, 463 U.S. at 43.
[97] *Alaska Wild. Rec. & Tourism Assn. v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995).
[98] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Envtl. Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    19

review questions of constitutional law *de novo* with no deference to the agency.[99] Vacatur is the "normal remedy under the APA because it directs reviewing courts to 'set aside' unlawful agency action."[100]

## SUMMARY OF ARGUMENT

Defendants unlawfully excluded dozens of subsistence communities and omitted important topics from the subsistence evaluation required under ANILCA § 810, which led to a gross understatement of the adverse impacts of the roads and mines on subsistence, as well as substantive determinations heavily skewed in favor of industrial development. Moreover, no subsistence evaluation and no substantive determinations have been approved at all for the portion of the Ambler Road that would cross NPS lands. Without having conducted a proper subsistence evaluation and made lawful substantive determinations, Defendants were prohibited by law from making decisions pertaining to the disposition and management of public lands.

Defendants established an unduly narrow "area of potential effects" to guide the identification of historic properties and the assessment and resolution of adverse effects on such properties, in violation of the NHPA and its implementing regulations. Further, Defendants failed to analyze cultural resource impacts and public access impacts in the

_____

[99] *See Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2001) (*en banc*).
[100] *See Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1149 (D. Alaska 2020) (citing 5 U.S.C. § 706(2)(A)).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    20

EIS, in violation of NEPA and its implementing regulations. Casey Hammond's continuing performance of the duties of Assistant Secretary for Land and Minerals Management after his term automatically ended in March 2020 violated the Federal Vacancies Reform Act and Appointments Clause of the U.S. Constitution.

To avoid repetition and minimize the burdens on this Court and the other Parties, Plaintiffs hereby incorporate by reference, as though fully set forth herein, all factual allegations, claims, and arguments relating to Defendants' failure to comply with CWA § 404 permitting requirements set forth in the plaintiffs' briefs in the related case, *Northern Alaska Environmental Center v. Haaland*, 3:20-cv-00187-SLG.[101]

For the reasons discussed below and in the other case, the Final EIS, Joint RODs, Subsistence Evaluation, NHPA § 106 review and PA, BLM and NPS rights-of-way, CWA § 404 permit, and other actions, failures to act, findings, conclusions, and decisions are unreasonable, arbitrary, capricious, contrary constitutional power, and contrary to law and should be vacated.

## ARGUMENT

## I.     ANILCA

In enacting ANILCA, Congress intended to "provide for the maintenance of sound

---

[101] Plaintiffs are concurrently submitting an Unopposed Motion to Accept Overlength Brief (ECF 98), which includes a request for leave to incorporate the CWA § 404 facts, claims, and arguments from the other case.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                          21

populations of, and habitat for, wildlife species," "protect the resources related to subsistence needs," and "protect and preserve historic and archeological sites, rivers, and lands."[102] Congress found that the "continuation of the opportunity for subsistence uses ... is essential to Native physical, economic, traditional, and cultural existence," and that "the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses."[103] Congress declared it to be federal policy that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands"[104] Congress also intended to ensure that "rural residents who have personal knowledge of local conditions and requirements" play a "meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska."[105] The term "subsistence" in ANILCA is defined broadly.[106] Subsistence extends beyond a "sufficient food supply" and includes "customary and traditional

---

[102] 16 U.S.C. § 3101(b).
[103] *Id*. § 3111(1)-(2).
[104] *Id*. § 3112(1). *See id.* §§ 3101(c), 3111(4).  *See Alaska Wild.,* 67 F.3d at 731; *City Tenakee v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990).
[105] 16 U.S.C. § 3111(5).
[106] *See id*. § 3113 (defining "subsistence uses" to mean the "customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles …; for barter, or sharing for personal or family consumption; and for customary trade").

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    22

practices which ANILCA was designed to protect."[107]

ANILCA establishes both procedural and substantive requirements.[108] Federal land management agencies must conduct a two-step process when determining whether to authorize the "use, occupancy, or disposition" of public lands.[109] In the first step, known as Tier 1, the federal agency must evaluate the potential impacts of a proposed project on subsistence.[110] In the second step, known as Tier 2, the agency must hold hearings in subsistence communities and make several substantive determinations.[111] Only after a federal agency has demonstrated compliance with ANILCA's subsistence protections is it authorized to "manage or dispose of public lands."[112] Actions that would "significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[113]

### A. Defendants Failed to Prepare an Adequate Tier 1 Subsistence Evaluation.

In Tier 1, the federal agency with "primary jurisdiction" over public lands affected by a proposed use must evaluate: (1) the effect of the proposed activity on "subsistence

---

[107] *Alaska Wild.*, 67 F.3d at 731 (citing 16 U.S.C. § 3113 and *Native Vill. Quinhagak v. United States*, 35 F.3d 388, 394 n. 5 (9th Cir. 1994)).
[108] *See Sierra Club v. Marsh*, 872 F.2d 497, 502-03 (1st Cir. 1988); *City Tenakee v. Clough*, 750 F. Supp. 1406, 1421, 1427 (D. Alaska 1990).
[109] 16 U.S.C. § 3120(a).
[110] *See id.*
[111] *See id.* § 3120(a)(1)-(3).
[112] *See id.* § 3120(a), (d).
[113] *Amoco Prod. Co. v. Vill. Gambell*, 480 U.S. 531, 554 (1987).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    23

uses and needs," (2) the "availability of other lands for the purposes sought to be achieved," and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[114] ANILCA § 810 thus commands federal agencies to "consider site-specific aspects of a proposed action," including its "effect on local 'subsistence uses and needs.'"[115] A proper Tier 1 evaluation must reflect ANILCA's broad definition of subsistence, including the potential destruction of village culture and way of life,[116] and the agency must consider cumulative impacts along with direct and indirect impacts.[117]

### 1. Defendants Unlawfully Excluded Subsistence Communities from the Tier 1 Evaluation.

Contrary to the mandates of ANILCA § 810, Defendants applied a proximity-based threshold at the outset of the Tier 1 evaluation and, on that basis, unlawfully excluded many subsistence communities from the entire subsistence review. The exclusion of these communities resulted in a gross understatement of the impacts of the proposed Ambler Road and associated mines and secondary roads on subsistence.

In the subsistence technical report underlying Defendants' Tier 1 evaluation,

---

[114] 16 U.S.C. § 3120(a).

[115] *Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1017 (D. Alaska 2020) (emphasis added).

[116] *See* 16 U.S.C. § 3113; *Alaska Wild.*, 67 F.3d at 731; *Native Vill. Quinhagak*, 35 F.3d at 394 n. 5.

[117] *See City Tenakee*, 915 F.2d at 1312-13.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    24

Defendants identified potentially affected subsistence communities by looking at "communities that harvest subsistence resources within or near the project area, use the project area to access subsistence use areas, or harvest resources that migrate through the project area and are later harvested elsewhere."[118] They applied criteria to "capture communities that may experience direct or indirect impacts on their subsistence uses resulting from construction and operation" of the Ambler Road."[119] They also recognized that the road would bisect the range of the Western Arctic Caribou Herd ("WAH"), a "highly migratory and important subsistence resource to communities in Western and Northwestern Alaska."[120] Given the potential for the Ambler Road to adversely affect these caribou, Defendants included members of the WAH Working Group as part of their effort to "capture[] potential indirect or cumulative impacts to communities who use the caribou that migrate through the project area and are later harvested elsewhere."[121] Using these criteria, Defendants identified 53 potentially affected subsistence communities.[122]

Defendants divided this group into three categories. The first category consisted of 27 communities that Defendants deemed "primary" based on their geographical proximity to one or more of the three alternative road corridors.[123] Primary communities

---

[118] BLM_0016196.
[119] Id.
[120] Id.
[121] Id.
[122] BLM_0016196, 0016198, 0016200-01.
[123] BLM_0016196.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    25

included those situated within 50 miles of an alternative and those with harvest areas within 30 miles of an alternative.[124] A second category of 26 communities consisted of members of the WAH Working Group with village sites and harvest areas that fell outside the 50-mile and 30-mile boundaries, respectively.[125] The members of this group can be thought of as the "WAH-only" communities. A third category was made up of an overlapping list from the first two groups. It included a total of 42 communities—15 of the 27 that met the geographical proximity requirements and were also members of the WAH Working Group, plus the 26 WAH-only communities.[126] The 42 members of this third category were referred to as the "caribou study" communities.[127]

For each of the 27 communities considered primary, Defendants' subsistence technical report and Tier 1 evaluation provided at least a minimal level of individualized discussion of their subsistence uses.[128] In contrast, the technical report addressed subsistence uses of the WAH by the 42 caribou study communities in a general and cursory way in two paragraphs in the "overview" section of the report.[129] The report also contained a handful of references to this group in the "potential impacts" section.[130] For

---

[124] BLM_0016196, 0016198, 0016200-01.
[125] BLM_0016200-01.
[126] *See id.*
[127] BLM_0016348-49.
[128] BLM_0016221-0016348, 0016816-34.
[129] BLM_0016348-49.
[130] BLM_0016375, 0016376, 0016378, 0016391.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    26

the 15 members of the caribou study group which had received some individual

discussion, this represented a small supplement. The 26 WAH-only members of this

group, however, received no individualized discussion at all anywhere in the technical

report. In the actual Tier 1 subsistence evaluation, Defendants did not even provide a

cursory analysis for the 26 non-primary communities; they excluded them entirely.[131]

The range of WAH caribou is vast, stretching from Alaska's Arctic coast in the

north, to the Dalton Highway in the east, to the shores of Kotzebue Sound, Norton Sound,

and the Seward Peninsula in the west and southwest.[132] Defendants have acknowledged

that communities throughout the entire WAH range rely heavily on caribou for

subsistence:

> With few exceptions, use of caribou among the 42 study communities is high, with
> over 50 percent of households in 30 of the 42 study communities using caribou. …
> On average, caribou contribute approximately 25 percent toward the total harvest
> for the study communities. Nearly half of households (48 percent) participate in
> caribou hunting, and residents harvest an average of 101 pounds of caribou
> annually. … Strong sharing networks between communities and regions ensure
> that residents of the study communities continue to receive and consume caribou,
> and the resource remains culturally important to all study communities regardless
> of current harvest levels.[133]

Defendants have also acknowledged the potential for severe impacts on WAH caribou

from the Ambler Road, especially when combined with subsequent mining activities and

---

[131] BLM_0016816-34.
[132] BLM_0016682, 0016685, 0016694.
[133] BLM_0016348-49.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    27

the network of secondary roads that would be facilitated by the project:

> … [E]ach of the action alternatives would permanently remove habitat acreage in the winter, migratory, and peripheral ranges of the WAH caribou. ... [and] would fragment the WAH caribou range. … Fragmentation may result in reduced dispersion of individuals across the winter range and subsequent crowding in smaller habitat fragments ... .[134]

> ... The mines, mining roads, and secondary access roads would increase habitat fragmentation exponentially. … Migrating caribou would encounter a network of active roads and industrial development that does not exist elsewhere in their range. It is much more likely that a system of roads would jeopardize long-distance migration than any single road … Areas of high road density [on the Arctic Coastal Plain] resulted in up to 86 percent declines in caribou density in those areas … and subsequent crowding in other areas. … [M]ultiple intersecting roads may create a corralling effect on caribou, which could delay their movement, increase stress levels, or prevent access to suitable habitat …[135]

> … Caribou migration may be altered to the point where calving success and winter survival are affected. These would both have major impacts on the herd population. … These changes could lead to a higher mortality rate in [WAH] caribou affecting the overall population.[136]

Defendants have thus acknowledged the likelihood of profound adverse effects, including the potential for population-level declines, on WAH caribou from the Ambler Road, associated mines, and secondary roads. Defendants have also acknowledged that subsistence communities throughout the WAH range rely heavily on these caribou through harvesting, sharing networks, and cultural practices.

Defendants failed to provide any legitimate explanation for excluding 26

---

[134] BLM_0015535-36.
[135] BLM_0015935-38.
[136] BLM_0016817.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    28

subsistence communities known to rely heavily on WAH caribou from the entire Tier 1 evaluation, and they could not do so. Defendants had a duty to conduct a site-specific Tier 1 evaluation with respect to each of the 53 subsistence communities they identified as potentially affected by the Ambler Road.[137]

Federal agencies may eliminate subsistence communities from further evaluation if, *after* completing a proper site-specific Tier 1 evaluation, they determine that the proposed activity "may significantly restrict subsistence uses" for some communities but not others.[138] Nothing in ANILCA authorizes federal agencies to apply a stringent threshold at the *outset* of the Tier 1 evaluation and, on that basis, exclude potentially affected subsistence communities from the evaluation entirely. Moreover, Defendants' use of a threshold based on geographic proximity to a road project is wholly inappropriate and unlawful when what matters to subsistence communities is their continued access to WAH caribou, which migrate over long distances, not the communities' proximity to the road.

---

[137] *Se. Alaska*, 443 F. Supp. 3d at 1017-18 (emphasis added).
[138] *See Vill. Gambell v. Hodel*, 774 F.2d 1414, 1421-22 (9th Cir. 1985), *rev'd in part other grounds* 480 U.S. 531 (1987); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *aff'd* 857 F.2d 1307 (9th Cir. 1988); *City Tenakee*, 750 F. Supp. at 1426, 1428, 1429; *Hanlon v. Barton*, 740 F. Supp. 1446, 1448-49 (D. Alaska 1988). *See also Tribal Vill. Akutan v. Hodel*, 792 F.2d 1376, 1378-79 (9th Cir. 1986), *vac'd other grounds* 480 U.S. 943 (1987).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    29

### 2. Defendants Failed to Evaluate Road and Mine Impacts on Caribou Forage Vegetation and Resultant Adverse Impacts on Subsistence.

The Tier 1 evaluation also downplays subsistence impacts by omitting any meaningful discussion of road and mine impacts on caribou forage vegetation and resultant adverse impacts on subsistence.

Defendants acknowledged in the EIS that the Ambler Road and the mines and secondary roads it would enable are expected to result in widespread, long-term adverse effects on vegetation, including adverse impacts on lichen and other vegetation that serve as important forage for caribou:

> Construction of the action alternatives would result in the loss of caribou habitat … The reduction of lichen-dominated vegetation types would result in disproportionately greater impacts on WAH [caribou] than the reduction of other vegetation types, because of the importance of lichen as a food source. … [E]ach of the action alternatives would permanently remove habitat acreage in the winter, migratory, and peripheral ranges of the WAH caribou. … [D]ecline in percent cover of lichens has been detected up to 3,280 feet … from gravel roads used for mining … .[139]

> … [M]ining would result in loss [and alteration] of vegetation and wetlands … from disturbance of surface and groundwater flow, lowering of the water table from dewatering activities, and fugitive dust from heavy metals and accessory roads. … [T]he potential magnitude of impact and alteration is anticipated to be in the thousands of acres, not including accessory roads. In addition, hundreds of thousands of acres of mining claims exist in the advanced mining scenario, which could result in more loss and alteration than initially predicted if more claims are developed.[140]

---

[139] BLM_0015535-36.
[140] BLM_0015921-22.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    30

… [F]ugitive dust from heavy metals can travel thousands of feet to several kilometers in distance, particularly if strict mitigation measures are not employed or practiced. This can result in increased or complete loss of lichen and moss … Heavy metal dust can persist in the soil for many decades … resulting in adverse impacts to the surrounding vegetation and habitat. Additionally, mosses, lichen, and vegetation can accumulate heavy metals in their tissue … which could have impacts to overall vegetation health ... Fugitive dust impacts would occur around the mine footprints, due to blasting, loading, ore stockpiles, crushing activities, waste piles and exposed mill tailings … as well as along the entire truck haul route along the Dalton Highway to Fairbanks. Spills of ore concentrate due to trucking accidents and inadequately sealed ore containers could result in further contamination. In addition, mining tailings and settling ponds associated with the mines could potentially lead to contamination of surface water and groundwater, leading to pollution and other impacts to vegetation … The development of these mines and accessory roads would also result in an increased risk of spread and establishment of NNIS in the surrounding environment, which could alter vegetation and wetland community composition. …[141]

Thousands of acres of wetlands and vegetation would be impacted by these projects … result[ing] in widespread changes to wetlands and vegetation … which would be further compounded by the effects of climate change. … Some of these impacts to wetlands and vegetation would be permanent, forever changing the project area.[142]

The Tier 1 subsistence evaluation, however, failed to meaningfully discuss these impacts on vegetation, or the consequences for caribou foraging, caribou abundance, caribou availability for subsistence harvesting, or any other vegetation-related impacts on caribou and subsistence. The caribou section vaguely mentions that road construction and operation could affect caribou abundance through "loss .. of habitat,"[143] while the

---

[141] BLM_0015922.
[142] BLM_0015923.
[143] BLM_0016817.

vegetation section focuses on subsistence harvesting of vegetation, such as berries, wild plants, and wood.[144] The Tier 1 evaluation also cross-references the subsistence section of the EIS,[145] which makes isolated references to "dust deposition" and "habitat fragmentation"[146] but fails to address the subsistence impacts resulting from the massive scale of damage to and destruction of vegetation, including caribou forage habitat, that is expected across the region.[147] The cumulative impact section of the Tier 1 evaluation discusses impacts of the roads and mines on caribou and vegetation separately, but it never connects them to each other and never acknowledges the harm to subsistence communities that would result from widespread destruction and degradation of caribou forage vegetation and the effects this would have on caribou migration, population abundance, and availability for subsistence harvesting.[148]

Similarly, the underlying technical report devotes only one sentence to the subject, and it appears to be addressing the direct health impacts to caribou of ingesting toxic dust, not the potential for fugitive dust to damage or destroy vast swaths of lichen and other caribou forage vegetation.[149] Moreover, the technical report ignores many Ambler Road-related factors besides fugitive dust that could damage or destroy caribou forage

---

[144] BLM_0016822-23.
[145] BLM_0016815.
[146] BLM_0015584, 0015586, 0015587, 0015597.
[147] *See generally* BLM_0015578-99.
[148] BLM_0016832-33.
[149] BLM_0016373.

vegetation, such as direct destruction from road and mine construction, invasive species, off-road vehicles, spur roads and trails, spills of hazardous materials, hydrology changes, soil changes, permafrost thawing, and increases in wildfires.[150] The technical report also gives no indication of the potential impacts on subsistence resulting from the harm to caribou forage vegetation.[151]

Defendants' failure to evaluate the adverse impacts of the network of roads and mines on caribou forage vegetation and resultant adverse impacts on subsistence renders the Subsistence Evaluation inadequate and unlawful.

### 3. *Defendants Failed to Evaluate Water Withdrawal and Dewatering Impacts on Fish and Resultant Adverse Impacts on Subsistence.*

The Tier 1 evaluation understates subsistence impacts even further by leaving out any meaningful discussion of the water withdrawals that would occur in connection with the construction and operation of the Ambler Road, dewatering of streams and groundwater as part of mining operations, impacts of such activities on salmon, sheefish, and other fish species, spawning areas, and other aquatic habitat, and resultant impacts on subsistence.

Construction of the Ambler Road would require massive water withdrawals. Ice roads used for winter construction would require an estimated "1 million gallons of water

---

[150] *See generally* BLM_0016188-0016411.
[151] *See id.*

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    33

for each mile of a 25-foot-wide ice road," and ice pads would require about "250,000 gallons … per acre."[152] The water would be "withdrawn from lakes or large rivers near the construction activities."[153] Water would also be withdrawn from "freshwater sources during construction and throughout operations, primarily for dust control."[154] In the EIS, Defendants have generically described the types of impacts that water withdrawals can have on fish, streams, lakes, and wetlands.[155] Defendants did not specify, however, the ice road mileage, number and acreage of ice pads, locations where water withdrawals would take place, which water bodies would be affected, what types of fish and aquatic life occupy them, or whether the water bodies would have sufficient water left in them to continue supporting fish and aquatic life.[156]

Defendants have provided similarly cursory and generic discussions of dewatering impacts relating to mining in the EIS,[157] but the EIS does acknowledge that the drawdown of the water table to access ore, especially near spawning grounds, has the potential for devastating effects on fish spawning areas important for subsistence:

> As a mine is excavated, pumps are used to remove mine water and allow access to the ore. Removal of natural groundwater … creates a cone of depression in the groundwater table, which can lower the water table well below natural stream or lake levels and considerably reduce flow into streams, the hyporheic zone, and

---

[152] BLM_0015469.
[153] Id.
[154] BLM_0015498.
[155] BLM_0015471, 0015497, 0015498, 0015518.
[156] See, e.g., BLM_0015512 (note 28), 0015518 (note 49).
[157] BLM_015921-22, 0015929.

PLAINTIFFS' OPENING BRIEF
Alatna Village Council v. Heinlein, 3:20-cv-00253-SLG                                    34

wetlands … The hyporheic zone is the region of sediment and porous space beneath and alongside a stream bed that provides the linkage between surface and groundwater systems and riparian and floodplain habitat. The importance of the hyporheic zone to the health and survival of fish cannot be overstated. It is used for spawning and egg incubation for many fish species in the study area that are major targets of subsistence harvest. … Hyporheic zones are important in stream nutrient cycling and the regulation of temperature and water quality, and provide unique habitats for fish and aquatic invertebrates. … [D]ewatering has the potential to substantially reduce groundwater flows into important spawning, egg incubating, and wintering habitats relied upon by salmon, sheefish, whitefish, and other important subsistence species.[158]

Several of the prospects within the Ambler Mineral Belt are located on tributaries that drain directly into or downstream of the Kobuk River sheefish spawning grounds. Given the proximity of the road and other foreseeable future [mining] actions to the Kobuk River sheefish spawning grounds and the large numbers of sheefish that migrate to and spawn in this limited habitat, sheefish may be more vulnerable to population-level effects than other species. … The Kobuk River spawning grounds … support "the largest population of spawning sheefish in northwestern Alaska … The importance of this habitat for the Kobuk River sheefish population, and ultimately to the communities that depend on this species, cannot be overstated. … Mining-related water quality impacts near sheefish spawning habitat would have the potential to devastate or severely affect the Kobuk River sheefish population, particularly if mitigation measures were to fail. The road east of the Ambler Mining District could also negatively affect the Alatna River whitefish spawning grounds, as well as several essential fish habitat streams that support Pacific salmon.[159]

Given the enormous threat to subsistence use of fish posed by construction-related water withdrawals and mine-related dewatering, one would expect the Tier 1 evaluation to address these issues in detail. It fails to do so at all.[160] The underlying technical report

---

[158] BLM_0015928-29.
[159] BLM_0015934.
[160] BLM_0016820-22, 0016832-33.

includes a few off-hand references to water withdrawals without acknowledging or explaining the consequences for subsistence.[161] The only discussion of mine-related dewatering concerns its effect on vegetation.[162] Neither document contains any mention of dewatering's potentially devastating impacts on fish, spawning areas, and subsistence, even though fish provide the greatest quantity of subsistence resources in Interior Alaska.[163]

Defendants' failure to evaluate the impacts of water withdrawals and dewatering on fish and subsistence renders the Subsistence Evaluation inadequate and unlawful.

### 4. *Defendants Failed to Evaluate Public Access and Resultant Adverse Impacts on Subsistence.*

Despite numerous requests for Defendants to evaluate the impacts flowing from reasonably foreseeable public access, Defendants refused to do so. This led to a further downplaying of the adverse impacts that the Ambler Road and associated mines and secondary roads would have on subsistence.

Defendants have acknowledged that the "potential for increased access into the region was a key concern voiced by residents during both scoping and traditional knowledge studies ..."[164] Defendants firmly rejected this possibility with respect to the

---

[161] BLM_0016372, 0016381.
[162] BLM_0016833, 0016435-36.
[163] *See supra* note 5.
[164] BLM_0015965. BLM_0015412, 0015415, 0015808, 0016386, 0016585, 0016587.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                        36

Ambler Road, however, pointing repeatedly to AIDEA's proposal for an "industrial access road" and their own commitment to "require a new ROW application and authorization process" for any proposal to "modify[] the restricted access industrial road to one capable of supporting public access."[165] Defendants therefore restricted the scope of the subsistence evaluation based on the assumption that none of the alternatives would allow public access.[166]

All actions must be considered as part of the Tier 1 indirect and cumulative impact analyses if they are reasonably foreseeable.[167] Neither AIDEA's application for a private road, nor Defendants' assurance that they would require further review before opening federal lands to the public, alter the fact that public access is reasonably foreseeable and must be analyzed.

Defendants have acknowledged that there would be substantial non-mining-related usage of the Ambler Road through numerous points of entry, including secondary roads

---

[165] BLM_0015407-08, 0015901. BLM_0015415, 0015418.

[166] BLM_0016398, 0016416. *See also* BLM_0015901 ("[G]eneral public access is not reasonably foreseeable and thus a public access road is not considered to be a contributing factor to indirect or cumulative impacts."), 0016586 ("BLM_… determined that public access is not reasonably foreseeable").

[167] Courts commonly apply NEPA standards when addressing the procedural aspects of ANILCA § 810. *See Se. Alaska*, 443 F. Supp. 3d at 1016-17, and 1017 n. 172. This includes the requirement under both statutes to consider indirect and cumulative impacts. *See City Tenakee*, 915 F.2d at 1312-13; *Sierra Club v. Penfold,* 857 F.2d 1307, 1321-22 (9th Cir. 1988); *Sierra Club*, 664 F. Supp. at 1307. *See also* BLM_0016435-36 (discussing reasonably foreseeable future actions as part of the ANILCA § 810 subsistence review for the Ambler Road project, albeit inadequately).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    37

all along the route constructed by local communities to facilitate commercial deliveries and by mining companies with claims outside the Ambler Mining District.[168] Further, Defendants have recognized the likely use of the road by non-federal landowners and their employees, contractors, and others in connection with activities on their lands;[169] by federal, State, and local government officials for monitoring, oversight, fire management, law enforcement, emergency response, and other purposes;[170] and by scientists and researchers engaged in data-gathering and other activities.[171] Moreover, Defendants have admitted the community of Kobuk would be connected to the Ambler Road almost immediately due to its close proximity and the presence of existing roads and trails connecting the village to the Dahl Creek airstrip and the Bornite Mine exploration camp, which sits very close to the Ambler Road corridor.[172] Defendants have also acknowledged that use of the planned subsistence ramp crossings, winter trails, and designated RS2477 routes by subsistence harvesters and others could lead to unpermitted use of the Ambler Road itself,[173] and that there could be unauthorized usage of the road

---

[168] BLM_0015401, 0015415, 0015437-38, 0015550-51, 00015555, 0015556, 0015902, 0015903, 0015904-07, 0015945, 0015947, 0016587.

[169] BLM_0015902, 0015903, 0016487. *See supra* note 88.

[170] BLM_0015901, 0015902, 0015903, 0016487, 0016587.

[171] BLM_0015903.

[172] NPS_0044131-32; BLM_0015437-38, 0015551, 0015555, 0015904, 0015945 (describing connection from Kobuk to Ambler Road as "certain"), 0015998 (map showing proximity of Kobuk and existing roads and trails connecting it to planned Ambler Road route), 0016488, 0051379, 0051384.

[173] BLM_0015555, 0015902, 0016588, 0016487.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    38

by residents and outsiders for other purposes as well.[174] The presence of guard gates at either end of the Ambler Road, more than 200 miles apart, and sporadic monitoring of the road by drivers,[175] is not sufficient to preclude public access through these many points of entry along the route. More generally, given Defendants' recognition that there would be extensive non-mining-related usage along the entire Ambler Road corridor by many different categories of users, some authorized and some unauthorized, public access was reasonably foreseeable and it was unreasonable for Defendants to refuse to consider the impacts associated with it.

Moreover, the formal opening of some or all of the Ambler Road to public access could occur in a number of ways. For example, the State of Alaska could decide not to restrict public access along the 60% majority of the route traversing its lands, and the same is true for the 15% of the route controlled by Native corporations. The Final EIS acknowledges that BLM's authority to require and enforce mitigation is limited to BLM-managed lands,[176] which constitute just 12% of the route approved by the agencies. The Alaska Department of Natural Resources ("DNR") has never agreed that the portion of the Ambler Road traversing its lands would preclude public access. On the contrary, Alaska DNR has made it clear that it "must separately evaluate questions related to use of

---

[174] BLM_0015499, 0015586, 0015603, 0015946, 0016487-88, 0016587.
[175] BLM_00015555, 0015573, 0015586, 0015902, 0016587.
[176] BLM_0016448 (BLM's "authority to require and enforce mitigation generally is limited to mitigating impacts to BLM-managed lands and resources on those lands.").

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    39

the road and restrictions on use and cannot commit at this time regarding" access

restrictions on the road segments traversing State lands.[177] Indeed, Alaska DNR

emphasized that its statutory and constitutional obligations may limit its ability to

preclude public access to State lands:

> AS 38.05.285 requires the use of state land shall conform to the constitution of the State of Alaska and the principles of multiple use consistent with the public interest. For this project, a road easement authorization per AS 38.05.850 will be required. When an easement application is submitted … [DNR] will evaluate the proposed activities for consistency with authorized activities or constraints on state lands. ... As part of the adjudication process, [DNR] will evaluate multiple-use considerations and restrictions, as well as economic benefits. Any restriction of general public use will need to be carefully weighed against other proposed multiple-use considerations, and will only be approved if it is deemed sufficiently in the public's best interest.[178]

Alaska DNR also noted that "[t]o date, AIDEA has not submitted permit applications to

any of the State agencies for the proposed Ambler Road project," and it emphasized that

it had not made any commitments to "adopt or not adopt specific terms, conditions,

and/or mitigation measures."[179] Defendants have also admitted that Native corporations

have similar authority to decide whether to authorize access across their lands.[180] It is

---

[177] BLM_0015415, 0015902.
[178] BLM_0051767. BLM_0074919. *See also* BLM_0087897 (asking for removal of language from the EIS indicating BLM requirements would apply to State lands).
[179] BLM_0087872-73. BLM_0016489 ("To achieve full effectiveness, it would be necessary for these [mitigation] measures to be in place throughout the length of the road and not just on BLM-managed land … Without State of Alaska participation, the effectiveness would be substantially reduced …").
[180] BLM_0015903 (main text and note 5).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    40

thus entirely foreseeable that the State and/or Native corporations could decide to authorize public access along the majority of the Ambler Road route for a variety of purposes, such as economic development, community development, transportation, tourism, recreation, and subsistence.

Furthermore, despite their current assurances, Defendants could later decide that opening some or all of the road to public access does not require subsistence, environmental, and historic property reviews because the physical changes to the existing road necessary to facilitate public access and associated impacts would not be significant enough to trigger such reviews.[181] Indeed, if the road is adequate for the many types of non-mining-related uses discussed above, it may not require significant modification before being opened to more general public access and thus may not undergo any further evaluation, contrary to Defendants' assumptions.[182]

In light of the extensive non-mining-related access that is expected, as well as the many avenues for some or all of the Ambler Road to be formally opened to more general public access, Defendants' assumption that no portion of the road will ever be open to public access without further federal agency review is unreasonable. Indeed, NPS and

---

[181] *See* 42 U.S.C. § 4332(C) (requiring an EIS only for "major Federal actions significantly affecting the quality of the human environment").
[182] BLM_0016586.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                              41

others repeatedly called attention to this flaw.[183] During scoping, for instance, NPS told BLM that the EIS "should assume community access as a given once work on the project starts rather than treating it as a hypothetical future possibility."[184] Later, NPS again urged BLM to evaluate public access, explaining that "Public Access should be considered a reasonably foreseeable scenario and analyzed" and asserting that BLM's position on this issue was not "defensible."[185]

Defendants' rigid adherence to a faulty assumption concerning public access has led to a failure to meaningfully address whole categories of subsistence-related impacts in the ANILCA § 810 evaluation, such as increased competition from sport hunting and fishing and habitat degradation and wildlife disturbance from increased off-road vehicle use, as well as an overall understatement of the adverse impacts of the project on subsistence.[186]

---

[183] BLM_0015238 (Doyon comments) ("…[T]here remains a very real possibility that the project … ultimately will be opened to public use, and that BLM must seriously consider this possibility in its environmental review and decisionmaking process.");
BLM_0008538-39 (Native Village of Kotzebue comments) ("[G]iven the … clamor for access already … the multiple land jurisdictions that the road will cross and how rapidly politics and priorities … can change … we have no great confidence in assurances that this road will not be open to the general public in the future.").
[184] NPS_0044131-32.
[185] BLM_0080168.
[186] BLM_0008538-39, 0015237-39, 0016385-86 (brief discussion of competition from non-local harvesters, constrained by erroneous BLM assumption regarding public access); 0016398 (discussing 2016 study showing increased road access adversely affects

## B. Defendants' Tier 2 Hearings and Determinations Were Unlawfully Skewed in Favor of Road and Mining Development.

Defendants' exclusion of subsistence communities and downplaying of adverse impacts continued in the Tier 2 phase of the ANILCA § 810 subsistence evaluation.

As discussed above, if an agency determines at the end of Tier 1 that a proposed activity "may significantly restrict subsistence uses," the agency must proceed to Tier 2.[187] The standard for carrying forward subsistence communities into Tier 2 is "quite low."[188] A "threat of significant restriction" is enough to mandate Tier 2 hearings and determinations,[189] and the occurrence of the threat "need not be likely."[190] The agency is prohibited from authorizing a proposed activity unless and until the relevant land management agency holds a Tier 2 hearing "in the vicinity of the area involved" and makes the three required substantive determinations protective of subsistence.[191]

### 1. Defendants Applied an Improper Threshold Standard and Unlawfully Excluded Subsistence Communities from the Tier 2 Hearings and Determinations.

Defendants applied an overly demanding threshold in determining whether to

_____

subsistence hunting, but dismissing findings due to erroneous BLM assumption concerning public access), 0016435 (acknowledging that public access "would contribute" to adverse impacts on subsistence hunting and fishing, if it were allowed).
[187] *See supra* note 138.
[188] *Sierra Club*, 664 F. Supp. at 1307.
[189] *Vill. Gambell*, 774 F.2d at 1422.
[190] *Hanlon*, 740 F. Supp. at 1449. *See also Tribal Vill. Akutan*, 792 F.2d at 1378-80.
[191] 16 U.S.C. § 3120(a), (a)(2)-(3), (d).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                43

proceed with Tier 2 and, as a result, excluded seven subsistence communities from the second phase of the subsistence review. By doing so, Defendants failed to disclose the full extent of subsistence impacts, and this unlawfully skewed their final determinations in favor of industrial development.

Instead of properly applying the minimal "may significantly restrict" standard, Defendants erroneously and unlawfully focused on whether subsistence impacts would be "expected" to occur and whether they would be "substantial," "large," "major," or "extensive:"

> An alternative would be considered to significantly restrict subsistence uses if … it can be <u>expected</u> to <u>substantially</u> reduce the opportunity to use subsistence resources … <u>Substantial</u> reductions are generally caused by <u>large</u> reductions in resource abundance, a <u>major</u> redistribution of resources, <u>extensive</u> interference with access, or <u>major</u> increases in the use of those resources by non-subsistence users.[192]

With respect to the chance of subsistence impacts occurring, it is improper, as a matter of law, to require a showing that subsistence impacts are "likely" before proceeding to Tier 2.[193] Instead, federal agencies must proceed to Tier 2 whenever there is a "significant possibility" of significant restrictions on subsistence.[194] Defendants' approach, in which

---

[192] BLM_0016814 (emphasis added).
[193] *See Vill. Gambell*, 774 F.2d at 1414; *Hanlon*, 740 F. Supp. at 1448-49. *See also Tribal Vill. Akutan*, 792 F.2d at 1378-80.
[194] *See Hanlon*, 740 F. Supp. at 1449-52; *City Tenakee*, 750 F. Supp. at 1425. *See also Alaska Wild.*, 67 F.3d at 730, 731 (referencing U.S. Forest Service's application of this standard).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                              44

subsistence impacts must be "expected," is even more stringent than a likelihood requirement and clearly violates ANILCA § 810.

With respect to the extent of harm to subsistence, the terms "substantial," "large," "major," and "extensive" all demand a higher showing for subsistence impacts than merely a "significant" restriction.[195] In contrast, in *Kunaknana*, the Ninth Circuit upheld the U.S. Department of the Interior's ("DOI's") approach in which Tier 2 proceedings could be avoided only where there were "no" impacts or only "slight" impacts on subsistence.[196] Maintaining a low threshold for Tier 2 serves ANILCA § 810's overarching purpose to protect subsistence, which Congress found is essential to the very existence of Native communities,[197] by ensuring that the impacts of public land disposals on subsistence are fully evaluated and minimized.

As a result of its application of an overly stringent threshold standard, Defendants unlawfully excluded 7 of the 27 primary subsistence communities from Tier 2, depriving them of formal hearings as well as the ultimate Tier 2 determinations through which federal agencies must demonstrate compliance with ANILCA's substantive standards.

---

[195] *See* 16 U.S.C. § 3120(a).
[196] *Kunaknana v. Clark*, 742 F.2d 1145, 1151-52 (9th Cir. 1984).
[197] *See supra* note 103.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                      45

### 2. Defendants' Determination That the Adverse Impacts on Subsistence from the Ambler Road Project Are "Necessary" Was Erroneous and Unlawful.

Defendants determined that the necessity of the project outweighed the harm to subsistence communities.[198] This determination was unlawfully skewed in favor of road and mine development by the many flaws and gaps in the Tier 1 evaluation discussed above.

To protect subsistence, an agency must determine that the expected harm to subsistence resulting from a proposed project is "necessary, consistent with sound management principles for the utilization of the public lands."[199] The term "utilization," in this context, refers to the array of multiple uses within the federal land manager's purview, and the purpose of ANILCA § 810 is to reconcile its goal of subsistence protection with these other uses.[200] In other words, the statute calls upon the agency to balance subsistence against other competing interests.[201]

Through unlawful threshold determinations and legal standards, Defendants excluded 26 subsistence communities from any Tier 1 or Tier 2 review at all, and they excluded another 7 from the Tier 2 hearings and determinations. By doing so, Defendants

---

[198] BLM_0016835-36.
[199] 16 U.S.C. § 3120(a)(3)(A).
[200] *Hoonah Indian Assn. v. Morrison*, 170 F.3d 1223, 1227-28 (9th Cir. 1999).
[201] BLM_0016835 (explaining that Defendants' "necessary" determination "considers and balances a variety of factors with regard to the proposed activity on public lands").

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    46

downplayed the true extent of harmful impacts the Ambler Road and associated mining and secondary roads would have on subsistence throughout the region.

Defendants also omitted major categories of impacts from their Tier 1 evaluation, including the widespread, long-term impacts of the roads and mines on caribou forage vegetation and subsistence, the potentially devastating impacts of construction-related water withdrawals and mine-related dewatering on fish, spawning habitat, and subsistence, and the adverse effects of reasonably foreseeable public access on subsistence. As a result, Defendants' necessity determination was based on an incomplete evaluation that grossly understated the degree of subsistence impacts, and this unlawfully skewed the balancing at the heart of the necessity determination in favor of road and mine development.

> ### 3. *Defendants' Determination That the Ambler Road Project Would Involve the "Minimal" Amount of Public Lands Was Erroneous and Unlawful.*

Defendants also determined that the public lands used for the project would be the minimal amount needed to achieve its purpose.[202] This determination was completely unsupported by any evidence or analysis, and it further skewed Defendants' final decision in favor of industrial development.

The second Tier 2 determination intended to protect subsistence is whether a

---

[202] BLM_0016836.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    47

proposed project would "involve the minimal amount of public lands necessary" to achieve its purpose.[203] The focus of this inquiry is on the minimization of the public lands footprint of the project overall, not just the acreage important for subsistence.[204]

Defendants simply accepted AIDEA's proposal for a 250-foot wide right-of-way and failed to evaluate whether a narrower width would be sufficient.[205] Several commenters urged Defendants to consider a narrower width to reduce impacts on subsistence and other resources.[206] In response to one such comment, Defendants indicated they were unable to evaluate narrower road widths because the project design was only at a "10 percent level of engineering," but they said the "final ROW [right-of-way] easement ... may be able to be reduced, taking into consideration the width needed to operate and maintain the facility and dependent on final engineering design."[207] Defendants failed to require a more complete project design and failed to do any further analysis to minimize the right-of-way width, however, before issuing their final decisions. The Joint RODs, and the 50-year rights-of-way approved by BLM and NPS shortly thereafter, each specify a 250-foot width.[208]

_____

[203] 16 U.S.C. § 3120(a)(3)(B). *See City Tenakee*, 750 F. Supp. at 1428-29.
[204] *See City Tenakee*, 750 F. Supp. at 1429.
[205] BLM_0015419, 0015550 (text and note 57), 0015602, 0015775 (note 4), 0015858.
[206] BLM_0006735 (comments 146-47), 0006762 (comment 241), BLM_0095198 (comment 1400).
[207] BLM_0095198 (response to comment 1400).
[208] BLM_0016723, 0102321; NPS_0009720, 0049697.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    48

In contrast, the normal highway width in Alaska is 100 feet,[209] and the State of Alaska recently limited the access road for the Donlin Mine to a 150-foot right-of-way.[210] Moreover, the Dalton Highway is subject to a 200-foot width specified by statute.[211] Defendants' authorization of a 250-foot right-of-way thus extends well beyond the routine widths for major highways and industrial access roads in Alaska. It also reaches far beyond the width of the proposed Ambler roadway, which is anticipated to be 32 feet wide after Phase 3 construction.[212] Defendants failed to evaluate whether vegetation clearing and other project needs could be accomplished within a smaller right-of-way width. Defendants also failed to evaluate whether and to what extent realignment and reconstruction projects may be conducted in the future within the 250-foot right-of-way without the need for a modification of the easement, thus avoiding governmental and public scrutiny the concerning subsistence, environmental, and historic property impacts of such projects.[213]

Defendants' minimal public lands determination was arbitrary, unreasonable, and unlawful because it was unsupported by any evidence or analysis and because common

_____

[209] *See* AS § 19.10.015(a).
[210] *See* Ex. 3 (Alaska DNR, Final Finding and Decision, ADL 232346 (Jan. 2, 2020)). Plaintiffs are concurrently submitting a Motion Requesting Judicial Notice for Exhibits 3, 4, 5, and 6.
[211] *See* AS § 19.40.050. *See also* AS § 19.59.001(8) (defining "highway" to include the "highway" itself and the associated "right-of-way thereof").
[212] BLM_0016836.
[213] NPS_0009797-98.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    49

practice with large-scale road projects in Alaska demonstrates that a smaller right-of-way width may have been feasible.

### C. Defendants Failed to Satisfy Their Subsistence Protection Obligations Relating to Gates of the Arctic National Preserve.

Given the profound inadequacies of the BLM-led subsistence review discussed above, it would not be surprising if NPS were reluctant to approve the final document. Whatever the reason, Defendants have not signed, adopted, or otherwise approved any subsistence evaluation with respect to NPS-managed lands in the Gates of the Arctic National Preserve. In the absence of an approved subsistence evaluation, Defendants' approvals of the Joint NPS-FHWA ROD and 50-year right-of-way for the NPS portion of the Ambler Road project are unlawful.

Congress authorized the construction of a transportation route across Gates of the Arctic National Preserve and exempted it from NEPA review.[214] Nothing exempts such a project from the subsistence protections in ANILCA § 810 though. On the contrary, the Preserve "shall be administered under the laws governing the administration of [National Park System] lands and under the provisions of this Act,"[215] which includes ANILCA § 810.[216]

The Tier 1 and Tier 2 obligations discussed above must be satisfied by the "head"

_____

[214] *See* 16 U.S.C. § 410hh(4)(b)-(e).
[215] *Id*. § 410hh.
[216] *See id*. § 3120.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    50

of the agency with "primary jurisdiction" over the lands in question.[217] With respect to

the 26 miles of the Ambler Road that would traverse lands within the Gates of the Arctic

National Preserve, this refers to the NPS Director.[218] The NPS Director never signed,

adopted, or otherwise approved the Subsistence Evaluation for the Ambler Road project,

or the substantive determinations set forth therein, with respect to lands within Gates of

the Arctic National Preserve.[219]

The Secretary of the Interior has delegated oversight responsibilities relating to the

NPS and National Park System to the Assistant Secretary for Fish and Wildlife and Parks

("Assistant Secretary FWP").[220] As such, the Assistant Secretary FWP or the Secretary

arguably could have approved the Subsistence Evaluation for the Ambler Road instead of

the NPS Director, but neither did so. The Assistant Secretary FWP approved the Joint

NPS-FHWA ROD,[221] but that document did not adopt, incorporate, or otherwise approve

the Subsistence Evaluation. Instead, the ROD merely indicated that NPS had

"collaborated" with BLM in developing the Subsistence Evaluation, that BLM had served

---

[217] *Id.* § 3120(a).
[218] *See* 54 U.S.C. § 100302(a)(3). For projects substantial enough to require an EIS, the Secretary is required to carry out Tier 2. *See* 16 U.S.C. § 3120(b). Since an EIS is not required for a transportation project across the Gates of the Arctic National Preserve, however, both the Tier 1 and Tier 2 obligations remain with the NPS Director.
[219] NPS_0009719; BLM_0016841.
[220] *See* U.S. Dept. Interior, Departmental Manual ("DM"), https://www.doi.gov/elips/browse, 109 DM 6; 209 DM 6.
[221] NPS_009716.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    51

as its "primary author," and that it was attached as an appendix to the Joint BLM-Corps ROD.[222] These references do not amount to approval of the Subsistence Evaluation. If they did, any entity that collaborated in the development of a project review (e.g., by serving as a cooperating agency, participating agency, or consulting party), or any entity that ever mentioned the existence of a document attached as an appendix to another document, could be considered to have approved that document. The Allakaket and Alatna Tribal councils, for instance, served as cooperating agencies in the development of the Ambler Road EIS,[223] but they never approved it, as evidenced by their role as Plaintiffs in the present litigation.

A draft of the Subsistence Evaluation lacking the Tier 2 substantive determinations was attached as an appendix to the Final EIS.[224] Even if a draft were sufficient, which it is not, NPS did not approve the EIS in any way because of ANILCA's statutory requirement that it prepare an EEA in lieu of an EIS.[225]

The final Subsistence Evaluation was signed and approved by the Central Yukon

_____

[222] NPS_0009719. NPS did not prepare a separate subsistence evaluation either. The NPS_EEA contains similar language noting that BLM had prepared a subsistence evaluation for the Ambler Road Project, that NPS had "worked with BLM throughout the process," and that the document was attached as an appendix to the Joint BLM-Corps ROD. NPS_0009805.
[223] BLM_0015398, 0015409.
[224] BLM_0016412-41.
[225] See 16 U.S.C. § 410hh(4)(d). Notably, the draft subsistence evaluation expressed an assumption that both NPS and BLM would eventually approve it, BLM_0016437, but NPS did not fulfill this expectation.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    52

Field Office Manager for BLM.[226] It was also attached as an appendix to the Joint BLM-Corps JROD, which was signed and approved by the Principal Deputy Assistant Secretary for Land and Minerals Management, purporting to exercise the authority of the Assistant Secretary for Land and Minerals Management ("Assistant Secretary LMM").[227] The Assistant Secretary LMM has oversight authority only over BLM and BLM lands though.[228] That office does not have authority over NPS or National Park System lands.

Accordingly, the Subsistence Evaluation has not been approved by any official with authority over NPS lands, and the requirements of ANILCA § 810 have not been met. All decisions authorizing the use, occupancy, and disposition of NPS lands in connection with the Ambler Road project are therefore unlawful.

## II. NHPA

NHPA § 106 is a "'stop, look, and listen' provision that requires federal agencies to consider the adverse effects of a proposed "undertaking"[229] on historic properties and

---

[226] BLM_0016841.

[227] BLM_0016742. The problems with the Principal Deputy's attempt to exercise the authority of the Assistant Secretary LMM are discussed in Part IV below. Chad Padgett, former Alaska State Director for BLM, also signed the Joint BLM-Corps ROD to "recommend approval" of it. BLM_0016741.

[228] *See* 109 DM 7; 209 DM 7.

[229] An "undertaking" is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of the Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." 36 C.F.R. § 800.16(y). *See* 54 U.S.C. § 300320.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    53

"consult with any Indian tribe … that attaches religious and cultural significance" to potentially affected historic properties.[230] Historic properties include "properties of traditional religious and cultural importance to an Indian tribe."[231] These are often referred to as traditional cultural properties ("TCPs")[232] or ethnographic landscapes,[233] and they must be considered by federal agencies during the NHPA § 106 process.[234]

---

[230] *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citation omitted). *See* 54 U.S.C. §§ 302706(b), 306108; 36 C.F.R. §§ 800.3-800.6; *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006); *Te-Moak Tribe v. U.S. Dept. Interior*, 608 F.3d 592, 607 (9th Cir. 2010). An "historic property" is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in the National Register [of Historic Places]." 36 C.F.R. § 800.16(l)(1). *See* 54 U.S.C. § 300308. "Eligible for inclusion" includes "both properties formally determined as such … and all other properties that meet the National Register criteria." 36 C.F.R. § 800.16(l)(2). *See id*. § 60.4 (National Register criteria).

[231] 36 C.F.R. § 800.16(l)(1). *See* 54 U.S.C. § 302706(a).

[232] A TCP is a "cultural resources category defined as a property 'that is eligible for inclusion in the NRHP because of its association with cultural practices or beliefs of a living community that are (a) rooted in that community's history and (b) are important in maintaining the continuing cultural identity of the community." BLM_0016154.

[233] An ethnographic landscape is a "category of cultural landscape … consisting of a geographic area that is associated with a contemporary group and used or valued in traditional ways … An ethnographic landscape may contain a variety of natural and cultural features that groups may consider as heritage resources and that are culturally imbued with connections to distinctive and long-established group identities. Examples of these features include plant communities, waterways, fish/wildlife, customary and traditional use areas, and ceremonial grounds. Documentation of oral histories and Native place names are two common data collection methods that support the identification of ethnographic landscapes and other ethnographic resources." BLM_0016154.

[234] *See Muckleshoot*, 177 F.3d at 805-07; Advisory Council on Historic Preservation ("ACHP"), *Information Paper on Cultural Landscapes: Understanding and Interpreting Indigenous Places and Landscapes*, at 1 (Oct. 11, 2016), https://www.achp.gov/sites/ default/files/whitepapers/2018-06/InformationPaperonCulturalLandscapes.pdf; BLM_0015601-02, 0016025, 0016042, 0016055, 0016058.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    54

Federal agencies must fulfill their NHPA § 106 obligations through a four-step process: (1) initiation; (2) identification of historic properties; (3) assessment of adverse effects; and (4) resolution of adverse effects.[235] After initiation, federal agencies must determine the undertaking's "area of potential effects" ("APE"),[236] and they must make a "reasonable and good faith effort" to identify historic properties within the APE, using methods such as "background research, consultation, oral history interviews, sample field investigation, and field survey."[237] APE refers to the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties," and it is "influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking."[238]

Federal agencies must then "assess the effects of the undertaking" on historic properties within the APE and "determine whether the effect will be adverse."[239] An undertaking causes adverse effects if it "may alter, directly or indirectly, any of the characteristics of the historic property that qualify the property for inclusion in the National Register [of Historic Places] in any manner that would diminish the integrity of

---

[235] *See* 36 C.F.R. §§ 800.1(a), 800.3-800.6; ACHP, *Section 106 Applicant Toolkit*, https://www.achp.gov/digital-library-section-106-landing/section-106-applicant-toolkit.
[236] 36 C.F.R. § 800.4(a)(1).
[237] *Id.* § 800.4(b), (b)(1).
[238] *Id.* § 800.16(d). BLM_0016978, 0017005 (note 13).
[239] *Mont. Wild. Assn. v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013) (quoting *Muckleshoot*, 177 F.3d at 805). *See* 36 C.F.R. § 800.5.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                55

the property's location, setting, materials, workmanship, feeling, or association."[240]

Adverse effects do not need to physically alter an historic property to be direct. Direct

refers to the causation, not the physicality, of the effect.[241] Accordingly, if the effect

"comes from the undertaking at the same time and place with no intervening cause, it is

'direct' regardless of its specific type (e.g., whether it is visual, physical, auditory,

etc.)."[242] Additionally, adverse effects include "reasonably foreseeable effects caused by

the undertaking that may occur later in time, be farther removed in distance or be

cumulative."[243] Examples of adverse effects include: (a) "[p]hysical destruction of or

damage to all or part of the property;" (b) "[c]hange of the character of the property's use

or of physical features within the property's setting that contribute to its historic

significance;" (c) "[i]ntroduction of visual, atmospheric or audible elements that diminish

the integrity of the property's significant historic features;" and (d) "[t]ransfer, lease, or

sale of property out of Federal ownership or control without adequate and legally

enforceable restrictions or conditions to ensure long-term preservation of the property's

---

[240] 36 C.F.R. § 800.5(a)(1).
[241] *See Natl. Parks Conserv. Assn. v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019);
ACHP Office Gen. Counsel, Memo to ACHP Staff, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act*, at 2 (June 7, 2019), http://shpo.nv.gov/uploads/documents/OGC_memo_to_ACHP_staff_re_meaning_of_direct_6-7-19.pdf.
[242] ACHP Office Gen. Counsel Memo, at 2. *See Natl. Parks*, 916 F.3d at 1088.
[243] 36 C.F.R. § 800.5(a)(1). BLM_0017005 (notes 14-16).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                     56

historic significance."[244]

Finally, federal agencies must "develop and evaluate modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties,"[245] in that order of priority.[246] Agency commitments to avoidance, minimization, and mitigation may be carried out through a memorandum of agreement or programmatic agreement.[247]

### A.   Defendants' "Area of Potential Effects" Is Unreasonably Narrow and Unsupported by Any Reasoned Evaluation.

As discussed above, Defendants postponed all substantive aspects of the NHPA § 106 process until the post-ROD period, including the identification of historic properties, assessment of adverse effects, and resolution of adverse effects through avoidance, minimization, and mitigation. Defendants did make a critical decision, however, by establishing the boundary of the APE.[248] The APE is a fundamental driver of the whole NHPA § 106 process because it limits the scope of the area where the agencies will look for historic properties and evaluate potential impacts on them. Defendants defined the APE as a narrow linear corridor extending one mile on either side of the proposed

---

[244] *Id.* § 800.5(a)(2)(i), (iv), (v), (vii).
[245] *Id.* § 800.6(a).
[246] *See* 600 DM 6 §§ 6.4(A)-(B), (E), 6.6(B), (D), (J). *See generally* 604 DM 1.
[247] *See id.* §§ 800.6(b), (c), 800.14(b).
[248] BLM_0016984-0017105.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    57

Ambler Road route.[249]

This bounded area is far too small for any meaningful consideration of potential effects on landscape-level historic properties. TCPs and ethnographic landscapes often consist of a variety of features spread out over a large area that are fundamental to the identity and culture of indigenous people and are part of their heritage, such as traditional harvesting areas, ceremonial grounds, historic travel routes, and sacred sites.[250] During the Ambler Road review processes, Plaintiffs and others repeatedly called attention to the existence of such areas throughout the region and the need to carefully identify, study, and protect them.[251] Experts retained by Defendants were well aware that a narrow corridor would be inadequate for this task. As such, in both the 2014 and 2018 cultural resource data gap analyses, their study area was 10 miles wide, extending 5 miles on either side of the road corridor.[252] Even the cursory and generic evaluation of cultural resource impacts in the EIS uses a 10-mile wide study area.[253]

With respect to the NHPA § 106 process, Defendants have acknowledged the potential for visual impacts beyond one mile, but they dismissed such impacts out of hand as "unlikely," without providing any fact-based analysis or explanation.[254] They

---

[249] BLM_0015602, 0017005.
[250] *See supra* notes 232, 233.
[251] BLM_0006688, 0006884, 0016636-37; NPS_0008240-43,
[252] BLM_0016149-52, 0016155, 0016164, 0034561, 0034618, 0034599, 0034614.
[253] BLM_0015599.
[254] BLM_0017005.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    58

also failed to acknowledge or evaluate whether their proposed APE would be wide enough to capture other types of impacts, such as industrial noise, air and water pollution, vibration, bright lights, widespread destruction of vegetation, and degradation of natural and cultural features. These types of impacts can eliminate the essential characteristics of landscape-level cultural resources and destroy the meaning and purpose they serve in the lives of indigenous people.[255]

Furthermore, a wider APE is necessary to ensure adequate consideration of cumulative impacts. The Ambler Road project is intended to facilitate large-scale mining development, and it is expected to lead to the development of a network of secondary access roads and mines sprawling out in all directions along the 211-mile road corridor.[256] An APE extending only one mile in either direction is grossly inadequate to capture cumulative impacts resulting from these facilities and activities.

Defendants had a duty to establish an APE commensurate with the massive scope of the Ambler Road project and its potential to adversely affect landscape-level historic properties.[257] Their failure to do so is unlawful, and it will preclude any meaningful historic property review when the NHPA § 106 process is eventually carried out.

_____

[255] *See supra* notes 239-44.
[256] *See supra* notes 134-36.
[257] *See supra* note 238.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    59

## III. NEPA

NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions in an EIS.[258] An EIS must "[r]igorously explore and objectively evaluate" alternatives,[259] including the direct, indirect, and cumulative impacts of each alternative, as well as the means to mitigate adverse impacts.[260] The EIS must provide a "full and fair discussion" of impacts,[261] and it must apprise decisionmakers of the consequences of their decisions "at a time when they retain a maximum range of options."[262] The hard look required under NEPA "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."[263] NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis" so that the "'agency will not act on incomplete information, only to regret its

---

[258] *Te-Moak*, 608 F.3d at 599-607; *Nat. Res. Defense Council*, 421 F.3d 797, 810-11 (9th Cir. 2005); *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000).

[259] 40 C.F.R. § 1502.14(a).

[260] *See id.* §§ 1502.14(f), 1502.16, 1508.7, 1508.8, 1508.20. Furthermore, a cumulative impact analysis must provide a "useful analysis" that includes a detailed and quantified evaluation to allow for informed decision-making and public participation. *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002). *See Ocean Advocs. v. Army Corps*, 361 F.3d 1108, 1128 (9th Cir. 2004).

[261] 40 C.F.R. § 1502.1. *See Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005).

[262] *Pit River*, 469 F.3d at 785 (quoting *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1998)).

[263] *Metcalf*, 214 F.3d at 1142.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    60

decision after it is too late to correct.'"[264] NEPA requires "scientific integrity"[265] and

"high quality" information because "[a]ccurate scientific analysis ... and public scrutiny

are essential to implementing NEPA."[266] In the absence of adequate baseline data, "there

is simply no way to determine" the effects of a proposed action and, "consequently, no

way to comply with NEPA."[267] Where "incomplete information relevant to reasonably

foreseeable significant adverse impacts is essential to a reasoned choice among

alternatives and the overall costs of obtaining it are not exorbitant," the agency "shall

include" the information in the EIS."[268] Overall, the analysis in the EIS must provide a

"clear basis for choice among options by the decisionmaker and the public."[269] Post-

decisional studies and mitigation measures are not adequate substitutes for gathering and

evaluating the necessary baseline data and other information during the NEPA process

because they do not ensure that government decision-makers and the public are well-

informed before important decisions are made.[270]

---

[264] *Blue Mtns. Biod. Proj. v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989)).
[265] 40 C.F.R. § 1502.24.
[266] *Id*. § 1500.1(b).
[267] *Or. Nat. Desert Assn. v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (quoting *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016)). *See Half Moon Bay Fish. Mktg. Assn. v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).
[268] 40 C.F.R. § 1502.22(a).
[269] *Id*. § 1502.14.
[270] *See Or. Nat. Desert Assn. v. Jewell*, 840 F.3d 562, 570-71 (9th Cir. 2016); *N. Plains*

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                  61

## A. Defendants Failed to Analyze Adverse Impacts on Cultural Resources.

Defendants made no attempt to meaningfully evaluate cultural resource impacts in the EIS, as required under NEPA.[271] Instead, they unlawfully postponed until the post-ROD period the entire process of gathering baseline data, evaluating impacts, and developing methods to avoid, minimize, and mitigate such impacts.

Cultural resource impacts were identified early on as a "key issue" for purposes of the Ambler Road NEPA review.[272] NEPA regulations and guidance also specifically require consideration of cultural resource impacts.[273] An agency's reliance on incomplete or outdated information regarding cultural resources is unlawful.[274] The experts retained by Defendants to prepare the 2014 and 2018 cultural resource data gap reports also emphasized the importance of analyzing cultural resource impacts as part of the NEPA

---

*Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2012); *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 565-68 (9th Cir. 2000); *LaFlamme v. Fed. Energy Reg. Comm.*, 852 F.2d 389, 399-401 (9th Cir. 1988); *Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1180-81 (D. Mont. 2010), *aff'd* 663 F.3d 439 (9th Cir. 2011)

[271] BLM_0015599 ("Cultural resources is a broad term and includes archaeological, historical, and architectural resources; structures; travel corridors; and places of religious, spiritual, or cultural significance to tribes, including Traditional Cultural Properties (TCPs), Sacred Sites, traditional use areas, cultural landscapes, and geographic features.").

[272] BLM_0015401.

[273] *See* 40 C.F.R. §§ 1502.16(g), 1508.8(b), 1508.14, 1508.27(a), (b)(3); 516 DM 1 §§ 1.5(A)(1), 1.6(C)(2); *Indig. Envtl. Network v. U.S. Dept. State*, 347 F. Supp. 3d 561, 580-81 (D. Mont. 2018), *appeal dismissed as moot* App. No. 18-36068 (9th Cir., June 6, 2019) (citing 40 C.F.R. §§ 1502.16(g), 1508.8, and *Native Ecosys.*, 418 F.3d at 965).

[274] *See Indig. Envtl. Network*, 347 F. Supp. 3d at 581.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                         62

process.[275] They explained that "a number of studies will need to be conducted to identify cultural resources and assess project impacts to comply with NEPA."[276]

In *Indigenous Environmental Network*, the Keystone Pipeline project posed threats to cultural resources along the entire project length, and about 1,038 acres remained unsurveyed at the time a supplemental EIS was finalized.[277] The federal government claimed that cultural resource surveys were "ongoing" and that it would "identify cultural resources and mitigate harm to them throughout the process."[278] The court found this explanation insufficient and held that, "in the absence of further information on the 1,038 unsurveyed acres," the supplemental EIS failed to provide a "full and fair discussion of the potential effects of the project to cultural resources."[279] The court further explained that the government appeared to have "jumped the gun when it issued the ROD in 2017 and acted on incomplete information regarding potential cultural resources along the 1,038 acres of unsurveyed route," and the court required the government to "supplement the information on the unsurveyed acres … in order to comply with its obligations under NEPA."[280]

The lack of cultural resource information is far more egregious in the Ambler

---

[275] BLM_0016116, 0016117, 0016120, 0016121, 0016126-27, 0016164-65, 0034603-04.
[276] BLM_0016165.
[277] *Indig. Envtl. Network*, 347 F. Supp. 3d at 581.
[278] *Id*. at 580.
[279] *Id*. at 580-81 (quoting *Native Ecosys.*, 418 F.3d at 965).
[280] *Id*. (citing 40 C.F.R. §§ 1502.16(g), 1508.8).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    63

Road context. Defendants' own experts have made it clear that "no portion of the current proposed Project has had sufficient cultural resources investigations to allow for an assessment of the corridor, the road alignment, and ancillary construction areas."[281] With respect to ethnographic resources, for instance, "[i]n general … focused ethnographic research to identify resources such as ethnographic landscapes, TCPs, or sacred sites is lacking for the Project study area."[282] As a result, the experts found it is "not surprising that broad resources such as ethnographic landscapes have not yet been documented."[283] Similarly, the "archaeological survey coverage is low."[284] As a result, "little is known about the extent of cultural resources that may be affected by the proposed Project," and the "investigations completed to date in the Project alternative corridors is insufficient for understanding the nature and range of both ethnographic and archaeological resources in the Project study area or to assess the effects of the proposed Project to those

_____

[281] BLM_0016159.
[282] BLM_0016158. *See supra* note 233 (describing ethnographic landscapes); BLM_0016153 (describing ethnographic resources as "cultural and/or natural features of a region to which traditionally associated cultures have formed significant connections and that are closely linked with the communities' sense of purpose, existence as a community, development as ethnically distinctive people, and survival of their lifeways," which are "held as traditionally meaningful, and may be sites, landscapes, structures, objects, or natural resources such as plants, fish/wildlife, minerals, or water bodies that have legendary, religious, subsistence, or other significance in the cultural system of the group traditionally associated with them" and "may encompass both tangible and intangible aspects of these special places"); BLM_0015602 (summarizing above description).
[283] BLM_0016161.
[284] BLM_0016117, 0016164.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    64

resources."[285]

The limited information available does indicate, however, that there is a "high likelihood that archaeological resources will be located along any of the routes."[286] Likewise, "based on the long history of land use in the region," ethnographic resources such as broad cultural landscapes "likely exist within the study area."[287] Defendants have also acknowledged that "direct and indirect impacts to cultural resources, including previously undiscovered or unreported cultural resources, are likely under all action alternatives."[288] The large mining projects that would be enabled by the Ambler Road also carry a "high potential for additional direct and indirect impacts" on cultural resources, and the widening and other changes to the Dalton Highway necessary for the large-scale transport of mineral ore would further "increase[e] the probability for direct and indirect impacts."[289]

Much like the *Indigenous Environmental Network* case, Defendants' after-the-fact approach to cultural resource investigation has failed to provide a full and fair discussion of cultural resource impacts in the EIS, in violation of NEPA. Moreover, despite the fact that an initial cultural resource data gap analysis was prepared in 2014[290] and permit

---

[285] BLM_0016117, 0016164-65.
[286] BLM_0015601. BLM_0015440, 0015603-04.
[287] BLM_0015602.
[288] BLM_0015603.
[289] BLM_0015604.
[290] BLM_0034552-0034699.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    65

applications were submitted to Defendants in 2015, Defendants made no meaningful

effort in the ensuing years to overcome the enormous cultural resource data gaps. On the

contrary, as discussed above, all the cultural resource investigations, evaluation of

impacts, and consideration of how to avoid, minimize, and mitigate impacts were

postponed until after the key decisions were made in 2020 and early 2021, including the

issuance of the Final EIS, selection of Alternative A, and approval of the Joint RODs,

BLM and NPS rights-of-way, and CWA § 404 permit.

Defendants indicated cultural resource investigations would be done and impacts

would be addressed in the future as part of site-specific permitting under the PA adopted

as part of the NHPA § 106 process.[291] This precisely the kind of reliance on post-

decisional studies and mitigation measures that courts have rejected because they do not

ensure the government and public are well-informed before important decisions are

made, as NEPA requires.[292]

Indeed, Defendants' after-the-fact process is limited to the corridor that has

---

[291] BLM_0015401, 0015440, 0015601-02 ("Due to a lack of evaluation and comprehensive cultural resources and ethnographic investigations ... non-evaluated resources … will be evaluated for NRHP eligibility through compliance with the Section 106 Programmatic Agreement …"). The NHPA § 106 consultations held during the development of the EIS focused almost exclusively on the development of the PA. BLM_0015401, 0015410, 0015440. In the absence of archaeological and ethnographic studies available for discussion, there were no meaningful substantive consultations prior to the issuance of the RODs, rights-of-way, and CWA § 404 permit for the Project.
[292] *See supra* note 270.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    66

already been selected.[293] It does nothing to help the government, Tribes, and the public

compare the relative cultural resource impacts among the alternatives or inform the

government's selection of a particular alternative, as required under NEPA. With respect

to broad landscape-level cultural resources, avoidance and minimization are the priority,

and the design and selection of alternatives are the main ways to avoid and minimize

impacts.[294] Localized mitigation measures (e.g., avoiding discrete burial sites or

removing and preserving artifacts) implemented after the selection of the Ambler Road

route would not be effective in addressing landscape-level cultural resources.

Moreover, the NHPA § 106 process is limited to "historic properties" that are

eligible or potentially eligible for listing in the National Register of Historic Places

("NRHP").[295] Although these are defined broadly,[296] they are a subset of the even

broader range of cultural resources that must be addressed under NEPA.[297]

---

[293] BLM_0015440 (discussing the implementation of the PA "for a selected alternative");
BLM_0015601 ("If an alternative is selected, AIDEA will be required to inventory
archaeological, historic, and ethnographic resources … for the entire route" in accordance
with the Programmatic Agreement).
[294] *See* 600 DM 6 §§ 6.4(A)-(B), (E), 6.6(B), (D), (J). *See generally* 604 DM 1.
[295] BLM_0015602 ("For a cultural resource to be determined eligible for listing on the
NRHP, it must typically be a minimum of 50 years in age and meet the eligibility
requirements for historic properties described in the implementing regulations of the
NHPA …").
[296] *See supra* notes 230-33.
[297] BLM_0015602 ("While the NHPA deals with a subset of cultural resources known as
historic properties, NEPA takes a broader approach and addresses both cultural resources
and historic properties.").

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    67

Defendants have no legitimate excuse for failing to gather and evaluate information concerning cultural resource impacts in the EIS. Defendants have acknowledged that ethnographic information concerning cultural landscapes and other large-scale cultural resources "could be essential to a choice among alternatives, if it was determined that areas of significant cultural importance were impacted by one alternative but not another."[298] Defendants have also admitted that information about the likelihood of encountering archaeological sites "would be helpful in comparing alternatives" and in "identify[ing] the risk of impact associated with the various alternatives."[299] Moreover, Defendants' experts emphasized that existing data concerning cultural resources was "entirely inadequate" to support the assessment of Ambler Road routes, alignments, and engineering plans.[300]

Furthermore, Defendants have not, and cannot, contend that such studies are exorbitantly expensive in the context of a project with road construction costs deemed "acceptable" ranging from $356 million to $867 million, and acceptable operating costs ranging from $8 million to $15 million each year.[301]

---

[298] BLM_0016636, 0016637.
[299] BLM_0016607, 0016636. *See also* BLM_0016636 (expressing the same view with respect to paleontological resources).
[300] BLM_0034611.
[301] BLM_0015858, 0015859, 0015868. Whether data-gathering costs are exorbitant is determined "in light of the size of the project and/or the possible harm to the environment." *Save Our Ecosys. v. Clark*, 747 F.2d 1240, 1244 n.5 (9th Cir. 1984). The burden is on the government to demonstrate exorbitance. *See* 40 C.F.R. § 1502.22.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                68

Under the circumstances, significant adverse effects on cultural resources were reasonably foreseeable; information about such resources was essential to a reasoned choice among alternatives and not exorbitantly expensive; and Defendants were required to include such information in the EIS.[302] Their failure to do so violated NEPA and its implementing regulations.

**B.**      **Defendants Failed to Analyze Adverse Impacts Resulting from Public Access.**

An EIS must analyze indirect effects, which are those caused by the action but are "later in time or farther removed in distance" and "reasonably foreseeable."[303] Indirect effects include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."[304] An EIS must also analyze the "cumulative impact" of a proposed project "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."[305]

The same rationale discussed above in the context of ANILCA § 810 concerning public access is applicable under NEPA as well. Public access for some or all of the

---

[302] 40 C.F.R. § 1502.22(a).
[303] *Id*. § 1508.8(b).
[304] *Id*.
[305] *Id*. § 1508.7.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    69

proposed Ambler Road route is reasonably foreseeable, and Defendants' assumption that no portion of the road would ever be open to public access without further federal reviews and approvals is unreasonable, arbitrary, and capricious. Defendants' adherence to this erroneous assumption has led to an understatement and mischaracterization of a wide range of impacts, undermining the validity of the entire EIS. Public access has the potential to cause and exacerbate impacts through, for example, increases in off-road vehicle use, boat traffic, air and water pollution, wildlife habitat degradation and behavioral changes, competition for subsistence resources, disruption of subsistence activities, public health impacts on local communities, introduction and spread of invasive species, wildfire risk, strain on local infrastructure and services, and other activities and impacts. Defendants' failure and refusal to analyze the influence of public access on these impacts in the EIS was unlawful.

## IV.    FVRA AND APPOINTMENTS CLAUSE

The Secretary of the Interior is authorized to issue rights-of-way and otherwise dispose of and manage federal public lands pursuant to FLPMA.[306] The Secretary has delegated to the Assistant Secretary LMM authority for supervising BLM and overseeing

---

[306] Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq*. (general land management), 1761 *et seq*. (rights-of-way).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                    70

management of BLM lands.[307] This authority has not been further delegated to any subordinate officials.

Under the Appointments Clause of the U.S. Constitution, the President is authorized to nominate and appoint "officers of the United States" with the "advice and consent of the Senate."[308] The position of Assistant Secretary LMM within DOI is among those that require Presidential appointment and Senate confirmation, known as "PAS" positions.[309] The advice-and-consent requirement is meant to put a "check upon a spirit of favoritism in the President," "prevent the appointment of unfit characters," and provide a "source of stability in the administration,"[310] and the requirement represents a "significant structural safeguard[] of the constitutional scheme."[311]

A vacancy in a PAS position can be temporarily filled only through compliance

---

[307] *See* 109 DM 7; 209 DM 7. Any redelegation of authority from an Assistant Secretary is required to be done "in the form of a Departmental Manual release," and "no other form of redelegation is authorized." 209 DM 7 § 7.2.

[308] U.S. Const., art. II, sec. 2, cl. 2.

[309] *See* 43 U.S.C. §§ 1453, 1453a; 109 DM 7 § 7.1 (citing Reorg. Plan No. 3 1950 § 3, 15 Fed. Reg. 3174, 64 Stat. 1262 (eff. May 24, 1950), https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title5a-node84-leaf107&num=0&edition=prelim).

[310] *Bullock v. BLM*, 489 F. Supp. 3d 1112, 1124 (D. Mont. 2020), *appeal dismissed as moot* App. No. 20-36129 (9th Cir., Aug. 10, 2021) (quoting Alexander Hamilton, Federalist No. 76, https://guides.loc.gov/federalist-papers/text-71-80).

[311] *Natl. Labor Rels. Bd. v. SW General, Inc*., 137 S. Ct. 929, 935 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)). *See Bullock*, 489 F. Supp. 3d at 1124.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                        71

with the Federal Vacancies Reform Act ("FVRA").[312] The FVRA was enacted after significant conflict during the 1970s and 1980s due to the President's use of "temporary designees … without presidential submissions of nominations" to fill high-level positions.[313] Congress enacted the FVRA to protect the Senate's advice-and-consent power and prevent the President from engaging in "evasive temporary appointment practices."[314] A violation of FVRA procedures also violates the Appointments Clause.[315]

The FVRA provides that, if the holder of a PAS position "dies, resigns, or is otherwise unable to perform the functions or duties of the office," the "first assistant" to that official automatically assumes the office on a temporary basis.[316] The acting official is authorized to serve in this temporary capacity for no more than "210 days beginning on the date the vacancy occurs."[317] The only other ways the vacancy can be temporarily filled require the action of "the President (and only the President)."[318]

---

[312] 5 U.S.C. § 3347(a). None of the exceptions to the exclusivity rule are applicable here. *See id*. § 3347(a)(1)-(2), (b).
[313] *Bullock*, 489 F. Supp. 3d at 1124-25 (quoting *Natl. Labor*, 137 S. Ct. at 935-36).
[314] *Bullock*, 489 F. Supp. 3d at 1125 (citing *Natl. Labor*, 137 S. Ct. at 936).
[315] *See Bullock*, 489 F. Supp. 3d at 1129.
[316] 5 U.S.C. § 3345(a), (a)(1). *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556-57 (9th Cir. 2016).
[317] 5 U.S.C. § 3346(a)(1). Other start dates prompted by nominations and congressional adjournment are not relevant here. *See id.* § 3346(a)(2), (b), (c).
[318] *Id.* § 3346(a)(2)-(3). *See Natl. Labor*, 137 S. Ct. at 935-36; *Hooks*, 816 F.3d at 557; *Bullock*, 489 F. Supp. 3d at 1125.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG 72

## A. Casey Hammond's Approval of the Ambler Road Project Violated the FVRA and the Appointments Clause.

The Joint BLM-Corps ROD, as well the Subsistence Evaluation and PA attached as appendices to the ROD, were approved by Casey Hammond through his signature under the heading "Assistant Secretary Approval."[319] The text below Hammond's signature describes his position as "Principal Deputy Assistant Secretary, Exercising the Authority of the Assistant Secretary, Land and Minerals Management."[320]

Hammond began serving as Principal Deputy to the Assistant Secretary LMM in approximately December 2018.[321] This position gave him the status of "first assistant" to the Assistant Secretary LLM for purposes of the FVRA.[322] As such, he automatically became Acting Assistant Secretary LLM when Joe Balash resigned on or about August 30, 2019.[323] By operation of the FVRA, Hammond's temporary term serving as Acting Assistant Secretary LMM ended 210 days later, on or about March 28, 2020, and the position became vacant as a matter of law. [324]

---

[319] BLM_0016742. As noted above, the BLM Alaska State Director also signed the Joint BLM-Corps ROD to "recommend approval" of it.

[320] *Id.*

[321] *See* Ex. 4 (Casey Hammond, LinkedIn profile).

[322] *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 954 (D. Md. 2020); *LM-M v. Cuccinelli*, 442 F. Supp. 3d 1, 7-8, 10-11 (D.D.C. 2020); *Crawford-Hall v. United States*, 394 F. Supp. 3d 1122, 1129, 1132-33 (C.D. Cal. 2019).

[323] *See* 5 U.S.C. § 3345(a)(1); Ex. 5 (Washington Post, *Top Interior official who pushed to expand drilling in Alaska to join oil company there* (Sept. 4, 2019)).

[324] *See* 5 U.S.C. §§ 3346(a), (a)(1), 3348(b), (b)(1).

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                    73

No other person was nominated and confirmed to serve as Assistant Secretary

LLM during the remainder of the Trump administration. Instead, on May 5, 2020,

Hammond was ostensibly granted a "temporary redelegation of authority" to exercise the

authority of the Assistant Secretary LMM by former Interior Secretary David Bernhardt

through Secretarial Order 3345 ("SO 3345"), Amendment 32.[325] The tortured history of

SO 3345 and its 32 amendments is set forth at length in *Bullock*.[326] In that case, the

Montana federal district court admonished the President for attempting to "shelter

unconstitutional 'temporary' appointments for the duration of his presidency through a

*matryoshka* doll of delegated authorities."[327] The court rejected the idea that the FVRA

and Appointments Clause could be circumvented through "wordplay" in SO 3345 by

characterizing obvious attempts to improperly appoint acting officials as mere

delegations of authority.[328] Ultimately, the court held that SO 3345 and its amendments

violated the FVRA and Appointments Clause,[329] and the court enjoined William Perry

Pendley from exercising the authority of the BLM Director thereunder.[330]

---

[325] *See* Ex. 6 (Sec'y Interior, Order No. 3345, Amend. No. 32 (May 5, 2020)).
[326] *Bullock*, 489 F. Supp. 3d at 1118-19, 1126-27.
[327] *Id.* at 1126.
[328] *Id.* at 1127. *See also Vidal v. Wolf*, 501 F. Supp. 3d 117, 130 n. 9 (E.D.N.Y. 2020) (noting that President Trump had "validated concerns about the effects of circumventing the appointments process by saying of PAS vacancies: 'I'm in no hurry ... I have 'acting' [*sic*]. And my 'actings' are doing really great. I sort of like 'acting.' It gives me more flexibility.").
[329] *Bullock,* 489 F. Supp. 3d at 1129.
[330] *Id.* at 1130-31.

Likewise here, nothing in SO 3345 or its amendments can overcome the statutory and constitutional mandates of the FVRA and Appointments Clause. Hammond's term as Acting Assistant Secretary LMM ended 210 days after Joe Balash resigned, and the position then became vacant. Furthermore, by its terms, SO 3345 Amendment 32 was only effective from May 5 through June 5, 2020.[331] Even assuming Hammond's purported authorization to act as Assistant Secretary LMM after his term had automatically expired were valid, which it is not, the order terminated about seven weeks before he signed the Joint BLM-Corps ROD for the Ambler Road project on July 23, 2020.[332]

The approval of the Joint BLM-Corps ROD and other decisions made by Hammond while he was unlawfully and unconstitutionally acting as Assistant Secretary LMM should be vacated. After determining that actions were taken by officials performing the duties of a vacant office in violation of the FVRA, federal courts have vacated such actions based on APA language directing courts to "hold unlawful and set aside" any agency action that is "not in accordance with law."[333] For instance, in *LM-M*, the court found that Kenneth Cuccinelli's ostensible appointment as Acting Director of

---

[331] *See* SO 3345.
[332] BLM_0016742.
[333] 5 U.S.C. § 706(2)(D). *See LM-M*, 442 F. Supp. 3d at 9, 34-37; *Crawford-Hall*, 394 F. Supp. 3d at 1153-54.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                               75

the U.S. Citizenship and Immigration Services violated the FVRA.[334] Accordingly, under the relief provisions of both the APA and the FVRA, the court set aside two directives that Cuccinelli had issued and also set aside determinations and orders with respect to the five plaintiffs.[335] For further example, in *Crawford-Hall*, Lawrence Roberts automatically assumed the position of Acting Assistant Secretary of the Interior for Indian Affairs.[336] The court vacated decisions made after the end of his 210-day term relating to the acquisition of land in trust for a Tribe as not in accordance with law under the APA.[337] Additionally, in *Bullock*, after finding that the purported appointment of Pendley violated the FVRA and Appointments Clause and that relief "likely should be granted under the FVRA and APA," the court directed the parties to submit further briefing as to whether two BLM resource management plans and other actions should be set aside.[338] The case was mooted, however, after the government withdrew approval for the management plans and issued new records of decision.[339] As in these cases, decisions made by Hammond after the expiration of his 210-day term were unlawful and unconstitutional and should be vacated.

---

[334] *LM-M*, 442 F. Supp. 3d at 24-37.
[335] *Id*. at 30-37. Plaintiffs are not seeking relief pursuant to the narrower remedy provision of the FVRA, 5 U.S.C. § 3348(d).
[336] *Crawford-Hall*, 394 F. Supp. 3d at 1129.
[337] *See id.* at 1133, 1152-54.
[338] *Bullock*, 489 F. Supp. 3d at 1130-31.
[339] *See supra* note 310.

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG                                          76

## CONCLUSION

For the reasons discussed above and in the briefing in the parallel case concerning CWA § 404 issues, which are incorporated by reference as though fully set forth herein, Defendants' decision-making concerning the Ambler Road project, including the Subsistence Evaluation, NHPA § 106 review and PA, Final EIS, Joint RODs, BLM and NPS rights-of-way, CWA § 404 permit, and other related actions, failures to act, findings, conclusions, and decisions, were unreasonable, arbitrary, capricious, contrary constitutional power, and contrary to law and should be vacated.

DATED: December 1, 2021

Respectfully submitted,

CLEMMER LAW OFFICE, LLC

By: _____*s/ Teresa B. Clemmer*_____
         Teresa B. Clemmer (AK Bar No. 0111059)

*Counsel for Plaintiffs*

**EXHIBIT INDEX**

1.      Declaration of Norman Carl Burgett (Oct. 6, 2020)

2.      Declaration of Harding Sam (Sept. 25, 2020)

3.      Alaska Department of Natural Resources, Final Finding and
        Decision, ADL 232346 (Jan. 2, 2020)

4.      Casey Hammond, LinkedIn profile (undated),
        https://www.linkedin.com/in/casey-hammond-853897205/

5.      Washington Post, *Top Interior official who pushed to expand
        drilling in Alaska to join oil company there* (Sept. 4, 2019),
        https://www.washingtonpost.com/climate-
        environment/2019/09/04/top-interior-official-who-pushed-expand-
        drilling-alaska-join-oil-company-there/

6.      Secretary of the U.S. Department of the Interior, Order No. 3345,
        Amend. No. 32 (May 5, 2020)

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG

**CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 18,097 words, not including text exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits requested in Plaintiffs' Unopposed Motion to Accept Overlength Brief (ECF 98).


 /s/ *Teresa B. Clemmer*
 Teresa B. Clemmer

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 1, 2021, I caused copies of the following:

PLAINTIFFS' OPENING BRIEF PURSUANT TO LOCAL RULE
16.3(c)(1)

to be filed with the Court and served by electronic means on all counsel of record through the Court's CM/ECF system.

Hard copies of Plaintiffs' Opening Brief and Exhibits 1-6 thereto will also be sent to the Court's chambers pursuant to Local Civ. R. 5.4 and Section 16 of the Court's Electronic Filing Procedures Guide.

/s/ *Teresa B. Clemmer*
Teresa B. Clemmer

PLAINTIFFS' OPENING BRIEF
*Alatna Village Council v. Heinlein,* 3:20-cv-00253-SLG