TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

SARAH A. BUCKLEY (Virginia State Bar No. 87350)
ELISABETH H. CARTER (New York State Bar No. 5733274)
Trial Attorneys, Environmental Defense Section
P.O. Box 7611 Washington, D.C. 20044
202-616-7554 (Buckley) || 202-305-8865 (fax)
202-514-0286 (Carter)
sarah.buckley@usdoj.gov
elisabeth.carter@usdoj.gov

PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney, Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-353-1389 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ALATNA VILLAGE COUNCIL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS HEINLEIN, in his official capacity as Acting BLM Alaska State Director, *et al.*, <br><br> Defendants, <br><br> and <br><br> AMBLER METALS, LLC, *et al.*, <br><br> Intervenor-Defendants. | Case No. 3:20-cv-00253-SLG |

**DEFENDANTS' MOTION FOR VOLUNTARY REMAND**

**INTRODUCTION**

In 2015, the Alaska Industrial Development and Export Authority (AIDEA) submitted an application to federal land managers seeking to obtain a right-of-way, and begin construction of the Ambler Road. Defendants reviewed the application and sought public input in accordance with various statutes and regulations. In July 2020, the agencies concluded their reviews and issued final decisions, approving AIDEA's application subject to numerous terms and conditions and issuing rights-of-way on January 5, 2021.

Plaintiffs Alatna Village Council, et al. (AVC), with plaintiffs in the related case *Northern Alaska Environmental Center v. Haaland*, No. 20-cv-00187-SLG (NAEC), contend that Defendants violated a host of laws in evaluating the application. Defendants now recognize that it is appropriate to revisit the challenged decisions. Additional scrutiny in defending the fully briefed merits of Plaintiffs' claims has illuminated legal flaws that Defendants intend to reconsider through a further administrative process.

In particular, Defendants' analysis of impacts to subsistence uses under the Alaska National Interest Lands Conservation Act (ANILCA), and their consideration of impacts under the National Historic Preservation Act (NHPA) to properties of traditional religious and cultural importance to federally recognized tribes, was deficient. In addition, Defendants intend to supplement the analysis under National Environmental Policy Act (NEPA). Defendants therefore move for an order remanding the challenged decisions to

the agencies for reconsideration.[1]  The Department will determine, based on the totality of the administrative record as supplemented by the additional analysis and consultation described below, whether to affirm, amend, or terminate the right-of-way permits.

## LEGAL BACKGROUND

Plaintiffs' claims under various statutes all proceed under the Administrative Procedure Act's (APA) waiver of sovereign immunity and standard of review.

### I.  Alaska National Interest Lands Conservation Act

ANILCA reflects legislative policy and compromise of unique complexity and physical magnitude, commensurate with Alaska itself.  *See* Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371, 2371-2551 (1980).  In broad terms, "ANILCA sought to 'balance' two goals," of protecting "'the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska[,]'" while "'provid[ing] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people.'"  *Sturgeon v. Frost*, 139 S. Ct. 1066, 1075 (2019) (quoting 16 U.S.C. § 3101(d)).  In Title II, ANILCA made substantial additions to the National Park System, some of which were further included by Title VI and Title VII in the National Wild and Scenic Rivers System and National Wilderness Preservation

---

1    Plaintiffs request that numerous elements of "Defendants' decision-making" be vacated.  *See* Pls.' Opening Br. at 88, ECF No. 99.  Vacatur is not appropriate here, because the Department intends to suspend further activity under the Project pending remand.  *See* Decl. of Tommy Beaudreau ¶ 12, attached as Exhibit 1.  The Army Corps of Engineers issued the Clean Water Act Section 404 permit.  It will consider what action is needed with respect to the Section 404 permit in light of the Court's ruling on this motion and will follow the process outlined in its regulations at 33 C.F.R. § 325.7.

*Alatna Village Council v. Heinlein,*
DEFS.' MOT. FOR VOLUNTARY REMAND

Case No. 3:20-cv-00253-SLG
3

System, respectively.  In Title VIII Congress sought "to preserve Alaska's natural resources, historic sites, and ecosystems, while also providing the continued opportunity for rural residents to engage in a subsistence way of life."  *Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-cv-00195-SLG, 2020 WL 5625897, at *5 (D. Alaska Sept. 18, 2020) (citing *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091 (9th Cir. 2008)).

## II.     National Historic Preservation Act

The NHPA "is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs," but does not require that the agency reach particular outcomes.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999); *see also* 54 U.S.C. § 306108 (formerly 16 U.S.C. § 470f (2013)).  Nevertheless, the information gathered in the NHPA process helps to inform agency decision-making.

NHPA Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any historic property."  54 U.S.C. § 306108.  Regulations promulgated by the Advisory Council on Historic Preservation (ACHP) set forth procedures for implementing the NHPA.  36 C.F.R. pt. 800.  The regulations direct agencies to determine whether a project qualifies as an "undertaking" and is a "type of activity that has the potential to cause effects on historic properties."  *Id*. § 800.3(a).[2]  If

_____

2       The regulations define historic properties as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior" and includes "properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization that meet the National Register criteria."  36 C.F.R. §

*Alatna Village Council v. Heinlein,*
Defs.' Mot. for Voluntary Remand

Case No. 3:20-cv-00253-SLG
4

an undertaking is the type of activity with the potential to cause effects on historic properties, then the agency must consult with the State Historic Preservation Officer (SHPO) and, if appropriate, other consulting parties, including "[d]etermin[ing] and document[ing] the area of potential effects." 36 C.F.R. § 800.4(a)(1); *see also id*. § 800.16(d).[3] The agency also must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking," *id.* § 800.2(c)(2)(ii), and must provide such tribes or organizations a reasonable opportunity to identify historic properties and provide input regarding potential adverse effects on such properties. *Id.* § 800.2(c)(2)(ii)(A).

An agency must "make a reasonable and good faith effort" to identify historic properties within the APE. *Id.* § 800.4(b)(1); *see also Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x. 712 (9th Cir. 2012). If the agency finds that historic properties may be affected, it must further engage with all consulting parties, including Indian tribes. 36 C.F.R. § 800.4(d)(2). The agency then applies the regulatory criteria to determine if there is an adverse effect, *id.* § 800.5(a), and if so, engages in further consultation regarding the resolution of any such adverse effects, *id.* § 800.6. In certain circumstances, an agency may negotiate a programmatic agreement (PA) with the SHPO and the ACHP, if it chooses to participate, to comply with section 106 while

---

800.16(*l*)(1).

3      The regulations define an area of potential effects (APE) to mean "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d).

*Alatna Village Council v. Heinlein,*
Defs.' Mot. for Voluntary Remand

Case No. 3:20-cv-00253-SLG
5

Case 3:20-cv-00253-SLG   Document 111   Filed 02/22/22   Page 5 of 24

deferring identification of historic properties, assessment of effect on such properties, and effort to resolve adverse effects. *Id.* § 800.14(b).

## FACTUAL BACKGROUND

The Brooks Range contains rugged mountains and glaciated valleys draped by tundra and free-flowing rivers, supporting a diversity of fish and wildlife. Indigenous peoples have long inhabited the area, and it is valued by other Alaska residents and visitors. ANILCA contemplates a surface transportation corridor through the Gates of the Arctic National Preserve, to connect the Dalton Highway and the Ambler Mining District.[4] AIDEA's application for right-of-way approval and road construction triggered Defendants' duty to address ANILCA and numerous other laws and regulations.

### I. The Ambler Road Project

AIDEA initially submitted an application package on November 23, 2015, seeking approvals from the U.S. Bureau of Land Management (BLM), National Park Service (NPS), U.S. Army Corps of Engineers (Corps), and United States Coast Guard (USCG). *See* BLM_0000001-30.[5] AIDEA is an Alaska public corporation created in 1967 "to increase job opportunities and encourage the economic growth of the state, and specifically to support development of natural resources." BLM_0000024. AIDEA applied to build a "controlled-access industrial access road" limited to mining or

---

4     *See* ANILCA Section 201(4) (16 U.S.C. § 410hh(4)).

5     The complete November 23 application package is contained in the administrative record at NPS_0050198-52206.

*Alatna Village Council v. Heinlein,*
Defs.' Mot. for Voluntary Remand

Case No. 3:20-cv-00253-SLG
6

commercial uses with an expected 50 year lifespan consisting of "a new 211-mile-long gravel surfaced roadway along the southern flanks of the Brooks Range, extending west from the Dalton Highway near milepost (MP) 161 to the south bank of the Ambler River[.]" BLM_0000003. AIDEA sought authorization of a right-of-way to facilitate route analysis and assessment, followed by phased construction starting with a seasonal, single-lane gravel road approximately sixteen feet wide, then a year-round single-lane gravel road approximately twenty feet wide. BLM_0000007-8. If justified by ensuing exploration and initial mining activity, a third phase would upgrade the road to a two lane, all-season gravel surfaced roadway approximately thirty-two feet wide. BLM_0000008.

The agencies reviewed the application materials for the Ambler Road Project (Project), which involve a unique procedural interplay between ANILCA, other environmental laws, and the diverse land ownership pattern along the proposed road corridor.[6] Upon initial review, the agencies informed AIDEA that certain necessary information was missing and the application was incomplete. *See* BLM_0000043-46 (BLM letter dated January 21, 2016). AIDEA submitted a revised application on June 30, 2016. *See* NPS_0000155-60.[7] The agencies then determined that the application was complete. *See* NPS_0002865-66.

---

6    "The road would cross State lands (61%), federal lands managed by BLM (12%) and the National Park Service (NPS) (12%), and lands owned by two Alaska Native Corporations (15%)." BLM_0006660.

7    The complete June 30 application package is contained in the administrative record at NPS_0000179-2859.

On February 28, 2017, BLM published a Notice of Intent to prepare an Environmental Impact Statement (EIS) in the Federal Register pursuant to the National Environmental Policy Act (NEPA).[8]  *See* BLM_0000501-03 (82 Fed. Reg. 12,119 (Feb. 28, 2017)).  After receiving oral testimony in more than a dozen Alaska communities and a total of 7,225 written scoping communications, *see* BLM_0006671-73, BLM released a Draft EIS in August, 2019.  *See* BLM_0008037-38 (84 Fed. Reg. 45,799 (Aug. 30, 2019)); *see also* BLM_0006981-8029 (Draft EIS).  Following a public comment period during which it considered over 29,000 communications, BLM made modifications to the Draft EIS.  BLM_0016699.  On March 27, 2020, BLM published notice of the availability of the Final EIS.  *Id.* (85 Fed. Reg. 17,353-54 (Mar. 27, 2020)); *see also* BLM_0015376-16694 (Final EIS).  A Joint Record of Decision (JROD) by BLM and the Corps was executed on July 23, 2020.  *See* BLM_0016710-17028; BLM_0016741-43 (signatures).  The JROD constitutes the BLM's approval under NEPA, in accordance with the Federal Land Policy and Management Act and ANILCA, and the Corps' determination under Section 404 of the Clean Water Act and Section 10 of the Rivers and

---

8      BLM was designated as the lead agency for preparing the EIS to comply with NEPA.  *See* BLM_0006657.  BLM also directed compliance with ANILCA Section 810 and NHPA Section 106.  *Id.*  The Corps and Coast Guard were cooperating agencies given the potential that they would make additional "authorization decisions . . . about the proposed road project that require compliance with NEPA."  *Id.*; *see also* BLM_0006662-63; BLM_0007001 (detailing lead, cooperating, and participating agencies).

Harbors Act, to mutually select Alternative A and to authorize the Project.

BLM_0016720.[9]

## II.  ANILCA Section 810 Evaluation

BLM and NPS jointly engaged in the ANILCA Section 810 process, with BLM

serving as the primary author.  Concurrent with preparation of the EIS, the BLM held a

two-day subsistence workshop with cooperating agencies, prepared a subsistence

technical report and evaluation, and determined that the project may significantly restrict

subsistence uses.  *See* BLM_0067627-74.  BLM and NPS then prepared a draft 810

Evaluation and held hearings on subsistence resources and activities in conjunction with

public meetings on the Draft EIS.  BLM_0007880.  The final 810 Evaluation is an

appendix to the BLM JROD.  BLM_0016809-41.  The NPS ROD considered this

Evaluation in its selection of the route.  NPS_0009719.

## III.  NHPA Section 106 Consultation

BLM and NPS also jointly engaged in the NHPA Section 106 process, with BLM

again serving as the designated lead agency consistent with 36 C.F.R. § 800.2(a)(2).

BLM_0016733.  The agencies developed a PA and Cultural Resource Management Plan

(CRMP) as an alternative process for implementing Section 106 in a phased approach

---

[9]     NPS followed a similar process in conducting the Environmental and Economic
Analysis (EEA).  *See* NPS_0002870; NPS_0003820-52 (scoping); NPS_0003875-981
(draft EEA).  On August 4, 2020, NPS published notice of the availability of a Record of
Decision (ROD) and Final EEA.  *See* NPS_0009879 (85 Fed. Reg. 47,240 (Aug. 4,
2020)).  The ROD selected the Northern Alignment of the right-of-way through the
Preserve, along with various stipulations and mitigation measures.  NPS_0009719;
NPS_0009727-77.

under 36 C.F.R. § 800.14(b)(3). The ACHP elected to participate in the development of the PA due to the potential for "procedural problems" and "issues of concern to Indian tribes." BLM_0065632. Development of the PA and CRMP primarily took place in 2019 and included a series of meetings with interested parties and comment periods on draft versions of the PA and CRMP. BLM finalized the PA in April 2020, and it was signed by BLM, the SHPO, ACHP, other invited signatories, and concurring parties, but not by any tribes, on April 27, 2020. BLM_0016933-7013.

## LEGAL STANDARD

Courts recognize the propriety of voluntarily remanding a challenged agency action without judicial consideration of the merits. "A federal agency may request remand in order to reconsider its initial action." *Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001)). "Voluntary remand is consistent with the principle that '[a]dministrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider.'" *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1141 (C.D. Cal. 2002) (quoting *Trujillo v. Gen. Elec. Co.,* 621 F.2d 1084, 1086 (10th Cir. 1980)); *see also Lute v. Singer Co.,* 678 F.2d 844, 846 (9th Cir. 1982).

In determining whether to grant a voluntary remand, courts within the Ninth Circuit have looked to the Federal Circuit's decision in *SKF USA* for guidance. *See*, *e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 992; *N. Coast Rivers All. v. U.S. Dep't of the Interior*, No. 1:16-cv-307-LJO-MJS, 2016 WL 8673038, at *3 (E.D. Cal. Dec. 16, 2016).

In *SKF USA*, the court indicated that, in response to a challenge to agency action, "the agency may request a remand, without confessing error, to reconsider its previous position" or "the agency may request a remand because it believes that its original decision was incorrect on the merits and it wishes to change the result." *N. Coast Rivers All.*, 2016 WL 8673038, at *3 (quoting *SKF USA*, 254 F.3d at 1027-28). "Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *Cal. Cmtys. Against Toxics*, 688 F.3d at 992; *see also Rusty Coal Blackwater v. Sec. of the Interior*, No. 3:14-cv-244-LRH-VPC, 2015 WL 506475, at *2 (D. Nev. Feb. 5, 2015).

If a court grants a voluntary remand, it should then decide whether the agency's action should be vacated during the remand. "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted)).

## ARGUMENT

BLM has identified deficiencies with the ANILCA Section 810 and NHPA analyses underlying the challenged decisions. *See* Beaudreau Decl. ¶¶ 5-6, 8. Defendants request that the Court remand the decisions to the agencies to allow for reconsideration through the administrative process. *Id*. ¶¶ 9-11. Because the Department of the Interior intends to suspend further activity during remand, it is not appropriate to vacate any of Defendants' challenged decisions. *See id.* ¶ 12.

## I.     The Court Should Remand the Decisions to the Agencies

Remand is appropriate here because Defendants have identified concerns with the challenged decisions and are now committed to reconsidering those decisions through their own administrative process.  A remand is "generally required" if "intervening events outside of the agency's control" "affect the validity of the agency action." *SKF USA*, 254 F.3d at 1028.  But "even if there are no intervening events, the agency may request a remand (without confessing error) in order to reconsider its previous position." *Id*. at 1029.  Courts "generally grant an agency's motion to remand so long as 'the agency intends to take further action with respect to the original agency decision on review.'" *Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 436 (D.C. Cir. 2018) (citation omitted); *see also Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993).  An agency need not confess error to seek and receive a voluntary remand.  *See, e.g., SKF USA*, 254 F.3d at 1029; *Ethyl Corp.*, 989 F.2d at 524; *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 417 (6th Cir. 2004).  Rather, remand is appropriate if an agency has identified "a substantial and legitimate" concern regarding the challenged decision.  *See SKF USA*, 254 F.3d at 1029; *Cal. Cmtys. Against Toxics*, 688 F.3d at 992.  Remanding where an agency has identified such a concern allows agencies "to cure their own mistakes" consistent with their inherent authority to reconsider, and conserves judicial resources.  *Ethyl Corp.*, 989 F.2d at 524.

### A.     ANILCA Section 810

The Project would traverse hundreds of miles of relatively undisturbed habitats and numerous waterways along the southern edge of the Brooks Range, and thus

*Alatna Village Council v. Heinlein,*
Defs.' Mot. for Voluntary Remand

Case No. 3:20-cv-00253-SLG
12

presented substantial challenges in evaluating potential impacts to subsistence uses under

ANILCA.  Despite the agencies' efforts, certain aspects of the challenged decisions

require remand and further analysis.

ANILCA Title VIII advances a policy that "the utilization of the public lands in

Alaska is to cause the least adverse impact possible on rural residents who depend upon

subsistence uses of the resources of such lands[.]"  16 U.S.C. § 3112(1).  ANILCA

Section 810:

> imposes procedural requirements upon federal decisionmakers; pursuant to its terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs," the availability of other lands for the same purpose, and "other alternatives" that would reduce the impacts to subsistence uses.

*Se. Alaska Conservation Council v. United States Forest Serv.*, 443 F. Supp. 3d 995,

1015 (D. Alaska 2020) (quoting 16 U.S.C. § 3120(a)) (*Se. Alaska I*).  The agency must

first determine whether "the action 'would significantly restrict subsistence uses[.]'"  *Id*.

This determination is what Plaintiffs refer to as "Tier 1" of the 810 process.  *See, e.g.*,

Second. Am. Compl. ¶ 141, ECF No. 46.  If the agency determines that the action would

or may significantly restrict subsistence uses, then the agency must:

> provide notice to the affected communities, hold public hearings, and make three findings:  "[T]hat (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such action."

*Se. Alaska I*, 443 F. Supp. 3d at 1015 (quoting 16 U.S.C. § 3120(a)(1)-(3)); *see also*

*Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984). These hearings and findings comprise what Plaintiffs refer to as "Tier 2" of the 810 process. *See, e.g.*, Second Am. Compl. ¶¶ 142-143. These determinations are presented in the ANILCA Section 810 Final Evaluation, Appendix E to the JROD. BLM_0016809-40. The Subsistence Technical Report informed this analysis and is Appendix L to the Final EIS. BLM_0016188-411.

The agencies' analyses are deficient in several respects and therefore did not comply with ANILCA Section 810. First, they lack sufficient discussion of impacts on caribou forage vegetation and the resultant adverse impacts on subsistence. The EIS acknowledges that the Project and reasonably foreseeable future actions are expected to result in *widespread, long-term* adverse effects on vegetation, including adverse impacts on lichen and other vegetation that serve as important forage for caribou, BLM_0015535-36; BLM_0015921-23. But the Tier 1 evaluation itself failed to meaningfully discuss these impacts on vegetation, or the consequences for caribou foraging, caribou abundance, caribou availability for subsistence harvesting, or any other vegetation-related impacts on caribou and subsistence. The caribou section of the Tier 1 evaluation states that road construction and operation could affect caribou abundance through "loss . . . of habitat," BLM_0016817, and the vegetation section focuses on subsistence harvesting of vegetation, such as berries, wild plants, and wood. BLM_0016822-23. The Tier 1 evaluation also cross-references the subsistence section of the EIS, BLM_0016815, which makes references to "dust deposition" and "habitat fragmentation," BLM_0015584-87, but fails to address the subsistence impacts resulting from the damage

to and destruction of vegetation, including caribou forage habitat, that is expected across the region. *See generally* BLM_0015578-99; *see also* BLM_0016832-33. Despite the importance of this issue, the Subsistence Technical Report devotes only one sentence to this subject, BLM_0016373, and addresses other Project-related factors that could damage or destroy caribou forage vegetation, BLM_0016188-0016411. The Report also fails to address the potential impacts on subsistence resulting from the harm to caribou forage vegetation.[10]

Second, the analyses lack meaningful discussion of Project-related water impacts that would occur in connection with construction and operation of the Road, including the dewatering of streams and groundwater as part of mining operations, and the impacts of such activities on salmon, sheefish, and other fish species; spawning areas, and other aquatic habitat; and related subsistence uses. Construction of ice roads to be used for winter construction of the Ambler Road would require an estimated "1 million gallons of water for each mile of a 25-foot-wide ice road," and ice pads would require about "250,000 gallons . . . per acre." BLM_0015469; *see also* BLM_0015498. The EIS qualitatively described the types of impacts that water withdrawals can have on fish, streams, lakes, and wetlands, BLM_0015471, 0015497-98, but the only discussion of mine-related dewatering in the Tier 1 evaluation concerns its effect on vegetation. BLM_0016833. Neither the Tier 1 evaluation nor the Subsistence Technical Report contains any mention of dewatering's potentially significant impacts on fish, spawning

_____

10    These discussions fall short of BLM's own 810 guidance to "distill and summarize" the information in the EIS. *See* BLM_0042689-10.

areas, and subsistence, even though fish provide interior Alaska's greatest quantity of subsistence resources. BLM_0016833.

These deficiencies are compounded by new information not considered in the decisions suggesting declines in salmon and caribou populations critical to subsistence communities. Many subsistence communities within the Project area rely upon salmon runs within the Yukon River system. *See* BLM_0016264-68 (describing use in Koyukuk River region including to its confluence with the Yukon River); BLM_0016322-25 (Yukon River region). Yukon River salmon runs plunged in 2021 to historic lows.[11] Additionally, the Western Arctic Caribou Herd Working Group recently reported a decline in the Herd's population estimate from 244,000 to 188,000 over the last two years, "hitting a population level that justifies new hunting restrictions." *See* https://www.arctictoday.com/a-huge-alaska-caribou-herds-population-is-again-in-decline/ (last visited Feb. 21, 2022). Many subsistence communities are critically dependent on chum salmon and caribou harvest and consumption. *See* BLM_0016292 (estimating chum salmon constitute 44 and 48 percent of Alatna and Allakaket total subsistence

---

[11] The 2021 summer chum salmon count was approximately 153,497, not only "well below the historical median from years with late run timing of 1.6 million fish" but "the lowest in all the years of project operations (1995–2021)" and "well below the previous lowest counts of 442,546 and 448,665 in 2001 and 2000 respectively." *See* https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1344517999.pdf at 4 (last visited Feb. 21, 2022). Similarly, the 2021 "fall chum and coho salmon returns to the Yukon River were the lowest on record for a second consecutive year." *See* https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1350592856.pdf at 6 (last visited Feb. 21, 2022). These "low fall chum and coho salmon runs, on top of poor summer season salmon returns, led to extreme hardships for subsistence fishermen relying on these critical resources along the Yukon River." *Id*. at 3.

*Alatna Village Council v. Heinlein,*
Defs.' Mot. for Voluntary Remand

Case No. 3:20-cv-00253-SLG
16

Case 3:20-cv-00253-SLG   Document 111   Filed 02/22/22   Page 16 of 24

harvest, respectively, and caribou constitute 86.2 percent of Anaktuvuk Pass subsistence harvest); BLM_0016293 (estimating chum salmon constitute 51.4 and 56.8 percent of Hughes and Huslia total subsistence harvest, respectively); BLM_0016316 (Tanana River region communities); BLM_0016340 (Yukon River communities). The 810 Evaluation could not have considered this information because it postdates the challenged RODs, but deteriorating conditions now warrant thorough reconsideration. Instead, the 810 Evaluation only cursorily acknowledges that communities that rely on fish upstream and downstream of the Project corridor "could experience impacts on fish availability if larger impacts to fish movement or health occur," and that "[a]n impact of this scale would be quite significant." BLM_0016821-22.

The Section 810 analysis did not sufficiently analyze the extent or necessity of Project-related significant impacts to subsistence uses. These procedural deficiencies, in concert with broader trends impacting critical subsistence resources, necessitate remand of the decisions for a renewed Section 810 evaluation and determination.

B.    NHPA

Shortcomings in the NHPA Section 106 compliance efforts further necessitate a remand of the decisions to allow a more robust process to precede any future decisions.

The ACHP regulations allow agencies to develop and rely on a PA for "certain complex project situations" such as when "effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. § 800.14(b)(1)(ii). However, entering into a PA does not relieve the agencies from their obligation to conduct appropriate consultation, including with tribes, in development of a PA. *See id.*

§ 800.14(f).  Consultation must be meaningful, and may trigger an agency responsibility "to engage in further investigations" to evaluate possible impacts to historic properties. *Pueblo of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir. 1995); *see also Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1118-19 (S.D. Cal. 2010) (expressing concern where tribal "requests for information and meetings were frequently rebuffed or responses were extremely delayed as BLM-imposed deadlines loomed or passed").

BLM invited potentially interested parties to Section 106 consultation as early as April 2017.  *See e.g*. BLM_0050902.[12]   In March 2019 the process focused on utilizing a PA to comply with Section 106, and BLM extended a written invitation to 15 tribes to participate in PA development.  *See e.g*. BLM_0065617.  From that point, BLM limited its correspondence to those tribes who affirmatively indicated interest.  Ultimately, the early drafts of the PA and associated CRMP were drafted by BLM and circulated to required signatories and invited signatories,[13] but not tribes.  *See* BLM_0066019 at 5:03-6:17 (indicating this approach was adopted to maximize efficiency).  During development

---

12    A total of 108 parties were invited to participate as "consulting parties'" in the Section 106 process, including 52 potentially affected tribes, 23 Alaska Native Corporations, five tribal organizations, and 28 other entities representing state and federal agencies, municipal governments, landowners, and non-profit organizations. BLM_0017010-12.  Of these, 35 entities indicated they wished to participate, including 14 tribes (BLM subsequently referred to these 35 entities as the "consulting parties").  *Id*.

13    Invited signatories were AIDEA, Alaska Department of Natural Resources, the Corps and NPS.  *See* BLM_0016964-70.  Only these parties have the authority to amend, alter or terminate the agreement.  The way this PA was written, Tribes have no authority to require any such changes.

of the PA, BLM participated in government-to-government meetings with some tribes[14] where the Section 106 process was discussed.  *See e.g.* BLM_0081447-48; BLM_0081550-52.  Several tribes, including Plaintiffs, provided information about specific areas of importance, including a report intended to document a traditional cultural property (TCP).  *See* BLM_0063238; BLM_0081448; BLM_0087902.  Insofar as BLM responded, there was only limited correspondence between BLM's Section 106 lead and tribal representatives regarding this TCP.  *See* BLM_0063188-90; BLM_0055054-55; BLM_0066122-24; BLM_0063233-34.  The record does not demonstrate that BLM provided substantive responses to individual tribes, followed up with tribes following government-to-government consultations, or explained to individual tribes how the information and concerns they shared were taken into account.  While BLM stated during Section 106 meetings and in general correspondence that it was willing to meet with any requesting tribe, few government-to-government consultations took place prior to execution of the PA.[15]

---

14      These meetings address "responsibilities that arise from the unique legal relationship between the Federal Government and Indian tribal governments."  Exec. Order 13175, Consultation and Coordination with Indian Tribal Governments, Sec. 3(a), 65 Fed. Reg. 67,249, 67,250 (Nov. 9, 2000).

15      Plaintiffs' NHPA argument contends the APE, extending one mile on either side of the Road's proposed route, is "unreasonably narrow" and "far too small for any meaningful consideration of potential effects on landscape-level historic properties."  *See* Pls.' Opening Br. 68-70, ECF No. 99.  Configuring a particular APE "requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion."  *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1091 (10th Cir. 2004).  Defendants acknowledge that formulating the APE was an important step toward Section 106 compliance, and that opportunities for tribal input during that process were limited.  On remand, as part of renewed consultation efforts, Defendants would

The Department's priority of achieving a PA within the Project's shortened timeframe constrained the options for tribal consultation. The tribes were afforded only a secondary role in the ultimate adoption of the PA. Because Defendants have now determined that, in the specific circumstances presented by this case, these efforts are deficient and did not comply with the NHPA, Defendants seek a remand of the decisions to revisit their consultation obligations vis-à-vis tribal sovereigns affected by the Project. This will include revisiting whether Tribes should be included as invited signatories to that Agreement. Beaudreau Decl. ¶ 8.

## II.     The Court Should Remand the Challenged Decisions Without Vacatur

The underlying decisions need not be vacated while the agencies determine how to proceed on remand. "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (citation omitted); *see also Se. Alaska Conservation Council v. United States Forest Serv.*, 468 F. Supp. 3d 1148, 1151-52 (D. Alaska 2020). The Court has broad discretion in fashioning a remedy, and "when equity demands, [agency action] can be left in place while the agency follows the necessary procedures" to revise its action. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). In deciding whether to leave a decision in place, a court should also consider "the extent to which either vacating or leaving the decision in place

---

reconsider the appropriate scope of the APE, including in the context of the Road's potential to impact landscape-scale properties that have been identified as having cultural significance to tribes.

would risk environmental harm." *Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*, 960 F.3d 1120, 1144-45 (9th Cir. 2020). Here, these factors weigh in favor of a remand without vacatur.

First, Defendants seek remand in lieu of a decision on the merits, and the Court should decline to "order vacatur . . . without an independent determination that [the challenged agency decisions were] not in accordance with the law." *Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 135 (D.D.C. 2010); *see also WildEarth Guardians v. Bernhardt*, No. CV 20-56 (RC), 2020 WL 6255291, at *1 (D.D.C. Oct. 23, 2020) ("The Court remands the decisions without vacatur because it has not reviewed the EAs, FONSIS, and DNAs underlying the leasing decisions – therefore, it has no basis to vacate the agency action."). Even if the Court could reach the merits and consider Plaintiffs' alleged deficiencies of the decisions as a matter of law for purposes of determining whether to vacate, doing so would undermine a principal rationale for remand: "preserv[ing] scarce judicial resources by allowing agencies 'to cure their own mistakes.'" *Carpenters Indus.*, 734 F. Supp. 2d at 132 (quoting *Ethyl Corp.*, 989 F.2d at 524). Here, the Department has committed to correcting ANILCA and NHPA deficiencies as well as supplementing its NEPA analysis. Beaudreau Decl. ¶ 10. It makes little sense for the Court to undertake an evaluation on the merits of decisions that the agency is currently revisiting.

Second, vacatur here would constitute a disruptive interim change that may itself be changed. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992. Plaintiffs will not suffer prejudice, because Defendants intend to suspend the challenged rights-of-way, which will

defer any further project activity until remand and reconsideration are completed.

Beaudreau Decl. ¶ 12. Plaintiffs will be able to fully participate in further administrative proceedings, and will retain any ability to renew their arguments, or raise new ones, when future decisions issue. AIDEA presumably submitted its application and tempered any expectations under the realization that any economic benefits from the Ambler Road Project depend on an uncertain and lengthy timeline. *See* BLM_0015882 (Reasonably Foreseeable Action timeline); BLM_0015899 (describing sequence of events involving business agreements, state approvals, financing, design, and contracting until at least 2023). While AIDEA must procure agency approval(s) at nearly every step of subsequent Project implementation, *see Hammond v. Norton*, 370 F. Supp. 2d 226, 259 (D.D.C. 2005) and BLM_0102472-79, it has expended funds and resources to date. Vacatur could prove to be unnecessarily disruptive if a suitable version of the Project is approved following remand. Defendants' approach reflects the most equitable balancing of the unique circumstances here.

Third, vacatur is not needed because the Department will reconsider the right-of-way permits based on the totality of the administrative record, including additional analysis and consultation to address the defects discussed herein. The Department may decide to affirm, amend or terminate the right-of-way permits.

Finally, vacatur is not needed to prevent possible environmental harm. Defendants recognize the challenged decisions represent the first steps toward construction of a new road through "a vast, wild region of superlative natural beauty[.]" S. Rep. No. 96-413 at 146, 1980 U.S.C.C.A.N. at 5089, 1979 WL 10337. But suspension

of the rights-of-way protects against any risk of environmental harm, and further activity will only resume upon Defendants' determination that a legally sufficient analysis of the Project has been completed.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion and remand the challenged decisions to the agencies without vacatur.

Respectfully submitted this 22nd day of February, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

SARAH A. BUCKLEY
ELISABETH H. CARTER
Trial Attorneys
Environmental Defense Section
P.O. Box 7611 Washington, D.C. 20044
202-616-7554 (Buckley) || 202-305-8865 (fax)
202-514-0286 (Carter)
sarah.buckley@usdoj.gov
elisabeth.carter@usdoj.gov

*/s/ Paul A. Turcke*
PAUL A. TURCKE
Trial Attorney
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-353-1389 || 202-305-0506 (fax)
paul.turcke@usdoj.gov

*Counsel for Defendants*

Of Counsel:

ELIZABETH GOBESKI
Attorney Advisor
Office of the Regional Solicitor, Alaska Region

*Alatna Village Council v. Heinlein,*
DEFS.' MOT. FOR VOLUNTARY REMAND

Case No. 3:20-cv-00253-SLG
23

U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-4186
elizabeth.gobeski@sol.doi.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(2), because this memorandum contains 5,671 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word 2016 (16.0.5227.1000) MSO (16.0.5254.1001) 32-bit.

*/s/ Paul A. Turcke*
Paul A. Turcke

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2022, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke

*Alatna Village Council v. Heinlein,*
Defs.' Mot. for Voluntary Remand

Case No. 3:20-cv-00253-SLG
24

Case 3:20-cv-00253-SLG   Document 111   Filed 02/22/22   Page 24 of 24